UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLOBAL FLEET SALES, LLC, R.M.
ASIA (HK) LIMITED, RMA MIDDLE EAST
FZE, RMA AUTOMOTIVE CO., LTD., and
KEVIN ROBERT WHITCRAFT,

      Plaintiffs,                                       Case No. 12-15471

v.                                                 Hon. Patrick J. Duggan

LEONARD JAMES DELUNAS and
MOHAMMAD DAWOUD ("DAVID") WAHAB,

      Defendants/Counter-Plaintiffs/Third-Party
      Plaintiffs,

v.

KEVIN ROBERT WHITCRAFT, R.M.
ASIA (HK) LIMITED, and RMA MIDDLE
EAST FZE,

      Plaintiffs/Counter-Defendants,

and

THOMAS WHITCRAFT and MARK WHITCRAFT,

      Third-Party Defendants.

_____/

**OPINION AND ORDER (1) GRANTING DEFENDANTS' MOTION TO
DISMISS IN PART AND DENYING DEFENDANTS' MOTION TO
DISMISS IN PART, (2) DENYING THE RMA GROUP PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION, (3) GRANTING THE
WHITCRAFT THIRD PARTIES' MOTION TO DISMISS, AND (4)**

## DENYING THE RMA COUNTER-DEFENDANTS' MOTION TO STRIKE WITHOUT PREJUDICE

This dispute arises out of the pursuit of business opportunities in the Islamic Republic of Afghanistan in the wake of the NATO campaign against the Taliban and the subsequent souring of the business relationships established to execute those opportunities. Plaintiffs Global Fleet Sales, LLC, R.M. Asia (HK) Limited ("RMA-HK"), RMA Middle East FZE ("RMA-ME"), and RMA Automotive Company, Ltd. ("RMA Automotive") (collectively, the "RMA Group Plaintiffs"), along with Plaintiff Kevin Whitcraft (collectively, the "RMA Plaintiffs"), initiated this action against Defendants Leonard Delunas ("Delunas") and Mohammad Wahab ("Wahab") (collectively, "Defendants") seeking damages and various forms of injunctive and equitable relief in a multi-count complaint. Defendants answered the RMA Plaintiffs' Complaint and also filed a Counter-Complaint naming three of the five original plaintiffs as Counter-Defendants (RMA-HK, RMA-ME, and Kevin Whitcraft) as well as a Third-Party Complaint naming Third-Party Defendants Mark Whitcraft and Thomas ("Tom") Whitcraft (collectively, the "Whitcraft Third Parties"). On the same day, Defendants filed a motion to dismiss the RMA Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Other motions, described below, have also been filed.

A total of four motions, all of which have been fully briefed and argued at the February 6, 2014 motion hearing, are presently before the Court: (1)

2

Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 18); (2) the RMA Group Plaintiffs' Motion for Preliminary Injunction (ECF No. 42); (3) the Whitcraft Third Parties' Motion to Dismiss Third-Party Complaint (ECF No. 36); and (4) the RMA Counter-Defendants' Motion to Strike the Settlement Negotiations Paragraphs from the Counter-Complaint and Third-Party Complaint (ECF No. 26).  For the reasons stated herein, the Court grants in part and denies in part Defendants' Motion to Dismiss, denies the RMA Group Plaintiffs' Motion for Preliminary Injunction, grants the Whitcraft Third Parties' Motion to Dismiss, and denies the RMA Counter-Defendants' Motion to Strike without prejudice.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Parties

This action was initiated by five plaintiffs all of which are related to one another through business.  The four corporate plaintiffs are collectively referred to as the RMA Group Plaintiffs even though the RMA Group "is not an actual entity[; rather, the RMA Group] refers collectively to various affiliated companies[] . . ." that "provide products and services to build and rebuild the local infrastructure in countries that are developing and/or have been plagued with conflict."  (Compl. ¶

5, ECF No. 8.[1])  In Afghanistan, "the RMA Group has provided goods and services through various entities that one or more of the RMA Plaintiffs has formed, caused to be formed, and/or funded."  (*Id.* at ¶ 13.)  These include: RM Asia Afghanistan ("RMAA"); Asia Trade & Commodities Limited ("ATC"); Global Fleet Sales Limited (Afghanistan) ("GFSA"); and Insurance Corporation of Afghanistan ("ICA") (collectively, the RMA Afghan Entities).  (*Id.*)

Plaintiff Global Fleet is a limited liability company incorporated in Delaware with its principal place of business located in the Eastern District of Michigan, specifically, Southfield, Michigan.  (*Id.* at ¶ 23.)  RMA-HK is a corporation organized under the laws of the Hong Kong Special Administrative Region of the People's Republic of China with its principal place of business located in Bangkok, the capital of the Kingdom of Thailand.  (*Id.* at ¶ 24.)  RMA-ME is a United Arab Emirates corporation with its principal place of business located in Dubai, United Arab Emirates.  RMA Automotive is a Thai corporation with its principal place of business in in Bangkok, Thailand.  (*Id.* at ¶ 26.)  Lastly, Kevin,[2] a United States citizen residing in Thailand, is President of Global Fleet

---

[1] The Court refers to the RMA Plaintiffs' First Amended Complaint, filed on May 16, 2013, simply as the Complaint.  The original complaint was filed on December 13, 2012.  (ECF No. 1.)

[2] Although the Court traditionally identifies parties by their last names, the Court uses Kevin's, as well as Third-Party Defendants Mark and Tom's given names, as they all share a common last name.  The Court intends no disrespect in

and serves as a director of Plaintiffs RMA-HK, RMA-ME, and RMA Automotive. Kevin "holds legal ownership interests in three of the RMA Afghan Entities – RMAA, ATC, and ICA – as nominee on behalf of the RMA Group Plaintiffs." (*Id.* at ¶ 27.)

Defendant Delunas holds dual citizenship in both the United States and the Republic of Ireland. (*Id.* at ¶ 28.) According to the RMA Plaintiffs, Delunas was hired to serve as a Country Manager for the RMA Group Plaintiffs in Afghanistan from 2002 through the termination of the relationship in 2011. (*Id.* at ¶ 29.) In this capacity, Delunas was charged with procuring registration of the RMA Afghan Entities and holding shares of those companies for the ultimate beneficial interest of the RMA Plaintiffs. (*Id.* at ¶ 30.) Defendant Wahab, a friend and associate of Delunas, possesses dual citizenship in the United States and Afghanistan and resides in the latter. (*Id.* at ¶¶ 32-33.) Upon registration of the various RMA Afghan Entities, Wahab was listed as a corporate officer and shareholder of record. (*Id.* at ¶ 33-34.) Pursuant to various Declarations of Trust attached to the Complaint, however, Wahab allegedly held these shares as trustee.

## B.    The Underlying Events

In late 2001, following the tragic events of September 11, 2001, Kevin, who is involved in the business affairs of each of the RMA Group Plaintiffs, and

---

using the parties' first names; rather, the Court is merely attempting to militate against any possibility of confusion.

Delunas, who has worked for nearly four decades "as an owner of companies engaged in construction and engineering services and consulting[,]" began discussing various business opportunities that they expected to arise in post-conflict Afghanistan.  (Counter-Compl. ¶ 12, ECF No. 19.)  As a result of these discussions, according to the RMA Plaintiffs, Delunas was hired pursuant to a contract referred to as "the RMA Afghanistan Country Manager Agreement" sometime in 2002.  (Compl. ¶ 14, ECF No. 8.)  Although the RMA Plaintiffs did not attach a copy of this contract to their Complaint, they contend that the agreement provided that "Delunas was to manage the operations of the RMA Afghan Entities" and, in exchange for "Delunas's commitment to devote full time to the business of the RMA Afghan Entities and not to engage in other business, the RMA Group Plaintiffs agreed to pay [him] 25% of the net profits from the operations of RMAA, ATC, and GFSA."  (*Id.*)  In order to properly incentivize Delunas, the contract also obligated Delunas "to reimburse the RMA Group Plaintiffs for up to 25% of these entities' net losses."[3]  (*Id.*)

The RMA Plaintiffs allege that Delunas breached this contract in various ways.  For instance, despite receipt of millions of dollars over the course of the relationship, Delunas "advanced himself additional funds from the operations of the RMA Afghan Entities."  (*Id.* at ¶ 16.)  These advances were used for many

---

[3] The Court provides a more thorough explanation of the contract terms as alleged in the Complaint in its analysis of Count III (breach of contract).

6

unauthorized purposes, such as personal expenses, bonuses, and personal investments in other companies in Afghanistan.  (*Id.*)  Although the RMA Plaintiffs do not know the full extent of the monies extracted for personal gain by Delunas, the improper payments of which they are aware of to date exceed one million dollars.  (*Id.*)  An accounting is sought to determine the full extent of funds Delunas improperly diverted.  (*Id.*)

Delunas also breached the contract by pursuing various corporate opportunities for his personal benefit.  (*Id.* at ¶ 17.)  This not only violated the contract but also constituted a breach of Delunas's fiduciary duties to the RMA Afghan Entities.  Delunas allegedly used the funds he advanced himself "to invest in and operate other business ventures from which the RMA Plaintiffs derived no economic benefit."  (*Id.*)  Relatedly, Delunas entered into "contracts on behalf of the RMA Afghan Entities with various entities in Afghanistan in which [he] had an ownership, investment, or other economic interest."  (*Id.*)  Another example of Delunas's misconduct is that Delunas "informed banks in 2011 to no longer accept the RMA Plaintiffs' authorized signatures for bank accounts of the RMA Afghan Entities[,] fraudulently inform[ing] the banks that he was the sole authorized signatory on [such] accounts."  (*Id.*)

Having become aware of the aforementioned conduct, the RMA Plaintiffs notified Delunas in March of 2011 that they had appointed a new Country Manager

to manage the operations of the RMA Afghan Entities and were therefore terminating RMA Afghanistan Country Manager Agreement.  (*Id.* at ¶¶ 18, 133.) Despite the termination of the agreement, "Delunas seized certain goods sold by the RMA Group Plaintiffs to the RMA Afghan Entities for which the RMA Group Plaintiffs have yet to be paid."  (*Id.*)  To mitigate the damages caused by Delunas's breaches and other wrongful acts, the RMA Plaintiffs formed two new entities, both of which are wholly-owned subsidiaries of Plaintiff RMA-ME: RMA Group (Afghanistan) Limited ("RMA Group Afghanistan") and Global Star Motors Limited ("Global Star") (collectively, the "RMA Group Mitigating Entities").  (*Id.*) After forming these new entities, "certain payables and contract rights of RMAA, ATC, and GFSA were assigned to the RMA Group Mitigating Entities."  (*Id.*)

Further, notwithstanding the termination of the agreement, Delunas "continues to hold himself out to current and prospective customers . . . as the authorized representative of the RMA Group in Afghanistan."  (*Id.* at ¶ 19.)  As evidence of this, the RMA Plaintiffs point to a website operated and controlled by Delunas ("the Offending U.S. Web Site") that directs actual or prospective customers or suppliers who wish to contact the RMA Group's current Country Manager in Afghanistan to Delunas's email address, not the actual current Country Manager.  (*Id.* at ¶¶ 19-20.)  Delunas's continued operation of this website forms

8

the basis of the RMA Plaintiffs' Counts I (violation of the Lanham Act) and II (violation of the Computer Fraud and Abuse Act).

### C.    Court Proceedings

The RMA Plaintiffs filed a complaint with this Court on December 13, 2012, thereby instituting the present action. (ECF No. 1.) On May 16, 2013, The RMA Plaintiffs filed a First Amended Complaint.[4] (ECF No. 8.) Pursuant to a stipulated order extending the time for Defendants to answer the RMA Plaintiffs' Complaint, (ECF No. 14), Defendants filed both their Answer along with a Counter-Complaint and Third-Party Complaint, (ECF No. 19), as well as a Motion to Dismiss the RMA Plaintiffs' Complaint, (ECF No. 18), on August 30, 2013. The Third-Party Complaint names two new parties as defendants: Mark Whitcraft and Tom Whitcraft (collectively, the "Whitcraft Third Parties"). The Counter-Complaint names Plaintiffs Kevin, RMA-HK, and RMA-ME as counter-defendants (collectively, the "RMA Counter-Defendants" or "Counter-Defendants"). The RMA Counter-Defendants answered the Counter-Complaint, (ECF No. 27), and filed a Motion to Strike certain portions of the Counter-Party Complaint, (ECF No. 26), on September 25, 2013. On October 23, 2013, the Whitcraft Third Parties moved this Court to dismiss the Third-Party Complaint against them pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6).

---

[4] Hereinafter, Plaintiffs' First Amended Complaint will be referred to simply as Plaintiffs' Complaint.

(ECF No. 36.) To conclude what is shaping up to be an epic court battle, the RMA Group Plaintiffs filed a Motion for Preliminary Injunction on November 13, 2013. (ECF No. 42.) Each of the four motions presently before the Court has been fully briefed and oral argument was held on February 6, 2014.

In light of the factual complexity of this case, the intense disagreement as to what the facts really are,[5] and the multiplicity of motions and accompanying briefs, the Court believes that a roadmap of this Opinion and Order is necessary. The Court first addresses the sufficiency of the RMA Plaintiffs' Complaint by way of considering the arguments raised by Defendants in their Motion to Dismiss. Given the relationship between the allegations in the Complaint and the RMA Group Plaintiffs' request for a preliminary injunction, the Court then proceeds to analyze the propriety of granting such relief. The next set of motions the Court addresses are those challenging aspects of the Counter-Complaint and Third-Party Complaint. The Whitcraft Third Parties' Motion to Dismiss is analyzed prior to the fourth, and final, motion, the RMA Counter-Defendants' Motion to Strike.

---

[5] The facts recited in the Complaint and the Counter-Complaint, at least with respect to the facts relevant to the various allegations of wrongdoing, could hardly be more disparate. Upon reviewing these pleadings, and being required to construe the factual allegations therein in favor of different parties depending on the motion under consideration, the Court was reminded of the late Senator Patrick Daniel Moynihan's admonition that "[e]veryone is entitled to his own opinion, but not to his own facts."

10

## II.    DEFENDANTS' MOTION TO DISMISS

The RMA Plaintiffs filed this action seeking declaratory, injunctive, equitable, and monetary relief in a seven-count Complaint.[6]  These counts include: Count I – Violation of the Lanham Act, 15 U.S.C. § 1125(a); Count II – Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g); Count III – Breach of Contract; Count IV – Breach of Fiduciary Duties; Count V – Tortious Interference with Contract and Business Relations; Count VI – Tortious Interference with Prospective Economic Advantage; and Count VII – Unjust Enrichment.  (Compl., ECF No. 8.)  Defendants seek dismissal of this Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).[7]

---

[6] Specifically, the RMA Plaintiffs seek a declaratory judgment, injunctive relief, an accounting and imposition of a constructive trust, compensatory damages, treble damages, punitive damages, costs, and attorneys' fees.  (Compl. 2, ECF No. 8.)

[7] Because Defendants filed an Answer to the RMA Plaintiffs' Complaint, (ECF No. 19), a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is untimely.  *See* Fed. R. Civ. P. 12(b) (explaining that motions filed pursuant to the rule "must be made before pleading if a responsive pleading is allowed").  Insofar as Defendants' Answer constitutes a "pleading" as defined in Federal Rule of Civil Procedure 7(a)(2), the proper motion to file would be a Rule 12(c) motion for judgment on the pleadings.  This technical defect is not fatal, however, as the same standard of review governs motions filed under both Rule 12(b)(6) and Rule 12(c).  *EEOC v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001) (citation omitted).  Accordingly, the Court construes Defendants' post-answer motion to dismiss as a motion for judgment on the pleadings.

## A.    Standard of Review

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is reviewed under the standards applicable to motions brought under Rule 12(b)(6).  *EEOC v. J.H. Routh Packing Co.,* 246 F.3d 850, 851 (6th Cir. 2001) (citation omitted).  As with Rule 12(b)(6) motions, a Rule 12(c) motion allows the Court to make an assessment as to whether a plaintiff's pleadings have stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Under the Supreme Court's articulation of the Rule 12(b)(6) standard in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555-56, 570, 127 S. Ct. 1955, 1964-65, 1974 (2007), a court must construe the complaint in favor of the plaintiff and determine whether the plaintiff's factual allegations present claims plausible on their face.  This standard requires a claimant to put forth "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the requisite elements of their claims.  *Id.* at 557, 127 S. Ct. at 1965.  Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level."  *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (citing *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965) (internal citations omitted); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a

12

short and plain statement of the claim showing that the pleader is entitled to relief[.]").

In determining whether a plaintiff has set forth a "claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974), courts must accept the factual allegations in the complaint as true, *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965. This presumption, however, does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. Therefore, to survive a motion to dismiss, a plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ass'n of Cleveland Fire Fighters*, 502 F.3d at 548 (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65) (internal citations and quotations omitted).

Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of [a legal transgression], the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)) (internal citations omitted). In conducting its analysis, the Court may consider the complaint and any exhibits attached thereto, public

13

records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein. *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

## B.   Analysis of Causes of Action Set Forth in the RMA Plaintiffs' Complaint

### *Count I – Unfair Competition in Violation of Lanham Act § 43(a)* [8]

Count I of the RMA Plaintiffs' Complaint alleges that Delunas continues to operate a website – the "Offending U.S. Web Site" – that implies his continued affiliation with the RMA Group and his continued role as Country Manager for the RMA Afghan Entities. (Compl. ¶¶ 2, 19-20, 155.) Despite termination of the RMA Afghanistan Country Manager Agreement well-over two years ago, Delunas lists his email address and contact information for those seeking to do business with the RMA Afghan Entities and with RMA Group companies in other countries where Delunas was never employed nor affiliated with in any capacity. (*Id.* at ¶¶ 19-20.) According to the RMA Plaintiffs, "[b]y making such false associations, Mr. Delunas is trading upon goodwill that simply does not belong to him." (RMA Pls.' Resp. 8, ECF No. 28.) By engaging in this conduct, Delunas violated the

---

[8] Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits two types of unfair competition. Section 43(a)(1)(A) prohibits "false association" whereas section 43(a)(1)(B) prohibits "false advertising."

14

Lanham Act's prohibition against unfair competition as codified at 15 U.S.C. §

1125(a). [9]

Defendants believe that Count I fails for three reasons.  First, the RMA

Plaintiffs lack standing to assert a claim under the Lanham Act.  (Defs.' Br. 10,

ECF No. 18.)  Second, the RMA Plaintiffs have failed to state a claim for false

designation or association under section 43(a)(1)(A) of the Lanham Act.  (*Id.* at

11.)  Lastly, the RMA Plaintiffs have not stated a claim for false advertising under

section 43(a)(1)(B) of the Lanham Act.  (*Id.* at 12.)  The Court addresses these

arguments *seriatim*.

---

[9] Title 15 U.S.C. § 1125(a) provides:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

## 1.    *Standing*

To have standing under the Lanham Act, a claimant must demonstrate "'(1) a reasonable interest to be protected'" and "'(2) a reasonable basis for believing that the interest is likely to be damaged'" by a defendant's alleged false association or false advertising.  *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 410 (6th Cir. 2012) (quoting *Famous Horse, Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 113 (2d Cir. 2010)); 15 U.S.C. § 1125(a)(1) ("Any person who[]" violates the prohibitions set forth in the Act "shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act[]").

Defendants argue that the RMA Plaintiffs lack standing because the Complaint alleges that the "Official RMA Group Web Site" is owned by the RMA Group which is "not an actual entity" and cannot, therefore, be a party to this action.  (Defs.' Br. 10, ECF No. 18 (quoting Compl. ¶ 5).)  According to Defendants, the "Complaint fails to identify any of the legal entities included within the 'RMA Group' and fails to identify the relationship of those entities to the Plaintiffs or the 'Official RMA Group Web Site.'"  (*Id.*)  This argument lacks merit as the same paragraph of the Complaint that Defendants cite refers to the "[t]he various entities that comprise the RMA Group – including those that are among the RMA Group Plaintiffs[.]"  (Compl. ¶ 5.)  As such, the RMA Group

16

Plaintiffs have sufficiently alleged "a reasonable interest to be protected[.]"   *Static Control*, 697 F.3d at 410.

The second element of standing a plaintiff must establish is "a reasonable basis for believing that the interest is likely to be damaged" by the defendant's alleged false association or false advertising.   *Id.*   The Complaint alleges that "[t]he Offending U.S. Web Site is set up so that inquiries intended for the RMA Group Plaintiffs' authorized representative in Afghanistan are instead directed to Mr. Delunas."  (Compl. ¶ 2.)  Construing these allegations as true, the Court believes that the RMA Plaintiffs have satisfied the burden of demonstrating that a cognizable interest in business reputation and business opportunities is likely to be damaged by Delunas's operation of the Offending U.S. Web Site.  Accordingly, the RMA Plaintiffs have standing to assert a claim pursuant to the Lanham Act.

## 2.   *False Association*

Section 43(a)(1)(A) of the Lanham Act proscribes the use of false or misleading representations that are "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]"  15 U.S.C. § 1125(a)(1)(A).  The ultimate question is whether consumers are likely to be confused or to falsely believe that the products or services offered by the parties

17

are affiliated in some way.  *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623,

629-30 (6th Cir. 2002) (citations omitted).

Defendants seek dismissal of the false association claim on three separate

grounds.  First, Defendants argue that the RMA Plaintiffs have not specifically

identified the threshold element of a false or misleading statement on the

Offending U.S. Web Site.  (Defs.' Br. 12, ECF No. 18; Defs.' Reply 3, ECF No.

34.)  This is inaccurate, as the following examples demonstrate.  The Complaint

alleges that Delunas continues to hold himself out as being authorized to represent

the RMA Group Plaintiffs and their affiliates in Afghanistan and provides, as an

example of this conduct, his continued operation of the Offending U.S. Web Site.

(Compl. ¶ 2.)  The Complaint also alleges that the Offending U.S. Web Site

provides an email address for those seeking to obtain the services of the RMA

Group's current Country Manager that directs emails to Delunas instead of the

individual who replaced him in 2011.  (*Id.* at ¶¶ 19-20.)  Because the RMA

Plaintiffs allege that Delunas is no longer the Country Manager and is no longer

authorized to conduct business using the RMA name, Defendants' argument

regarding the failure to identify a false or misleading statement necessarily fails.

Defendants' second argument in support of dismissal is that Delunas is

actually affiliated with the entities listed on the Offending U.S. Web Site and is

therefore not falsely associating himself with those entities.  (Defs.' Br. 12, ECF

No. 18; Defs.' Reply 4, ECF No. 34.)  According to this argument, because the Complaint alleges Delunas is a twenty-five percent (25%) beneficial shareholder in both RMAA and GFSA, it follows that Delunas is affiliated the RMA Group Plaintiffs.  (Defs.' Br. 12, ECF No. 18.)  Once again, this argument misses the mark as it asks the Court to disregard factual allegations contained elsewhere in the Complaint.  The RMA Plaintiffs have alleged that "Delunas'[s] ownership interest in RMAA was limited to the term of the RMA Afghanistan Country Manager Agreement[,]" and that upon the 2011 termination of that agreement, Deluas "was obligated to surrender his ownership interest[.]"  (Compl. ¶ 113.)  They also allege that Delunas was never entitled to "a permanent ownership stake in the RMAA Old Companies [(*i.e.*, the RMA Afghan Entities)]."  (*Id.* at ¶ 137.)  On the basis of these allegations, which the Court must construe as true, Defendants' argument regarding Delunas's continued affiliation is not well-taken.

Lastly, Defendants contend that the Complaint does not contain factual allegations that would permit the Court to infer that confusion among the relevant customer audience is likely to occur.  (Defs.' Br. 12, ECF No. 18.)  The Court does not agree.  The Complaint alleges that Delunas is operating a website that suggests to all who view it that he is the RMA Group's Country Manager in Afghanistan and that directs inquiries to his email address instead of the email address of the current Country Manager.  The website references contracts performed by the

19

RMA Plaintiffs' companies and displays icons of companies with which the RMA Plaintiffs conduct business. Such allegations do, in fact, permit the Court to infer that confusion is likely. Moreover, "since the likelihood of confusion is generally a question of fact[,]" "dismissal for failure to state a claim upon which relief can be granted" is rarely appropriate. *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009).

### 3. *False Advertising*

Section 43(a)(1)(B) of the Lanham Act proscribes the use of false or misleading representations of fact which "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[.]" 15 U.S.C. § 1125(a)(1)(B). To state a cause of action for false or misleading advertising, a plaintiff must establish (1) that defendant has made false or misleading statements of fact concerning his own product or services or another's, (2) that statement actually or tends to deceive a substantial portion of the intended audience, (3) that statement is material, (4) that advertisements were introduced into interstate commerce, and (5) that there is some causal link between the challenged statements and harm to the plaintiff. *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery*, 185 F.3d 606, 613 (6th Cir. 1999).

20

Defendants contend that the RMA Plaintiffs have failed to state a false advertising claim because they "have not identified any false or misleading statements displayed the subject website relating to the 'nature, characteristics, qualities or geographic origin' of any party's products or services." (Defs.' Br. 14, ECF No. 18.)   The Court does not agree.   As previously mentioned, the Offending U.S. Web Site appears to contain references and hyperlinks to the RMA Group Plaintiffs' business relationships, locations, and contracts with suppliers and customers.   In this Court's opinion, advertising the services, contracts, and customer relationships of another as one's own to deceive customers into believing that "RM Asia" performed work actually performed by the RMA Group Plaintiffs constitutes a false or misleading statement of fact concerning the services and commercial activities advertised on the internet.   Further, such false and misleading factual statements relate to the nature, characteristics, and qualities of services and commercial activities Delunas advertises as the statements appear to trade upon the goodwill and established reputation of the RMA Group Plaintiffs.

Accordingly, the Court finds that the RMA Plaintiffs have stated a claim under the Lanham Act and therefore denies Defendants' Motion as to Count I.

## *Count II – Violation of the Computer Fraud and Abuse Act*

In order to state an access claim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(5), the RMA Plaintiffs must allege sufficient facts

21

demonstrating that Delunas "intentionally accesse[d] a protected computer without authorization," thereby causing damages.  18 U.S.C. § 1030(a)(5)(B)-(C).[10]

Count II of the Complaint alleges that Delunas's continued use and operation of the Offending U.S. Web Site post-termination violates the CFAA because his actions in accessing the website lack the requisite authorization. Defendants do not believe that these allegations suffice to state a claim, specifically arguing that Count II does not allege that the Offending U.S. Web Site is a computer within the meaning of the CFAA and that it fails to allege that any access to that computer by Delunas was done without authorization.  With respect to the latter argument, Defendants suggest that the Complaint's factual allegations regarding authorization (or lack thereof) are a red herring because the Complaint plainly states that "the RMA Group Plaintiffs have no affiliation with or control of the Offending U.S. Web Site."  (Compl. ¶ 156.)  Because the authorization argument is dispositive, the Court declines to address the first.

---

[10] Title 18 U.S.C. § 1030(a)(5) provides, in pertinent part, that whoever:

(B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss . . .

shall be punished as provided in subsection (c) of this section.

"The plain meaning of 'authorization' is '[t]he conferment of legality; . . . sanction.' [] Commonly understood, then, a defendant who accesses a computer 'without authorization' does so without sanction or permission." *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 303-04 (6th Cir. 2011) (citing *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132-33 (9th Cir. 2009)) (first alteration in original) (internal citation omitted); *Id.* at 304 ("'[A] person who uses a computer without authorization has no rights, limited or otherwise, to access the computer in question.'") (internal quotation marks omitted) (emphasis removed) (quoting *LVRC Holdings*, 581 F.3d at 1133). Although the RMA Plaintiffs "vaguely and cryptically imply . . . that they once owned the website or that Mr. Delunas somehow 'misappropriated' it from them[,]"[11] the Complaint

---

[11] For instance, the Complaint alleges since the termination of the RMA Afghanistan Country Manager Agreement, "Mr. Delunas no longer has the right to use and operate the Offending U.S. Web Site[.]" (Compl. ¶ 155.) Further implying ownership is the allegation that "Delunas has wrongfully refused to turn over . . . the database of all emails and other communications sent to or stored on the server(s) for the Offending U.S. Web Site[.]" (*Id.* at ¶ 149.) Lastly, the RMA Plaintiffs observe that the termination of the RMA Afghanistan Country Manager Agreement did not transfer ownership of the website to Delunas. (Pls.' Resp. 28, ECF No. 28.)

At the February 6, 2014 motion hearing, the parties seemed to agree that either RMAA and/or ATC owns the website. While this is suggestive of the RMA Group Plaintiffs' ownership given the allegations that Delunas's ownership stake in RMAA was divested upon termination of the RMA Afghanistan Country Manager Agreement, it is this Court's opinion that the allegations contained in this footnote do nothing to undermine the express statement that "the RMA Group

does not allege that the RMA Plaintiffs own or control the Offending U.S. Web Site; in fact, the Complaint expressly disclaims any such ownership or control. (Defs.' Reply 14, ECF No. 34; Compl. ¶ 156 ("At this juncture, the RMA Group Plaintiffs have no affiliation with or control of the Offending U.S. Web Site.").) This disclaimer of ownership and control dooms the RMA Plaintiffs' CFAA claim as an entity lacking both qualities simply has no basis for granting or withholding authorization to the website.  In other words, any claim that Delunas accessed a protected computer that the RMA Plaintiffs neither own nor control access is not merely implausible, it defies logic.  *Cf. Nianni, LLC v. Fox*, No. 2:11-cv-118-FtM-36DNF, 2011 U.S. Dist. LEXIS 128593, at *10-11 (M.D. Fla. Nov. 7, 2011) (unpublished) ("The Computer Fraud and Abuse Act does not contemplate a cause of action in which the defendant accesses a computer not owned by the plaintiff and makes allegedly false statements on that computer or website.")

Because the allegations in the Complaint belie any claim that Delunas violated the CFAA, the Court dismisses Count II of the Complaint with prejudice.

### Count III – Breach of Contract

The RMA Plaintiffs' Complaint seeks to state a claim against both Defendants for breaching various contracts.  Specifically, and according to the

---

Plaintiffs have no affiliation with or control of the Offending U.S. Web Site." (Compl. ¶ 156.)

RMA Plaintiffs' Response, five contracts are at issue.[12]  The chart below

summarizes which contracts were allegedly breached and by whom.

| Contract | Defendant Delunas | Defendant Wahab |
|---|---|---|
| RMA Afghanistan Country Manager Agreement | √ | |
| ICA Shareholder Agreement [13] | √ | |
| ATC Declaration of Trust [14] | | √ |
| GFSA Declaration of Trust [15] | | √ |
| BMG Declaration of Trust[16] | | √ |

To state a claim for breach of contract under Michigan law, a plaintiff must,

as a threshold matter, establish the existence of a valid contract.  *In re Brown*, 342

F.3d 620, 628 (6th Cir. 2003) (citing *Pawlak v. Redox Corp.*, 182 Mich. App. 758,

765, 453 N.W.2d 304, 307 (Mich. Ct. App. 1990)).  In Michigan, the elements of a

valid contract are (1) the identities of parties competent to execute an enforceable

---

[12] The Court cautions counsel that grouping the alleged breach of five separate contracts by two different defendants in one count is disfavored.  *See* Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count[.]").  This applies equally to the RMA Plaintiffs' remaining causes of action.

[13] The ICA Shareholder Agreement is attached to the RMA Plaintiffs' Response to Defendants' Motion to Dismiss as Exhibit B.  (ECF No. 28-2.)

[14] The ATC Declaration of Trust is attached to the Complaint as Exhibit E. (ECF No. 8-5.)

[15] The GFSA Declaration of Trust is attached to the Complaint as Exhibit F. (ECF No. 8-6.)

[16] The Badhakhshan Mining Group ("BMG") Declaration of Trust, executed on May 26, 2009, is attached to the RMA Plaintiffs' Response to Defendants' Motion to Dismiss as Exhibit C.  (ECF No. 28-3.)

contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *Hess v. Cannon Twp.*, 265 Mich. App. 582, 592, 696 N.W.2d 742, 748 (Mich. Ct. App. 2005). Once the existence of a valid contract has been demonstrated, a plaintiff seeking to state a claim for a breach of contract must then (1) establish the contract's terms, (2) present evidence of a breach of those terms, and (3) show an injury causally related to that breach. *Webster v. Edward D. Jones & Co.*, 197 F.3d 815, 819 (6th Cir. 1999).

Defendants set forth a bifurcated argument as to why Count III should be dismissed. First, Defendants contend that the RMA Plaintiffs have failed to establish the existence of valid contracts.[17] This argument has two components: (1) the Complaint fails to identify the specific parties to the various contracts and (2) at least some of the purported contracts are unenforceable for lack of consideration. Defendants' second line of argumentation suggests that even if the RMA Plaintiffs have established the existence of valid contracts, the Complaint fails to articulate the material terms of those contracts and how Defendants' conduct constituted a breach of those terms.

---

[17] With respect to the RMA Afghanistan Country Manager Agreement, Defendants blatantly claim that "no contract exists[.]" (Defs.' Br. 19, ECF No. 18.) At this stage in the proceedings, however, the Court is bound to accept the allegations contained in the Complaint as true and may not operate under the assumption that the relationship of the parties was one of partnership as alleged in the Counter-Complaint.

**1.    *The RMA Plaintiffs' Complaint Contains Sufficient Factual Allegations Identifying the Specific Parties to Each Contract.***

The Court is satisfied that the RMA Plaintiffs have provided enough factual content to sufficiently establish the parties to each of the contracts at issue. The Court briefly discusses each contract.

The RMA Afghanistan Country Manager Agreement has not been attached to the pleadings in this case and the Court, therefore, understands why Defendants would argue that the specific parties to this alleged contract have not been identified. The Complaint indicates that "[t]his dispute arises out of a contract whereby the RMA Group Plaintiffs retained Mr. Delunas to manage certain business operations in . . . Afghanistan[.]" (Compl. ¶ 1.) Interestingly, however, the Complaint also provides that "[t]he so-called 'RMA Group' is not an actual entity but refers collectively to various affiliated companies." (*Id.* at ¶ 5.) Because the Complaint never alleges which named-plaintiff entered into the purported agreement with Delunas, Defendants argue that the Complaint fails to state a claim. The Court, however, is not convinced. Taken in the light most favorable to the RMA Plaintiffs, and read in tandem with this Court's "judicial experience and common sense[,]" *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950, the allegations in the Complaint support a finding that one or more of the RMA Group entities entered into a contract with Delunas in 2002.

To the extent Defendants challenge the RMA Plaintiffs' failure to allege the parties to the remaining four alleged contracts, this argument falls flat as a cursory glance at the relevant documentation, which is properly considered on a Rule 12 motion, reveals the parties to each agreement.  The parties to the GFSA Declaration, executed on November 12, 2009, are Wahab and Global Fleet (with Kevin signing in his capacity as Director of Global Fleet).  (ECF No. 8-6.)  The ATC Declaration, dated November 4, 2007, is between Wahab and Kevin.  (ECF No. 8-5.)  A copy of the ICA Shareholder Agreement indicates that the parties are Delunas, Kevin, and an individual named Sadat Naderi.  (ECF No. 28-2.)  Lastly, Wahab and Kevin are parties to the BMG Declaration.  (ECF No. 28-3.)

## 2. *The RMA Plaintiffs' Complaint Alleges Legal Consideration in Connection with Two of the Three Declarations of Trust to Which Defendant Wahab is a Party.*

Defendants half-heartedly argue that the Complaint fails to allege a breach of contract claim against Wahab because the Complaint does not allege the existence of legal consideration.  This argument is easily dismissed with respect to the claims involving the ATC Declaration and the GFSA Declaration as the Complaint provides that "Wahab was paid a monthly consulting fee for using his name in the registration of GFSA and ATC[.]"  (Compl. ¶¶ 35, 120, 151.)  However, and despite the RMA Plaintiffs' efforts to construe these consulting fees as adequate consideration for the BMG Declaration, the Complaint does not

28

support any such link.  The Court will not infer the existence of legal consideration as it is a fundamental element of a binding contract, the existence of which must be proven as a predicate to stating a claim for a breach of contract.

The Court agrees with Defendants that the BMG Declaration is not supported by consideration.  Accordingly, the RMA Plaintiffs may not pursue Count III against Wahab with respect to the BMG Declaration.

**3.  *The RMA Plaintiffs Have Sufficiently Alleged the Material Terms of the Contracts at Issue and Have Adequately Alleged Breaches of Three of the Four Remaining Contracts at Issue.***

   *a.  Breach of Contract Claims against Defendant Delunas*

      i.  RMA Afghanistan Country Manager Agreement

Defendants contend that the RMA Plaintiffs have failed to state a viable claim against Delunas for breach of the RMA Afghanistan Country Manager Agreement because the material terms have not been established.  Further, without having established the material terms, the Complaint cannot plausibly allege a breach of those terms.

In arguing that the material terms of the RMA Afghanistan Country Manager Agreement have not been established, Defendants point to the fact that the contract itself has not been attached to the Complaint.  The failure to attach the contract is not, however, fatal to the breach of contract claim, so long as the

Complaint includes the language of specific contractual provisions.[18]

*Northampton Rest. Group, Inc. v. First Merit Bank, N.A.*, 492 F. App'x 518, 521

(6th Cir. 2012) ("[I]t is a basic tenant of contract law that a party can only advance

a claim of breach of written contract by identifying and presenting the actual terms

of the contract allegedly breached.") (quotation omitted).  Although Defendants

argue that the only material term identified in the Complaint is "Delunas's

entitlement to 25% of the profits and his liability for 25% of the losses[,]" arguing

as much does not make it so.  (Defs.' Br. 20, ECF No. 18.)

       In delineating the terms of the RMA Afghanistan Country Manager

Agreement, the Complaint provides as follows.  Delunas's "contractual obligations

included helping the RMA Group Plaintiffs establish and operate . . . the 'RMA

Afghan Entities'[.]"  (Compl. ¶ 1.)  The agreement required Delunas "to help

manage the delivery in Afghanistan of goods and services sold by the RMA Group

Plaintiffs."  (*Id.*)  Pursuant to the alleged contract, Delunas reported to Kevin and

needed Kevin's approval before entering into any major contracts.  (*Id.* at ¶ 104.)

In exchange for his managerial services, the contract compensated Delunas by

providing him with "25% of the net profit – if any – resulting from the RMA

Group's business in Afghanistan and share in the net losses of such operations up

_____

       [18] According to the RMA Plaintiffs, "the RMA Afghanistan Country
Agreement requires reference to multiple documents and possibly extrinsic
evidence to establish all of its essential terms and conditions."  (Pls.' Resp. 30,
ECF No. 28.)

to a maximum of 25%." (*Id.* at ¶ 103.)  The RMA Afghanistan Country Manager Agreement mandated that Delunas spend his time solely on the RMA Group Plaintiffs' businesses and prohibited him from becoming involved in other businesses in Afghanistan absent permission from Kevin.  (*Id.* at ¶¶ 14, 17, 105-06.)  In other words, Delunas was barred from competing with the RMA Afghan Entities and if he learned of investment opportunities in Afghanistan that were outside of the core business of the RMA Afghan Entities, Delunas was contractually-obligated to inform Kevin.  (*Id.* at ¶¶ 105-06.)  The Court finds that these allegations sufficiently establish the material terms of the RMA Afghanistan Country Manager Agreement.

Contrary to Defendants' arguments suggesting otherwise, the Complaint contains sufficient allegations of conduct in breach of the terms set forth above. For example, the Complaint alleges that Delunas is attempting to assert complete ownership and control over various RMA Afghan Entities despite the fact that the RMA Afghanistan Country Manager Agreement explicitly provided compensation by way of profit and loss sharing, not ownership.[19]  (*Id.* at ¶¶ 136-37.)  Delunas also wrongfully diverted funds from the RMA Afghan Entities despite termination

---

[19] Somewhat confusingly, the Complaint contains allegations that Delunas owns twenty-five percent (25%) of the shares of various RMA Afghan Entities. (*See, e.g.*, Compl. ¶¶ 39-40.)  The RMA Plaintiffs do allege, however, that this ownership interest was limited to the term of the RMA Afghanistan Country Manager Agreement and that upon the 2011 termination of the relationship, Delunas "was obligated to surrender his ownership interest[.]"  (*Id.* at ¶ 113.)

31

of the contract, improperly advanced himself funds without obtaining consent, and used those funds to invest in competing businesses. (*Id.* at ¶¶ 141, 144-45.)

In this Court's view, the Complaint sufficiently alleges a cause of action against Delunas for breach of the RMA Afghanistan Country Manager Agreement. Whether the RMA Plaintiffs succeed on this claim is left for another day.

   ii. ICA Shareholder Agreement

Unlike the breach of contract claim discussed above, the Court does not believe that the RMA Plaintiffs have stated a viable claim for breach of the ICA Shareholder Agreement. The Complaint alleges that Delunas was required to invest $605,626 in ICA as a shareholder pursuant to the ICA Shareholder Agreement and that he did not directly contribute these funds. (*Id.* at ¶ 125.) The Complaint then alleges that "[t]he RMA Group paid for Mr. Delunas'[s] shares in ICA . . . out of the profit share to which he was entitled pursuant to the RMA Afghanistan Country Manager Agreement." (*Id.* at ¶ 127.) To the extent the alleged breach rests on Delunas's failure to contribute the funds as set forth in the ICA Shareholder Agreement, the Complaint's factual allegations preclude any such claim as it is alleged that his contribution was taken out of profits to which he was otherwise entitled.

The Complaint also describes an unauthorized transfer of $2.6 million dollars from RMAA to ICA at Delunas's behest. (*Id.* at ¶ 56.) Not only do the

RMA Plaintiffs fail to point to any provision of the ICA Shareholder Agreement that Delunas breached by so doing, but they also fail to even explain any "contractual link between the alleged transfer and Mr. Delunas'[s] obligation to invest funds[.]" (Defs.' Reply 19, ECF No. 34.)  Accordingly, the Court dismisses Count III against Delunas in connection with the ICA Shareholder Agreement.

> b.    *Remaining Breach of Contract Claims against Defendant Wahab*

Having previously addressed Defendants' arguments regarding the insufficiency of the allegations in Count III as they pertain to Wahab, the Court need only address Defendants' remaining contention that "the Complaint does not allege that Mr. Wahab 'breached' the purported 'Declaration of Trust.'" (Defs.' Br. 23, ECF No. 18.)

> i.    GFSA Declaration of Trust

The argument for dismissal set forth immediately above is factually frivolous with respect to the GFSA Declaration breach of contract claim as the Complaint alleges that Wahab has wrongfully claimed ownership rights and control over the entity without consent of the beneficial shareholder, RMA Automotive, and has further seized property, contracts, and assets belonging to GFSA.  (Compl. ¶¶ 150, 152.)  The pertinent declaration provides that Wahab holds the shares in GFSA as trustee and that he must therefore "pay and deal with said share(s) . . . in such manner as the Beneficial Owner shall from time to time

33

direct." (GFSA Decl. of Trust, Compl. Ex. F, ECF No. 8-6.)  The conduct alleged is a breach of the arrangement to which Wahab agreed as he has failed to surrender the shares as requested.  (Compl. ¶ 22.)  As such, the Complaint states a claim of breach of the GFSA Declaration against Wahab.

   ii.  ATC Declaration of Trust

  Defendants argue that the RMA Plaintiffs have not alleged how Wahab breached the ATC Declaration.  According to the RMA Plaintiffs, Wahab breached by "refusing to surrender shares of stock held in trust for one or more of the RMA Plaintiffs."  (*Id.*)  Reading the Complaint as a whole, the Court is persuaded that the RMA Plaintiffs have sufficiently alleged a breach of contract claim with respect to the ATC Declaration.  While the paragraph of the Complaint just quoted does not actually specify which shares Wahab allegedly refused to surrender and even though the portion of the Complaint entitled "Mr. Wahab's Breaches" focuses entirely on the GFSA Declaration (making no reference at all to the ATC Declaration of Trust), (*see generally* Complaint 44), the Court believes that enough has been made of the fact that Wahab held the shares in trust that the allegation in paragraph twenty-two puts Wahab on notice of the claims asserted against him. The Court further believes that sufficient factual matter has been pleaded such that the claim is plausible.

   *c.*  *Summary of Breach of Contract Claims*

In sum, Count III survives the pleading stage although not entirely unscathed.  The breach of the RMA Afghanistan Country Manager Agreement claim against Delunas and the claims against Wahab related to the GFSA and ATC Declarations of Trust may go forward.  However, the Court dismisses the breach of the ICA Shareholder Agreement claim against Delunas and dismisses the breach of the BMG Declaration of Trust claim against Wahab.

### Count IV – Breach of Fiduciary Duties

In Count IV, the RMA Plaintiffs allege that Delunas and Wahab breached the fiduciary duties they owed to the RMA Plaintiffs by virtue of their positions as officers, directors, and/or record shareholders of the RMA Afghanistan Entities. Under Michigan law, "a fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another."  *Teadt v. Lutheran Church Mo. Synod*, 237 Mich. App. 567, 580-81, 603 N.W.2d 816, 823 (Mich. Ct. App. 1999).  When such a relationship exists, "the fiduciary has a duty to act for the benefit of the principal regarding matters within the scope of the relationship."  *Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.*, 266 Mich. App. 39, 698 N.W.2d 900, 906 (Mich. Ct. App. 2005) (per curiam) (citation omitted).  A fiduciary is duty-bound "to act for someone else's benefit," and must "subordinat[e] . . . personal interests to that of the other person." *Wallad v. Access BIDCO, Inc.*, 236 Mich. App. 303, 307, 600 N.W.2d 664, 666

(Mich. Ct. App. 1999) (per curiam) (emphasis, internal quotation marks, and citation omitted).  A claim for the tort of breach of fiduciary duty requires a plaintiff to allege: (1) the existence of a duty arising from a fiduciary relationship; (2) a breach of that duty; and (3) an injury that was proximately caused by that breach.  *Petroleum Enhancer, LLC v. Woodward*, Nos. 07-12425, 09-10247, 2013 U.S. Dist. LEXIS 24180, at \*19-24 (E.D. Mich. Feb. 22, 2013) (unpublished).

"Michigan courts have recognized fiduciary relationships such as trustees and beneficiaries, guardians and wards, attorneys and clients, and doctors and patients[.]"  *Portage Aluminum Co. v. Kentwood Nat'l Bank*, 106 Mich. App. 290, 294, 307 N.W.2d 761, 763 (Mich. Ct. App. 1981).  Further, it is axiomatic that "directors of a corporation owe fiduciary duties to stockholders and are bound to act in good faith for the benefit of the corporation."  *Wallad*, 236 Mich. App. at 306, 600 N.W.2d at 666 (citations omitted).  "Michigan law recognizes a fiduciary duty of loyalty for officers and directors of a corporation."  *Simon v. ASIMCO Techs., Inc. (In re Am. Camshaft Specialties, Inc.)*, 410 B.R. 765, 777 (Bankr. E.D. Mich. 2009) (citing the Michigan Business Corporation Act, Mich. Comp. Laws. § 450.1541a(1)) (additional citation omitted).

As an initial matter, Defendants appear to suggest that Count IV fails to state a claim because no fiduciary duties arose pursuant to the contracts they contend do not exist.  Further, if those alleged contracts are in fact binding, Defendants

36

contend that no fiduciary duties could arise from those contracts as a matter of law. (Defs.' Reply 21, ECF No. 34); *Horizon Painting v. Adams*, Nos. 265789, 266717, 2007 Mich. App. LEXIS 508, at *3 (Mich. Ct. App. Feb. 27, 2007) (unpublished) ("[T]here is no authority for the proposition that a fiduciary relationship exists between parties to contractual agreements[.]").  This argument fails to consider that at the pleading stage, "part[ies] may state as many separate claims or defenses as it has, regardless of consistency."  Fed. R. Civ. P. 8(d)(3).

Defendants also argue that the existence of any fiduciary relationship has not been alleged.  This argument is completely lacking in merit as the Complaint contains allegations that both Wahab and Delunas were officers, directors, and/or record shareholders of the various RMA Afghanistan Entities.  (*See, e.g.*, Compl. ¶¶ 33-34, 37, 39, 43-44, 48-49.)   Because corporate officers and directors "owe fiduciary duties to stockholders[,]" *Wallad*, 236 Mich. App. at 306, 600 N.W.2d at 666 (citations omitted), the RMA Plaintiffs, specifically RMA-HK and RMA Automotive, (Complaint ¶¶ 40, 45, 50), have stated a viable claim against both Delunas and Wahab for breaching those duties.[20]  Moreover, even if Defendants ultimately prevail in their argument that the Declarations of Trust to which Wahab

---

[20] Although Defendants insist that the RMA Plaintiffs lack standing to assert breach of fiduciary duty claims because the entities of which Defendants were officers or directors are not named plaintiffs, this argument is not well-taken as it is clear that a company's shareholders may assert claims for breach of fiduciary duties against the company's officers and directors.  (Defs.' Br. 24, ECF No. 18.)

37

is a party are not contracts, they have not provided any explanation as to why Wahab would not owe the RMA Plaintiffs fiduciary duties as a trustee. *Portage Aluminum*, 106 Mich. App. at 294, 307 N.W.2d at 763 (noting that Michigan courts recognize fiduciary duties arising from a trustee-beneficiary relationship).

Lastly, Defendants contend that Count IV fails because the Complaint does not explain how any of the alleged conduct constitutes a breach of Defendants' purported fiduciary duties. However, the Complaint alleges that the Defendants acted in contravention to the interests of the RMA Afghan Entities by usurping corporate opportunities, siphoning funds from the entities, and refusing to surrender shares held in trust. Taking these factual allegations as true, the Complaint states a claim for relief for breach of fiduciary duties that is plausible on its face. This is sufficient to deny Defendants' Motion to Dismiss with respect to Count IV.

### *Count V – Tortious Interference with Contract and Business Relations*

The RMA Plaintiffs contend that Defendants tortiously interfered with six specific contracts.[21] Having reviewed the lengthy factual allegations in the

---

[21] In the RMA Plaintiffs' Response Brief, Counts V and VI are grouped together. In discussing tortious interference in general, the RMA Plaintiffs indicate that Defendants tortiously interfered with the GFS-TACOM Contract, Ford Motor Company's Qualified Vehicle Modifier Program, and the PAE subcontract. (RMA Pls.' Resp. 35, ECF No. 28.) The Court has reviewed the portions of the Complaint cited to in the Response and wishes to note that the mere reference to these contracts or business relationships does not suffice to state a claim of tortious

Complaint, the Court believes that the RMA Plaintiffs have stated a claim for tortious interference with two of the six contracts, as discussed below.

The elements of tortious interference with contract in Michigan are "(1) a contract, (2) a breach, and (3) an unjustified instigation of the breach by the defendant." *Mahrle v. Danke*, 216 Mich. App. 343, 350, 549 N.W.2d 56, 60 (Mich. Ct. App. 1996). With respect to the third element, "[a] plaintiff must allege the intentional doing of a *per se* wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship. *Liberty Heating & Cooling, Inc. v. Builders Square, Inc.*, 788 F. Supp. 1438, 1447 (E.D. Mich. 1992) (citation omitted). "In order to prove the doing of an act 'with malice and unjustified in law,' [a] plaintiff must show specific, affirmative acts which corroborate the unlawful purpose of the interferer." *Id.* (citations omitted).

As Defendants argue in their Reply Brief, the RMA Plaintiffs cannot state a tortious interference claim for breach of the various Declarations of Trust. (Defs.' Reply. 24, ECF No. 34.) Although Defendants dispute that these declarations are binding contracts, *see supra*, they convincingly argue that this claim fails. First, there are simply no factual allegations suggesting that Delunas somehow instigated Wahab's conduct in refusing to surrender the shares he held in trust. Thus, there is

interference. Accordingly, the RMA Plaintiffs may not bring claims with respect to the three aforementioned contracts.

no viable claim against Delunas. Second, in order to state a claim of tortious interference, a plaintiff must allege "that the defendant was a 'third party' to the contract or business relationship." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 630 (6th Cir. 2013). Because Wahab was a party to the various Declarations, it is not possible that he tortiously interfered with those contracts. Accordingly, any tortious interference claim rooted in the Declarations of Trust is dismissed.

The Complaint fails to allege a claim for tortious interference of contract with respect to the RMAA lease entered into with the United States Army. (Compl. ¶ 139.) As Defendants point out, none of the RMA Plaintiffs are parties to this contract and, therefore, the RMA Plaintiffs may not bring a claim based on a breach of this contract. (Defs.' Reply 24, ECF No. 34.) The Court will not entertain any tortious interference of contract claim with respect to the United States Army lease and any such claim is therefore dismissed.

Next, with respect to the contract with the cell phone operating company in Afghanistan, the RMA Plaintiffs have not alleged that Delunas's allegedly harassing conduct induced or caused a breach or termination of the contract or expectancy. *Mino v. Clio Sch. Dist.*, 255 Mich. App. 60, 78, 661 N.W.2d 586, 597 (Mich. Ct. App. 2003). Accordingly, the RMA Plaintiffs' tortious interference with contract claim in connection with the cell phone generator maintenance contract identified in paragraph 142 of the Complaint is dismissed.

40

The RMA Plaintiffs contend that a viable tortious interference with contract claim exists with respect to an audit conducted by the Defense Contracting Audit Authority. The Court is not persuaded that this audit was a contract. Further, while one could infer from the Complaint that a failure to properly respond to the audit could preclude future business opportunities, the Complaint does not allege any presently realizable damage from any hypothetical breach. Rather, the Complaint merely alleges that "[t]he RMA Plaintiffs face potential losses if they cannot sufficiently reply" to the auditors. (Compl. ¶ 143.) While it is possible given the heading of Count V ("Tortious Interference with Contract and Business Relations") that the RMA Plaintiffs meant to include the audit under Count VI ("Tortious Interference with Prospective Economic Advantage") given that no contract has been alleged,[22] the fact that no damage had occurred at the time the Complaint was amended is problematic. At the motion hearing, counsel for the RMA Plaintiffs indicated that the harm in connection with the DCAA audit came to pass since amending the Complaint. In evaluating a Rule 12(b)(6) motion, however, the Court must look to the allegations as presented in the pertinent pleading. For these reasons, the Court dismisses the RMA Plaintiffs' tortious interference with contract claim as it relates to the audit.

---

[22] In fact, at the motion hearing, the RMA Plaintiffs admitted that the DCAA audit is not a contract but explained that it is a business relationship that Defendants interfered with and that this interference harmed the RMA Plaintiffs' ability to compete for and obtain business in the future.

41

The remaining tortious interference with contract claims survive Defendants' Motion to Dismiss.  These claims relate to the following contracts: (1) the Blanket Purchase Agreement ("BPA") that Plaintiff RMA-HK entered into with the United States Army to supply fuel for the United States Army Kabul Regional Contracting Center (*id.* at ¶¶ 134, 141) and (2) the RMA-HK and Dynocorp fuel supply agreement, (*id.* at ¶ 145).

### Count VI – Tortious Interference with Prospective Economic Advantage

In Count VI of the Complaint, the RMA Plaintiffs have pleaded a cause of action for tortious interference with economic advantage or expectancy in connection with various business expectancies.  In Michigan, the tort of interference with prospective business advantage requires a plaintiff to plead the following: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the plaintiff.  *Lakeshore Comm. Hosp. v. Perry*, 212 Mich. App. 396, 401, 538 N.W.2d 24, 27 (Mich. Ct. App. 1995) (citations omitted).  Unlike the tort of tortious interference with contract, "an advantageous contractual relationship is sufficient, but not necessary, to state a cause of action."  *Bonelli v. Volkswagen of Amer., Inc.*,

42

166 Mich. App. 483, 496 n.4, 421 N.W.2d 213, 220 n.4 (Mich. Ct. App. 1988)
(citation omitted).

In responding to Defendants' Motion to Dismiss, the RMA Plaintiffs
compiled a chart summarizing the tortious interference with prospective economic
advantage allegations.  The chart, which merely draws its content from the
Complaint, indicates that this count is pleaded against Wahab due to his repeated
abusive telephone calls to the RMA Plaintiffs' current Country Manager (during
which Wahab allegedly threatened the Country Manager with arrest and criminal
prosecution if he remains in Afghanistan) as well as his instigation of a meritless
and spurious complaint against non-party Global Star in the Afghanistan Ministry
of Justice.  (Compl. ¶ 153.)  As an initial matter, Global Star is not a party to this
action and the RMA Plaintiffs may not bring a tortious interference cause of action
on Global Star's behalf.  Further, although the Complaint alleges interference with
business operations, such conclusory allegations are not entitled to a presumption
of truth at the pleading stage.  The RMA Plaintiffs have failed to identify any
breach or termination of a business expectancy and the allegations against Wahab
are, therefore, too speculative to state a viable claim.  Accordingly, Count VI is
dismissed against Defendant Wahab.

Unlike the allegations against Wahab, the factual allegations in the
Complaint are sufficient to state a cause of action against Delunas for tortious

interference with prospective economic advantage.  The Complaint alleges a broad array of conduct that, if proven, suffices to state an actionable claim.  Thus, the Court denies Defendants' Motion to the extent it seeks dismissal of Count VI against Delunas.

### Count VII – Unjust Enrichment

Count VII of the Complaint seeks to state a claim of unjust enrichment against both Defendants.   In Michigan, a claim for unjust enrichment requires a plaintiff to show a "(1) receipt of a benefit by Defendant from Plaintiff, and (2) an inequity resulting to Plaintiff because of Defendant's retention of the benefit." *Belle Isle Grill Corp. v. Detroit*, 256 Mich. App. 463, 478, 666 N.W.2d 271, 280 (2003) (citation omitted).   If both elements are shown, courts will imply a contract to prevent unjust enrichment.  *Fodale v. Waste Mgmt. of Mich., Inc.*, 271 Mich. App. 11, 36, 718 N.W.2d 827, 841 (2006).  However, a contract will not be implied where there is an express contract governing the same subject matter.  *Id.*

Defendants' main argument in support of dismissal of Count VII relies on the RMA Plaintiffs' contention that the relationships of the parties are governed by contract.  Although Defendants deny that the RMA Afghanistan Country Manager Agreement and Declarations of Trust are contracts, they argue that the RMA Plaintiffs' unjust enrichment claim must fail because contracts will not be implied where express contracts govern the same subject matter.  *Id.*  In responding to this

44

argument, the RMA Plaintiffs note that Count VII is pled in the alternative to the breach of contract count (Count III) and concede that if successful on Count III, Count VII necessarily fails.  (Pls.' Resp. 37, ECF No. 28.)  Because pleading in the alternative is permitted at this stage of the proceedings, *see* Federal Rule of Civil Procedure 8(d)(3), and because the Court believes that the Complaint contains sufficient factual allegations in support of Count VII, the Court denies Defendants' Motion to Dismiss with respect to Count VII.

### C.    Conclusion

Although the RMA Plaintiffs' 203-paragraph Complaint is far from a model of clarity, *see* note 12, *supra*, having pieced together the allegations contained therein, the Court grants Defendants' Motion to Dismiss in part and denies Defendants' Motion in part.  The Court grants Defendants' Motion as follows: Count II (CFAA) is dismissed entirely; Count III (breach of contract) is dismissed as to the ICA Shareholder Agreement claim and the BMG Declaration claim; Count V (tortious interference with contract) is dismissed as to all claims save the BPA with the United States Army Regional Contracting Center and the Dynocorp fuel supply agreement; and Count VI (tortious interference with prospective business advantage) is dismissed against Defendant Wahab only.  In addition to those just addressed by implication, the Court denies Defendants' Motion with

45

respect to Counts I (Lanham Act), IV (breach of fiduciary duties), and VII (unjust enrichment).

## II.    THE RMA GROUP PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

On November 13, 2013, the RMA Group Plaintiffs filed a motion for preliminary injunction.   (ECF No. 42.)  In this motion, the RMA Group Plaintiffs seek relief by way of an order requiring Defendants to (1) refrain from continuing to operate the Offending U.S. Web Site, (2) restore control of the website to the RMA Group Plaintiffs, turn over the database of emails and other communications sent to or stored on the Offending U.S. Web Site's server, relinquish control of the server on which the website is hosted, and return various documents to the RMA Group Plaintiffs, (3) account for and return documents seized in an alleged July 2012 raid in Kabul, and (4) preserve rather than spoliate documents relevant to any claim or defense in this case.[23]  (*Id.* at 2-3.)  Defendants responded to this motion on December 9, 2013, (ECF No. 49), and the RMA Group Plaintiffs replied on December 26, 2013, (ECF No. 50).  Having considered the arguments presented in the briefs and at oral argument, the Court declines to issue preliminary injunctive relief and denies the RMA Group Plaintiffs' Motion for Preliminary Injunction.

---

[23] Defendants point out that only the relief related to the website was requested in the RMA Plaintiffs' Complaint.

46

### A.      Standard of Review

"[T]he preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.'"  *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991)); *see also Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) ("A preliminary injunction is an extraordinary measure that has been characterized as 'one of the most drastic tools in the arsenal of judicial remedies.'") (quotation omitted).  The party moving for the injunction has the burden to show that the circumstances warrant such relief, *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002), and must carry the burden of persuasion "by a clear showing," *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867 (1997) (citation omitted) (emphasis removed).  "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a motion for summary judgment." *Leary*, 228 F.3d at 739.

When a party moves for a preliminary injunction, district courts consider four factors to determine whether to grant relief: (1) the likelihood of success on the merits of the action; (2) the irreparable harm which could result without the requested relief; (3) the possibility of substantial harm to others; and (4) the impact

on the public interest.  *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir. 1985).  "Although these four factors must be considered in assessing a request for preliminary injunction, the four factors do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief.  Instead, the district court must engage in a realistic appraisal of all the traditional factors weighed by a court of equity."  *Id.*  Although the Court must balance and weigh the relevant factors, "a finding that there is no likelihood of irreparable harm...or no likelihood of success on the merits...is usually fatal."  *CLT Logistics v. River West Brands*, 777 F. Supp. 2d 1052, 1064 (E.D. Mich. 2011) (internal citations omitted).  "It follows that a district court need not address all the preliminary injunction factors where fewer are dispositive of the issue."  *Id.* (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).  Here, the Court only considers the first two factors.

## B.   Analysis

### 1.   *The RMA Group Plaintiffs Have Not Made A Sufficient Showing of Likelihood of Success on the Merits.*

A movant's burden on this factor ranges from requiring a "strong" likelihood of success, *Mason County Medical Association v. Knebel*, 563 F.2d 256, 261 n.4 (6th Cir. 1977), to merely "raising questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation," *Six Clinics Holding Corp. v. Cafcomp*

48

*Systems, Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). "The varying language applied to the likelihood of success factor can best be reconciled by recognizing that the four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met. Accordingly, the degree of likelihood of success required may depend on the strength of the other factors." *In re DeLorean*, 775 F.2d at 1229. As addressed below, the other most important factor in the preliminary injunction analysis does not weigh in favor of awarding an injunction; therefore, the RMA Group Plaintiffs have the burden to demonstrate a strong likelihood of success on the merits.

The RMA Group Plaintiffs contend that they are likely to succeed in establishing that Delunas's continued operation of the Offending U.S. Web Site violates the Lanham Act's prohibition against unfair competition because the Offending U.S. Web Site results in actual customer confusion.[24] As evidence of this confusion, the RMA Group Plaintiffs point to emails Delunas forwarded to the

---

[24] The RMA Group Plaintiffs also make arguments regarding the likelihood of success on the other counts contained in the Complaint. However, the two counts most pertinent to the relief sought by way of the instant Motion for Preliminary Injunction are the Lanham Act count (Count I) and the CFAA count (Count II). Because the Court has determined that the CFAA count does not withstand Defendants' Motion to Dismiss, *see supra*, the Court only touches upon the arguments raised in connection with Count I.

The Court further notes that some of the requested relief – primarily as it relates to the requests for documents – seems to be a proper subject for the discovery phase of the proceedings.

49

current Country Manager during a brief thawing in tensions occurring around the time of some settlement discussions.  These emails support the RMA Group Plaintiffs' confusion argument as the emails were seeking services from the RMA Group Plaintiffs but were sent to Delunas (who uses the same email he used when the Country Manager of Afghanistan), not to the actual Country Manager.

Although the Court previously determined that the Complaint sufficiently stated a cause of action for violation of the Lanham Act such that the count survived Defendants' Motion to Dismiss, *see supra*, the Court does not believe that the RMA Group Plaintiffs have demonstrated a strong likelihood of success on the merits given the number of important factual discrepancies between the parties' positions regarding the ownership of the RMA Afghan Entities.[25]  This factor, therefore, does not weigh in favor of issuing a preliminary injunction.

**2.    *The RMA Group Plaintiffs Have Not Demonstrated Irreparable Harm.***

To demonstrate irreparable harm, the RMA Group Plaintiffs must show that "they will suffer 'actual and imminent harm' rather than harm that is speculative or

---

[25] For instance, Defendants contend that Delunas operates the Offending U.S. Website, which is owned by RMAA, in his capacity of President of RMAA. The RMA Group Plaintiffs, on the other hand, argue that any ownership interest Delunas once possessed in RMA became extinguished upon the termination of the RMA Afghan Country Manager Agreement.  If this Court were to issue a preliminary injunction ordering that Defendants stop operating the website and relinquish control over various communications sent to the website, it would, in effect, be issuing an opinion on the merits of this dispute without a well-developed factual record.  This the Court will not do.

50

unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (quotation omitted).  Although the RMA Group Plaintiffs suggest that continued operation of the Offending U.S. Web Site will result in irreparable harm in the form of "[l]oss of good will, client trust, confidence and confidentiality and competitive advantage . . . for which there is no adequate remedy at law[,]" the Court is not persuaded that the RMA Group Plaintiffs have satisfied their burden of showing that such alleged harm is actual and imminent.  (RMA Group Pls.' Br. 14, ECF No. 42 (quotation omitted).)

Defendants convincingly argue that the RMA Group Plaintiffs' delay in moving for a preliminary injunction precludes a finding of irreparable harm.  In the Complaint, the RMA Group Plaintiffs allege that Delunas ceased to be affiliated with them in March of 2011 but has nevertheless continued to operate the website to this very day.  (Compl. ¶¶ 18, 155.)  Despite arguing that the operation of this website has created an ongoing likelihood of confusion among customers and business prospects, the RMA Group Plaintiffs did not seek a preliminary injunction until November 13, 2013, over two years after the alleged employment relationship terminated.  Moreover, despite instituting the present civil action on December 13, 2012 and amending the underlying complaint on May 16, 2013, the RMA Group Plaintiffs waited until November 13, 2013 – nearly a year after filing suit and nearly six months after amending the complaint – to seek preliminary injunctive

51

relief.  In the trademark infringement context, courts have explained that

"[s]ignificant delay in applying for injunctive relief . . . tends to neutralize any

presumption that infringement alone will cause irreparable harm pending trial, and

such delay alone may justify denial of a preliminary injunction for trademark

infringement."  *CTL Logistics*, 777 F. Supp. 2d at 1071 (quoting *Blockbuster v.*

*Laylco, Inc.*, 869 F. Supp. 505, 516 (E.D. Mich. 1994) (quoting *Citibank, N.A. v.*

*Citytrust*, 756 F.2d 273, 275-76 (2d Cir. 1985))) (internal quotation marks

omitted); *see also Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.,*

*Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013) ("[A]n unreasonable delay in filing for

injunctive relief will weigh against a finding of irreparable harm.") (citation

omitted); *Wells Fargo v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 771 (E.D. Mich.

2003) (nine-month delay in seeking preliminary injunction undermined plaintiffs'

allegation of irreparable harm).  The prolonged delay in this case preponderates

heavily against a finding of irreparable harm.

For their part, the RMA Group Plaintiffs explain that courts may presume

irreparable harm once a likelihood of success has been shown on customer

confusion.  (RMA Group Pls.' Br. 14, ECF No. 42 (citing, *inter alia*, *Circuit City*

*Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999).)  Attached to the

RMA Group Plaintiffs' Motion is a Declaration of Robert Gannon, the current

Country Manager in Afghanistan, which allegedly establishes actual customer

confusion with respect to the Offending U.S. Web Site.  However, as Defendants point out in their Response, "[t]here is some controversy as to whether the presumption of irreparable harm in trademark cases survived *eBay, Inc. v. MercExchange*, 547 U.S. 388, 126 S. Ct. 1837 (2006)[,]" wherein "the Supreme Court [of the United States] held that irreparable harm does not necessarily follow from a finding of patent infringement." *CLT Logistics*, 777 F. Supp. 2d at 1072. Even if the presumption that the RMA Group Plaintiffs remains viable, it would be inappropriate to apply the presumption in this case given the lingering factual questions surrounding ownership of and right of access to the website as well as the lengthy delay in seeking injunctive relief and the possibility that monetary damages would sufficiently rectify any harm the RMA Group Plaintiffs experience while the Court is able to adjudicate this dispute on the merits.

For the reasons above, this preliminary injunction factor, like the first factor discussed above, disfavors injunctive relief.

### C.   Conclusion

The Court does not believe that the RMA Group Plaintiffs have demonstrated a strong likelihood of success on the merits or that they have demonstrated irreparable harm.  Because preliminary injunctions involve the exercise of a power to be applied only in circumstances clearly demanding it, and

because the RMA Group Plaintiffs have not demonstrated that this is such a case, the Court denies the RMA Group Plaintiffs' Motion for Preliminary Injunction.

## III.   THE WHITCRAFT THIRD PARTIES' MOTION TO DISMISS THIRD-PARTY COMPLAINT

Third-Party Defendants Mark and Tom Whitcraft (the "Whitcraft Third Parties") have moved this Court to dismiss Defendants Delunas and Wahab's claims against them and therefore dismiss them from this action.  (Whitcraft Third Parties' Mot., ECF No. 36.)  The Whitcraft Third Parties first argue that dismissal is proper pursuant to Federal Rule of Civil Procedure 12(b)(2) because the Court lacks personal jurisdiction over them.  In the alternative, the Whitcraft Third Parties contend that the allegations made against them in the Third-Party Complaint fail to state a claim upon which relief can be granted and that dismissal is therefore proper pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A.   Procedural Background

In answering the RMA Plaintiffs' Complaint, Delunas and Wahab filed a Counter-Complaint against Plaintiffs Kevin, RMA-HK, and RMA-ME as well as a Third-Party Complaint against two additional defendants: Mark Whitcraft and Tom Whitcraft.  In the Counter-Complaint/Third-Party Complaint, Delunas and Wahab have pleaded the following counts: Count I – Breach of Partnership Agreement

(against all Whitcraft Defendants[26] and/or RMA-HK); Count II – Breach of

Fiduciary Duties in Connection with Partnership Agreement (against Whitcraft

Defendants and RMA-HK); Count III – Breach of Fuel Partnership (against

Whitcraft Defendants and RMA-HK); Count IV – Breach of Fiduciary Duties in

Connection with Fuel Partnership Agreement (against Whitcraft Defendants and

RMA-HK); Count V – Accounting; Count VI – Common Law and Statutory

Conversion; Count VII – Promissory Estoppel (plead in the alternative); Count

VIII – Unjust Enrichment (plead in the alternative); and Counts IX through XI –

Breach of Contract – plead in the alternative against the Whitcrafts and RMA-HK.

(ECF No. 19.)  The Whitcraft Third Parties seek dismissal of these counts against

them pursuant to Rule 12(b)(2).

## B.    Jurisdictional Facts

Mark, the father of Kevin and Tom, is a United States citizen residing in the

Kingdom of Thailand pursuant to a permanent resident permit.  (Whitcraft Third

Parties' Br. 2, ECF No. 36.[27])  In 1958, after serving in the United States military

in the Korean War, Mark obtained a job with Goodyear which required that he

move to Thailand.  (*Id.* at 3.)  Mark has resided in Thailand continuously since

---

[26] The "Whitcraft Defendants" refers to Kevin, Mark, and Tom.

[27] The jurisdictional facts stated herein are set forth in separate Declarations filed by both Mark and Tom.  The Court cites to the Whitcraft Third Parties' Brief which in turn cites the two Declarations.

1958 with the exception of a two year period (1966-1968) spent in Hong Kong.
(*Id.*)  Mark does not reside in Michigan, is not registered to vote in Michigan, and
owns no real property in Michigan.[28]  (*Id.*)

Mark "started the RMA Group[]"[29] in 1985 and "was the Chief Executive
Officer of the RMA Group until approximately 1996," when his son Kevin
succeeded him in that position.  (*Id.*)  After Kevin became CEO, Mark transitioned
to Chairman of the RMA Group and became "much less involved in day-to-day
operational decisions."  (*Id.*)  Of the various entities involved in the present action,
Mark holds positions in only three: (1) RMA-HK; (2) RMA-HK's parent company,
Clipper Holdings, Ltd. ("Clipper"); and (3) Global Fleet.  Mark has served as a
director of RMA-HK since 1996 and of Clipper since 2007.  (*Id.* at 4.)  Neither
RMA-HK nor Clipper is located in Michigan.  (*Id.*)  Mark serves as both a
manager and treasurer of Global Fleet, which has its principal place of business in
Southfield, Michigan.  (*Id.*)  Mark has "no role in the day-to-day business activities
of" Global Fleet.  (*Id.*)  With respect to the RMA Afghan Entities, Mark has never
held a position with any of the companies, has never been involved in any of the

---

[28] Mark owns a single parcel of real property in the United States; it is
located in the State of Hawaii.  (Whitcraft Third Parties' Br. 3, ECF No. 36.)

[29] The Court is not entirely certain how Mark "started the RMA Group[]"
and served as its CEO given the allegations made in the Complaint that the RMA
Group "is not an actual entity[; rather, it] refers collectively to various affiliated
companies[.]"  (Compl. ¶ 5, ECF No. 8.)

day-to-day business activities of the companies, nor has he owned any stock in the companies. (*Id.*) Since the RMA Group began operations in Afghanistan, Mark traveled there only once for a three-day period in 2006. (*Id.*) Lastly, Mark alleges that he has never entered into any agreements with Delunas or Wahab, (*id.*), but this Court must accept Third-Party Plaintiffs' factual allegations regarding Mark being a part of various partnerships with Delunas as true.

Tom holds dual citizenship in both the United States and the Kingdom of Thailand. (*Id.*) He last resided in the United States in 1985 while pursuing post-secondary education. (*Id.*) Tom is not a Michigan resident, is not registered to vote in Michigan, and owns no property in Michigan. (*Id.* at 5.) Tom holds positions in the following entities: (1) RMA-HK; (2) Clipper; and (3) Global Fleet. (*Id.*) Tom has been a director of RMA-HK since 1990 and a director of Clipper since 2007. (*Id.*) With respect to the only Michigan-based entity – Global Fleet – Tom is a manager; he owns no shares and alleges that he has "no involvement in its day-to-day business activities." (*Id.*) With respect to the RMA Afghan Entities, Mark has never held a position with any of the companies, has never been involved in any of the day-to-day business activities, nor has he owned any stock in the companies. (*Id.*) Tom has never been to Afghanistan and claims that he has never entered into any agreements with Delunas or Wahab. (*Id.*) The Court, however,

must construe Third- Party Plaintiffs' allegations regarding Tom's membership in various partnerships with Delunas in their favor.

## C.   Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2)

The Whitcraft Third Parties raise a jurisdictional issue in their motion seeking dismissal.  They contend that this Court does not have personal jurisdiction over them because they have insufficient contacts with the State of Michigan to subject them to either general or limited personal jurisdiction in this Court.

### 1.   *Applicable Law*

When reviewing a Rule 12(b)(2) motion, a federal district court may proceed by relying solely on written submissions and affidavits to resolve the jurisdictional question or it may permit limited discovery or hold an evidentiary hearing in aid of the motion.  *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989) (citation omitted).  Regardless of which method a court ultimately selects, "'the plaintiff always bears the burden of establishing that jurisdiction exists.'"  *Id.* (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S. Ct. 780, 785 (1936) and *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 929 (6th Cir. 1974)).  "The weight of the plaintiff's burden, however, depends on whether the trial court chooses to rule on written submissions or to hear evidence on the personal-jurisdiction issue[.]"  *Id.*  In this case, the Court will issue a ruling on the written submissions alone as Third-Party Plaintiffs "contend that the record before

the Court is sufficient to confer personal jurisdiction over" the Whitcraft Third

Parties.[30]  (Third-Party Pls.' Resp. 8 n.1, ECF No. 46.)

When a court "rules on written submissions alone, the plaintiff may not rest

on his pleadings to answer the movant's affidavits, but must set forth, 'by affidavit

or otherwise[,] . . . specific facts showing that the court has jurisdiction." *Serras*,

875 F.2d at 1214 (quoting *Weller*, 504 F.2d at 930) (alteration in original).

Although this places some burden on Third- Party Plaintiffs, this burden is

"relatively slight[,]" *American Greetings Corp. v. Cohen*, 839 F.2d 1164, 1169 (6th

Cir. 1988), and only requires "a *prima facie* showing that personal jurisdiction

exists in order to defeat dismissal[,]" *Theunissen v. Matthews*, 935 F.2d 1454, 1458

(6th Cir. 1991).  Further lessening the burden is the rule that courts must consider

the pleadings and affidavits in the light most favorable to the party seeking to

establish jurisdiction.  *Theunissen*, 935 F.2d at 1459.

Personal jurisdiction over an out-of-state defendant arises from "certain

minimum contacts with [the forum] such that maintenance of the suit does not

offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v.*

---

[30] Delunas and Wahab "believe that there exist other, and as of yet undiscovered, contacts and connections between [the Whitcraft Third Parties] and the State of Michigan.  As a result, [they] request the opportunity to conduct limited jurisdictional discovery if the Court" is inclined to grant the Whitcraft Third Parties' Motion to Dismiss.  (Third Party Pls.' Resp. 8-9 n.1, ECF No. 46.) The Court does not believe that additional discovery is warranted and therefore denies this request.

*Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945) (quotation omitted).

Personal jurisdiction takes two forms: general personal jurisdiction and specific or

limited personal jurisdiction.  A court applies principles of general jurisdiction

when a claimant's cause of action is unrelated to a defendant's in-state activities.

*Helicopteros Nactionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 n.9, 104 S.

Ct. 1868, 1872 n.9 (1984) (citation omitted).  Specific jurisdiction is applied when

a claimant's cause of action arises out of specific instances of a defendant's

conduct, such as a defendant's business transactions, within the forum state.  *Id.* at

414 n.8, 104 S. Ct. at 1872 n.8.  In the instant dispute, Third- Party Plaintiffs seek

to invoke the doctrine of specific jurisdiction, as evidenced by their argument that

the Whitcraft Third Parties are amenable to jurisdiction pursuant to Michigan

Compiled Laws § 600.705.[31]

-----

[31] Michigan Compiled Laws § 600.705, captioned "Limited personal jurisdiction over individuals[,]" provides, in pertinent part:

> The existence of any of the following relationships between an individual or his agent and the state shall constitute a sufficient basis of jurisdiction to enable a court of record of this state to exercise limited personal jurisdiction over the individual and to enable the court to render personal judgments against the individual or his representative arising out of an act which creates any of the following relationships:

> (1)   The transaction of any business within the state.

> (2)   The doing or causing an act to be done, or consequences to occur, in the state resulting in an action for tort. . . .

Where, as here, subject matter jurisdiction arises out of a federal question, "personal jurisdiction over a defendant exists 'if the defendant is amenable to service of process under the [forum] state's long-arm statute and if the exercise of personal jurisdiction would not deny the defendant[] due process.'" *Bird v. Parson*, 289 F.3d 865, 871 (6th Cir. 2002) (alterations in original) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992)). Because "[t]he Michigan Supreme Court has construed Michigan's Long-Arm Statute to bestow the broadest possible grant of personal jurisdiction consistent with due process," "the two questions become one." *Innovation Ventures, LLC v. N2G Distributing, Inc.*, 635 F. Supp. 2d 632, 636 (E.D. Mich. 2008) (alteration in original) (quotations omitted).

In order to comport with the strictures of the Due Process Clause, this Court must determine whether the Whitcraft Third Parties have sufficient "minimum contacts" with the State of Michigan such that haling them into this Court comports with "'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316, 66 S. Ct. at 158 (quotation omitted). The United States Court of Appeals for the Sixth Circuit has set forth the following three criteria that

---

(5)   Entering into a contract for services to be rendered or for materials to be furnished in the state by the defendant.

(6)   Acting as a director, manager, trustee, or other officer of a corporation incorporated under the laws of, or having its principal place of business within this state. . . .

61

must be satisfied before a court exercises personal jurisdiction over a non-

consenting out-of-state defendant:[32]

> First, the defendant must purposely avail himself of the privilege of
> acting in the forum state or causing a consequence in the forum state.
> Second, the cause of action must arise from the defendant's activities
> there.  Finally, the acts of the defendant or consequences caused by
> the defendant must have a substantial enough connection with the
> forum state to make the exercise of jurisdiction over the defendant
> reasonable.

*Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968);

*see also Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 150 (6th Cir.

1997) ("Although not the last word on personal jurisdiction, the *Mohasco* test

continues to provide a useful starting point for analyzing jurisdictional questions of

the sort presented here.") (citations omitted).

## 2.   *Application of the* **Mohasco** *Factors*

"The *Mohasco* [C]ourt called purposeful availment the '*sine qua non* for *in*

*personam* jurisdiction.'"  *Kerry Steel*, 106 F.3d at 150 (quoting *Mohasco*, 401 F.2d

at 381-82).  Pursuant to authority from the Supreme Court of the United States,

purposeful availment means that an actor has taken advantage "of the privilege of

conducting activities within the forum State, thus invoking the benefits and

---

[32] The Court notes that the Whitcraft Third Parties have not consented to
jurisdiction; the instant motion constitutes a limited appearance and does not,
therefore, imply any such consent.  (Whitcraft Third Parties' Br. 8-9, ECF No. 36.)

protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 2183-84 (1985) (quotation omitted).

Third- Party Plaintiffs contend that the Whitcraft Third Parties are subject to this Court's jurisdiction because "it is entirely reasonable and foreseeable that one who forms, owns, manages, operates, and controls a multi-million dollar company with its princip[al] place of business in Michigan may be subject to a lawsuit in this State as a result of the operations of that company." (Third-Party Pls.' Resp. 17, ECF No. 46 (citations omitted).) In other words, Third-Party Plaintiffs suggest that the Whitcraft Third Parties have purposefully availed themselves of the benefits and protections of Michigan law and can therefore be subjected to suit.

Third-Party Plaintiffs' argument is unavailing as the Whitcraft Third Parties' purportedly wrongful conduct is divorced from their roles with Global Fleet and, therefore, does not satisfy the requisites of either the Due Process Clause or Michigan Compiled Laws § 600.705. In other words, contrary to the arguments suggesting otherwise, the mere fact that, for example, Global Fleet conducts business in Michigan does not mean that its managers are amenable to suit in Michigan for conduct unrelated to their roles as managers of Global Fleet.[33] Thus, while Third-Party Plaintiffs' argument regarding Mark and Tom's purposeful availment of Michigan opportunities is arguably true in the context of conduct

---

[33] As explained above, the finding of jurisdiction in such a circumstance would be pursuant to the principle of general, not specific, jurisdiction.

63

related to their role as managers of Global Fleet, the same is not true here for the reasons explored more fully immediately below.

The second *Mohasco* factor is the real problem for Third-Party Plaintiffs as the causes of action pleaded in the Third-Party Complaint do not arise from the Whitcraft Third Parties' Michigan activities. *Mohasco*, 401 F.2d at 381. Third-Party Plaintiffs contend that the Whitcraft Third Parties' decision to establish Global Fleet, a closely-held limited liability company, and to locate Global Fleet's principal place of business in Southfield, Michigan supports a finding of personal jurisdiction. (Third-Party Pls.' Resp. 15, ECF No. 46.) This is so because both Mark and Tom are managers of Global Fleet and, as evidenced by Global Fleet's Operating Agreement, the managers (of which there are three in total) exercise exclusive authority and discretion regarding Global Fleet's business activities. (*Id.*) Further, Mark, as Treasurer of Global Fleet, is an officer. (*Id.*) Assuming that these roles are sufficient for this Court to exercise limited personal jurisdiction over these individuals, Third-Party Plaintiffs do not seem to appreciate that the allegations in the Third-Party Complaint are completely untethered from Global Fleet's conduct or any conduct Mark and Tom engaged in in connection with Global Fleet.

Although Third-Party Plaintiffs contend that the Whitcraft Third Parties caused Global Fleet "to make significant sales of goods with a final destination of

64

Afghanistan" and that Delunas was deprived of "his share of profits generated by these sales[,]" the alleged agreement regarding the apportionment of profits was, according to the Third-Party Complaint, contained in a Partnership Agreement that Delunas entered into with Kevin and the Whitcraft Third Parties, *not* an agreement with Global Fleet.  (*Id.*)  While Third-Party Plaintiffs have alleged breaches of various partnership agreements, these agreements were not entered into in Michigan.  Moreover, the work to be performed pursuant to the alleged partnership agreements arouse out of business to be performed in Afghanistan, not Michigan. Further, the fact that Mark and Tom are managers of Michigan-based Global Fleet (one of the RMA Group Plaintiffs) does not *ipso facto* make jurisdiction proper, particularly in light of Third-Party Plaintiffs decision not to name Global Fleet as a counter-defendant and the concomitant absence of any allegations against Global Fleet.  Although Third-Party Plaintiffs argue that Mark and Tom are named because they are part of the alleged partnerships and Global Fleet is not, as the Whitcraft Third Parties suggest in their Brief, "[i]f the entity that is alleged to be the basis of the Whitcraft Third Parties' jurisdictional ties to the forum is not relevant to the Third-Party Plaintiffs' claims, neither are its officers, directors, managers, or shareholders."  (Whitcraft Third Parties' Br. 15-16, ECF No. 36.) Third-Party Plaintiffs' justifications for finding personal jurisdiction are simply too attenuated to satisfy the demands imposed by the Due Process Clause.

65

For the reasons elucidated above, this Court lacks personal jurisdiction over both Mark and Tom and dismissal of the claims made against these parties is proper pursuant to Federal Rule of Civil Procedure 12(b)(1).[34]  Accordingly, the Court grants the Whitcraft Third Parties' Motion to Dismiss and Mark and Tom are dismissed from the present action.[35]

## IV.    THE RMA COUNTER-DEFENDANTS' MOTION TO STRIKE

The fourth, and final, motion pending before the Court is the RMA Counter-Defendants'[36] Motion to Strike filed on September 25, 2013 pursuant to Federal Rule of Civil Procedure 12(f) and Federal Rule of Civil Procedure 408.  (ECF No. 26.)  In this motion, the RMA Counter-Defendants ask this Court to strike paragraphs 47, 54, 55, and 56 from the Counter-Complaint on the grounds that the content is immaterial and impertinent pursuant to Rule 12(f) because the facts alleged in the paragraphs, if sought to be introduced at trial, would be inadmissible

---

[34] Because the Court grants the Whitcraft Third Parties' Motion to dismiss on jurisdictional grounds, the Court declines to analyze alternative arguments made pursuant to Rule 12(b)(6).

[35] The Whitcraft Third Parties' Motion to Dismiss is the sole motion before the Court challenging the sufficiency of the Counter-Complaint/Third-Party Complaint.  As such, the Counter-Complaint survives the pleading stage as to the counter-defendants named therein.

[36] For purposes of refreshing recollection, the RMA Counter-Defendants are Kevin Whitcraft, RMA-HK, and RMA-ME.  Plaintiffs Global Fleet and RMA Automotive are not named as counter-defendants.

pursuant to Federal Rule of Evidence 408.[37]   Counter-Plaintiffs contend that the

allegations contained in the challenged paragraphs are not inadmissible offers to

compromise and that the record is too scant to grant a motion to strike on this

basis.  (*See generally* Counter-Pls.' Resp., ECF No. 31.)

### A.   Summary of Allegations Contained in the Challenged Paragraphs

Paragraphs 47, 54, and 55 of the Counter-Complaint describe a meeting that

took place in London, England in September of 2011 between Delunas and Kevin

allegedly regarding the conduct, operation, and winding up of what Counter-

Plaintiffs describe as various partnerships Delunas entered with the Whitcraft

Defendants.[38]  (Counter-Compl. ¶ 54, ECF No. 31.)  At the September 2011

meeting, Delunas and Kevin allegedly agreed "that from July 31, 2011 forward, the

Partnership's share of the profits generated by the Fuel Partnership would be

divided as follows: 50% for [] Delunas and 50% for the Partnership, such that []

---

[37]   Rule 408(a) ("Compromise Offers and Negotiations") provides, in
pertinent part, that evidence of the following is not admissible--on behalf of
any party--either to prove or disprove the validity or amount of a disputed
claim or to impeach by a prior inconsistent statement or a contradiction:

> [Prohibited uses.] (1) furnishing, promising, or offering--or accepting,
> promising to accept, or offering to accept--a valuable consideration in
> compromising   or   attempting   to   compromise   the   claim;   and

> (2) conduct or a statement made during compromise negotiations
> about the claim . . . . .

[38] Delunas contends that his relationship with the RMA Plaintiffs was one of
partnership, not contract.

Delunas would be entitled to 25% of all profit generated by the Fuel Partnership on and after July 31, 2011." (*Id.* at ¶ 47.)   Paragraph 54 provides a series of terms that Delunas and Kevin agreed upon in connection with the dissolution and winding down of the partnerships, including the creation of the RMA Group Mitigating Entities,[39] how employees of the partnerships would be handled, and so forth. (*Id.* at ¶ 54.) Paragraph 55 describes the formation of the RMA Group Mitigating entities.

Paragraph 56 of the Counter-Complaint describes a December 12, 2012 meeting between Delunas and Kevin at which they "discuss[ed] additional terms pursuant to which the Partnership would be wound-down. Those terms included the payment by the Partnership of $8.2 million to [] Delunas to partially satisfy a portion of the obligations owed to [] Delunas by the Partnership." (*Id.* at ¶ 56.)

### B.   Standard of Review

Pursuant to Federal Rule of Civil Procedure 12(f), a "court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). As with other motions brought pursuant to Rule 12, in deciding a Rule 12(f) motion, a court "must accept the matters well-pleaded as true and should not consider matters outside the

---

[39] These entities include RMA Group Afghanistan and Global Star.

68

pleadings." *County Vanlines, Inc. v. Experian Info. Solutions, Inc.*, 205 F.R.D. 148, 152 (S.D.N.Y. 2002).

The Sixth Circuit has held that striking a pleading is "a drastic remedy" that "should be sparingly used by the courts." *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953) (citations omitted). This rule is driven by the "practical difficulty of deciding cases without a [well-developed] factual record[.]" *Id.* Animated by this concern, "[t]he motion to strike should be granted only when the pleading to be stri[c]ken has no possible relation to the controversy." *Id.* (citations omitted); *see also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892 (2d Cir. 1976) (citing cases). "Evidentiary questions . . . should especially be avoided at such a preliminary stage of the proceedings." *Lipsky*, 551 F.2d at 893.

## C.     Analysis

Before the bar of Federal Rule of Evidence 408 applies to challenged evidence, "there must first be an actual dispute concerning the validity or the amount of a claim." *ForeWord Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 U.S. Dist. LEXIS 125373, at *17 (W.D. Mich. Oct. 31, 2011) (unpublished). "Although litigation need not have been threatened, the operation of the Rule applies only where an actual dispute or difference of opinion exists." *Id.* (citing *Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 527 (3d Cir.

69

1995)).  Evidence relating to "business negotiations taking place before a dispute arises are not subject to exclusion under Rule 408."  *Id.* at *18 (citing *Walls v. First UNUM Life Ins. Co.*, 982 F. Supp. 929 (W.D.N.Y. 1997)).

Counter-Defendants contend that evidence of the facts contained in the challenged paragraphs would be inadmissible at trial pursuant to Federal Rule of Evidence 408.  As support, Counter-Defendants rely on the allegations in the Counter-Complaint acknowledging that the parties' business relationship became irreparably broken in March 2011.  (Compl. ¶ 133, ECF No. 8; Answer ¶ 133, ECF No. 19.  *But see* Counter-Compl. ¶ 51 (providing that "unlawful[]" termination of relationship occurred on June 5, 2011).)  Further, "the alleged breach by the RMA Counter-Defendants occurred before the September 2011 and the December 2012" meetings.  (Counter-Defs.' Resp. 2, ECF No. 39 (citing Counter-Compl. ¶ 53 ("[O]n June 5, 2011, [] Delunas advised the Partnership that Kevin['s] communication constituted a breach of the Partnership Agreement[.]")) (emphasis removed).)  According to Counter-Defendants, based on this chronology, a dispute between the parties had already arisen such that the September 2011 and December 2012 meetings are properly considered settlement discussions, not business negotiations as Counter-Plaintiffs contend.  (*Id.* 2-3.)

Counter-Plaintiffs, on the other hand, deny that the meetings constitute settlement discussions.  Further, even if they are, Counter-Plaintiffs contend that

70

given the lack of an evidentiary record, the Court is not well-positioned to determine whether any evidence related to these meetings will be offered for a prohibited use under Rule 408.  (Counter-Pls.' Resp. 17-18, ECF No. 31.)  Lastly, Counter-Plaintiffs suggest that the information in the challenged paragraphs set forth facts regarding the existence of a partnership and the terms relating to the winding-up of said partnership and therefore do not relate to an alleged offer to compromise.

Although the Court agrees with Counter-Defendants that the timing of the meetings (particularly the December 12, 2012 meeting, which occurred just one day before the RMA Plaintiffs instituted the present action) suggests that these meetings may have been compromise negotiations, and further agree that the Counter-Plaintiffs' argument that the meetings are directly relevant to and support the Counter-Plaintiffs' claims but that the allegations would not be used to prove or dispute the validity or amount of a disputed claim is rather circular, the Court cannot, at this juncture, reach the conclusion that the challenged paragraphs have "no possible relation to the controversy."  *Brown & Williamson*, 201 F.2d at 822. Because several opportunities remain to seek exclusion of the challenged evidence prior to the commencement of trial, the Court does not believe that granting Counter-Defendants' Motion to Strike at this time is warranted.

### D.   Conclusion

For the reasons above, the Court denies Counter-Defendants' Motion to Strike but does so without prejudice.

### V.   ORDER

For the reasons set forth herein, the Court orders as follows:

**IT IS ORDERED** that Defendants' Motion to Dismiss (ECF No. 18) is **GRANTED IN PART** and **DENIED IN PART**; specifically, Count II (CFAA) of the RMA Plaintiffs'(First Amended) Complaint (ECF No. 8) is **DISMISSED WITH PREJUDICE**, Count III (breach of contract) is **DISMISSED WITH PREJUDICE** as to the ICA Shareholder Agreement claim and the BMG Declaration of Trust claim, Count V (tortious interference with contract) is **DISMISSED WITH PREJUDICE** as to all claims save the BPA with the United States Army Regional Contracting Center and the Dynocorp fuel supply agreement, and Count VI (tortious interference with prospective business advantage) is **DISMISSED WITH PREJUDICE** against Defendant Wahab only;

**IT IS FURTHER ORDERED** that the RMA Group Plaintiffs' Motion for Preliminary Injunction (ECF No. 42) is **DENIED**;

**IT IS FURTHER ORDERED** that the Whitcraft Third Parties' Motion to Dismiss Third-Party Complaint (ECF No. 36) is **GRANTED** and that Third-Party

72

Plaintiffs **MARK WHITCRAFT** and **TOM WHITCRAFT** are **DISMISSED**

from this lawsuit;

      **IT IS FURTHER ORDERED** that Counter-Defendants' Motion to Strike

(ECF No. 26) is **DENIED WITHOUT PREJUDICE**.

Date: February 18, 2014


                    s/PATRICK J. DUGGAN
                    UNITED STATES DISTRICT JUDGE

Copies to:

**Irina Kashcheyeva, Esq.**
**Michael J. Lockerby, Esq.**
**Scott T. Seabolt, Esq.**
**Erin M. Pawlowski, Esq.**
**Jason P. Klingensmith, Esq.**
**Robert P. Zora, Esq.**
**Edward H. Pappas, Esq.**

73