UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLOBAL FLEET SALES, LLC, R.M.
ASIA (HK) LIMITED, RMA MIDDLE
EAST FZE, RMA AUTOMOTIVE CO.,
LTD. and KEVIN ROBERT WHITCRAFT,

       Plaintiffs,

v.

LEONARD JAMES DELUNAS and
MOHAMMAD ("DAVID") WAHAB,

       Defendants,

_____/

LEONARD JAMES DELUNAS and
and DAVID WAHAB

       Defendants/Counter-Plaintiffs,

v.

KEVIN ROBERT WHITCRAFT, R.M. ASIA
(HK) LIMITED, and RMA MIDDLE EAST
FZE,

       Plaintiffs/Counter-Defendants.

Case No. 12-15471
Honorable Laurie J. Michelson
Magistrate Judge R. Steven Whalen

---

**OPINION AND ORDER GRANTING COUNTER-DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS [122]**

---

This is a complicated contractual dispute arising from the 2011 breakdown of the business relationship between Kevin Whitcraft and Leonard Delunas, who in 2002 agreed to sell various goods and services together to the United States military and others in Afghanistan. Presently before the Court is a motion for judgment on the pleadings as to just one of the nearly 20 counts that the parties have asserted against each other.

By way of background, in 2012, Whitcraft and various companies associated with him filed a multi-count complaint against Delunas and his associate, Mohammad Wahab. Whitcraft claims that when Delunas was under contract to manage their business operations in Afghanistan, he siphoned corporate funds for personal use and engaged in self-dealing. Whitcraft also says that once their relationship ended, Delunas and Wahab refused to hand over control of his companies' assets in Afghanistan and that Delunas improperly continued to hold himself out as their authorized representative. (*See generally* Dkt. 8, Am. Compl.)

Delunas and Wahab (Counter-Plaintiffs) filed a counterclaim against Whitcraft and two of his companies, claiming that Delunas and Whitcraft had actually formed a partnership back in 2002. Delunas says Whitcraft and his companies (Counter-Defendants) breached the partnership agreement by trying to oust him. And, according to Delunas, though he abided by the terms they had set to dissolve the partnership, Whitcraft has failed to pay Delunas a fair share of the partnership's profits and assets. (*See generally* Dkt. 19, Counterclaim.)

One of Counter-Plaintiffs' counterclaims is a common law and statutory conversion claim under Michigan law. Counter-Defendants have moved to dismiss that claim as a matter of law pursuant to Federal Rule of Civil Procedure 12(c). (Dkt. 122, Defs.' Mot.) After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motion. *See* E.D. Mich. LR 7.1(f)(2). The Court agrees that Counter-Plaintiffs' conversion claim must be dismissed as a matter of law.

**I.**

**A.**

Since the 1990s, Leonard Delunas has had a social and business relationship with the Whitcraft family, including Mark Whitcraft and his sons Kevin and Thomas. (Counterclaim

¶¶ 13–15.) Of the three Whitcrafts, only Kevin Whitcraft remains as a defendant to Delunas's claims. (*See* Dkt. 55.) The Whitcraft family has pursued a trading business in Southeast Asia through a group of companies they formed under the umbrella of the RMA Group, which includes Counter-Defendants RMAHK and RM Middle East. (Counterclaim ¶¶ 16–18.)

Delunas claims that in March 2002 he formed a partnership agreement with the three Whitcrafts. (*Id.* ¶ 21.) They agreed to do business together in Afghanistan, including importing, selling, and maintaining generators, vehicles, and heavy equipment, and "general trading." (*Id.* ¶ 22.) They eventually expanded into other areas of business, including fuel supply. (*Id.* ¶ 23.)

Though the alleged partnership agreement is not in writing, Delunas claims that it contained numerous detailed terms. Among those alleged terms, Delunas and the three Whitcrafts agreed to each have an equal 25% share of the partnership's profits and losses. (*Id.* ¶ 24.) The profit would "include all revenue generated by any entity affiliated, in any manner, with the RMA Group from business in or relating to Afghanistan, as well as any legal entity or unincorporated association established or to be established by the Partnership to conduct business in or relating to Afghanistan." (*Id.*) The alleged agreement also entitled each partner to "true, complete and accurate accounts" of the partnership's finances and access to the partnership's books and records. (*Id.*) The partners also allegedly agreed to specific terms concerning the possible termination of the partnership: (1) "The Partnership would continue until such time as the Partners mutually agreed to dissolve and wind down the Partnership in accordance with governing law and the terms of the Partnership Agreement"; and (2) "Upon dissolution and the winding down of the Partnership, the assets of the Partnership in or relating to Afghanistan (or the cash value of such assets) would be divided equally between the four Partners." (*Id.*) Finally, the partners allegedly agreed that the Whitcrafts owed Delunas several

3

specified "fiduciary duties," including a "duty to render true and accurate accounts and full information regarding all things affecting the Partnership" and a "duty to cooperate in the winding-down of the Partnership, and in particular in the realization, application and distribution of the Partnership assets." (*Id.* ¶ 25.)

Delunas and the Whitcrafts did business in Afghanistan through several entities. At first they used RMAHK as their vehicle for the business. (*Id.* ¶ 27.) They then set up a series of entities in Afghanistan, including RM Asia Afghanistan Limited (RMAA), Asia Trade & Commodities Co., Ltd. (ATC), and Global Fleet Sales Co. Ltd. (GFSA). (*Id.* ¶¶ 29, 31, 36.) Though the ownership and management structures of these entities varied (*see id.* ¶¶ 29, 32, 33, 38), the profits of all three were subject to the alleged partnership's 25% profit sharing agreement. (*Id.* ¶ 39.)

Delunas also claims that in 2005 he and the Whitcrafts, through RMAHK, formed a separate partnership with a non-party, Sadat Naderi, to supply fuel to United States military and other government operations in Afghanistan. (*Id.* ¶¶ 41–43.) Like the more general alleged partnership agreement, this one was also unwritten but allegedly contained various detailed terms. Under the alleged fuel partnership, Naderi and RMAHK shared the profits and losses equally. (*Id.* ¶ 45.) Because Delunas was entitled to 25% of RMAHK's profits via the original alleged partnership agreement, he was effectively entitled to a 12.5% share of the fuel partnership's overall profits. (*Id.*) The alleged fuel partnership agreement also had provisions entitling the partners to "true, complete and accurate accounts" of the partnership's finances and access to the partnership's books and records. (*Id.*) And similar to the main partnership agreement, Delunas claims that this partnership had two provisions detailing possible termination: (1) "The Fuel Partnership would continue until such time as the Fuel Partners

mutually agreed to dissolve and wind down the Fuel Partnership in accordance with governing law and the terms of the Fuel Partnership Agreement"; and (2) "Upon dissolution and winding of the Fuel Partnership, the assets of the Fuel Partnership would be divided between the Fuel Partners in the same proportion as profits and losses." (*Id.*) And under the alleged fuel partnership, Delunas claims that the Whitcrafts and RMAHK agreed to owe Delunas a host of fiduciary duties, similar to the ones they allegedly agreed to owe under the main agreement. (*Id.* ¶ 46.)

**B.**

In 2011, the relationship between Delunas and Whitcraft deteriorated. According to Delunas, on June 5, 2011 Whitcraft notified him over email that the Whitcrafts and RMAHK "intended to take over the day-to-day operational management and control of the Partnership business" and "vest operational management to Robert Wilson Gannon, with overall control for the Partnership Business passing from Mr. Delunas to Kevin Whitcraft." (Counterclaim ¶¶ 51–52.) Delunas claims that his same-day response, which will be discussed further below, included several specific details, including that "Delunas advised the Partnership that Kevin Whitcraft's communication constituted a breach of the Partnership Agreement" and that the "Partners should formally dissolve and wind-down the Partnership." (*Id.* ¶ 53.) Delunas also claims that he set out various requirements for how to accomplish the wind-down and dissolution. (*Id.*)

In September 2011, Delunas and Whitcraft met in London, where they allegedly "agreed" to a host of detailed terms for how to end their business relationship. (*Id.* ¶ 54.) For instance, the alleged fuel partnership would stay active "so long as the business opportunity remained." (*Id.*) But retroactive to July 31, 2011, Delunas's share of the overall fuel profits would increase from 12.5% to 25%. (*Id.*) The Counter-Defendants would also set up new entities in Afghanistan (the

NewCos) to take over the business that had been done through RMAA and ATC (the OldCos). (*Id.*) However, the OldCos "would remain active until all accounts receivable under existing contracts entered into by those entities had been paid, all accounts payable owed by those companies had been paid, and all tax returns and taxes owed by OldCos had been filed and paid." (*Id.*) The OldCos' employees would also mostly be terminated and transitioned to the NewCos. (*Id.*) The OldCos also "would notify their customers that all business (other than existing contracts) would be transferred to the NewCos in accordance with all contractual and other legal requirements (such as proper approvals of novations, assignments, etc.)." The transition from the OldCos to the NewCos would happen as soon as possible but not later than October 31, 2011. (*Id.*) Additionally, the Whitcrafts or RMAHK would purchase Delunas's and Wahab's ownership interests in the OldCos. (*Id.*) Finally, they would also pay Delunas everything owed to him under the alleged partnership agreement, including the profits due to him and 25% of the value of the partnership's assets, including the OldCos' assets. (*Id.*)

The parties implemented some of this arrangement. For instance, Counter-Defendants formed two NewCos in late 2011: RMA Group Afghanistan and Global Star Motors. (*Id.* ¶ 55.) For his part, Delunas claims that, among other things, he terminated the OldCos' staff, notified the OldCos' staff that the OldCos could not take on any new work, transferred equipment and premises from the OldCos to the NewCos, and notified customers that the OldCos were no longer taking on new business. (*Id.* ¶ 57.)

But Counter-Plaintiffs allege that Counter-Defendants "refused to participate in the process of properly winding-down the Partnership." (*Id.* ¶ 58.) And they further allege that in the process, Counter-Defendants have wronged them in several ways. First, according to Counter-Plaintiffs, "[t]he OldCos have not been properly wound-down because they have not received all

6

revenues to which they are entitled, in part because [Counter-Defendants] have diverted such revenues through the illegal and improper novation/assignment of OldCos' contracts to NewCos." (*Id*.) Second, "[Counter-Defendants] and the Partnership have failed and refused to account to Mr. Delunas for all profits received by the Partnership and Fuel Partnership, and [Whitcraft] and the Partnership have failed and refused to make all required payments to Mr. Delunas, including but not limited to Mr. Delunas' proportionate share of the value of the assets of OldCos." (*Id*.) Third, "[Mr. Whitcraft] and the Partnership have failed to purchase all shares in the OldCos." (*Id*.) Finally, Counter-Plaintiffs claim that in 2011 Counter-Defendants allegedly "without legal authority, unlawfully orchestrated the novation/assignment" of certain lease agreements that ATC had entered in 2010 and 2011 to provide trucks to the U.S. government—valued at $3 million per year—from the OldCos to the NewCos. (*Id.* ¶¶ 61–63.) Counter-Plaintiffs claim that Counter-Defendants "did so through their creation of counterfeit OldCo letterhead, counterfeit OldCo company seals and by misrepresenting themselves as officers of OldCos authorized to novate/assign the benefits of the leases agreements [sic]." (*Id*. ¶ 63.)

Overall, Counter-Plaintiffs claim that Counter-Defendants converted the following: "(1) the Profits to which Mr. Delunas is entitled pursuant to the Partnership and Fuel Partnership; (2) the value of Mr. Delunas' 25% ownership interest in the assets of the Partnership; [and] (3) the revenue and profits generated by the Leases that [Counter-Defendants] unlawfully novated/assigned to NewCos and converted for their own use and benefit." (*Id.* ¶ 94.)

## II.

### A.

As a preliminary matter, Counter-Plaintiffs ask the Court to convert the present motion into one for summary judgment and conclude "that there is at least a question of fact" on their conversion claim. (Dkt. 123, Pls.' Resp. at 11.) The Court declines to do so.

To some extent, this request stems from exhibits that Counter-Defendants attached to their motion—evidence that, to put it lightly, suggests that Counter-Plaintiffs' took some liberty in pleading the facts. In particular, Counter-Plaintiffs alleged in their counterclaim that in response to Whitcraft's June 5, 2011 email informing Delunas of the decision to transfer management to Robert Gannon, Delunas responded to Whitcraft with these very specific details:

> [1] Delunas advised the Partnership that Kevin Whitcraft's communication constituted a breach of the Partnership Agreement. . . .
>
> [2] the Partners should formally dissolve and wind-down the Partnership so as to assure the orderly transition of the Partnership Business (if any) and to deal with all accounts payable, tax filings/payments and all other liabilities;
>
> [3] that such formal dissolution and winding down should include (among others) a formal accounting of the profits and losses (if any) of the Partnership, and a determination of all amounts due and owing to Mr. Delunas;
>
> [4] that such formal dissolution and winding down should include (among others) the release and indemnification of Mr. Delunas and Mr. Wahab [who was named as an officer and registered shareholder for some of the entities the parties set up to do business in Afghanistan (*see* Counterclaim ¶ 32–33, 38)] from any and all liabilities that Mr. Delunas or Mr. Wahab had theretofore incurred on behalf of and/or in connection with the Partnership Business, including but not limited to any contractual or tax liabilities.

(Counterclaim ¶¶ 52–53.)

The actual email exchange, which Counter-Defendants have attached to their motion, reveals that Delunas's response included almost none of these details. Delunas did not expressly write that he viewed Whitcraft's message as a breach of any partnership agreement. (*See* Defs.'

8

Resp. Ex. A, B.) Delunas wrote nothing about a formal dissolution and wind-down of any partnership or "deal[ing] with all accounts payable, tax filings/payments and all other liabilities." (*See id.*) Nor did Delunas write about indemnification for himself or Wahab. (*See id.*) At most, Delunas's emails contained only some general statements about ending his relationship with Whitcraft and settling their affairs. For instance, in one June 5, 2011 email, Delunas wrote under the subject "UNWINDING BUSINESS AFFAIRS," that "I will not join you in your plan to move forward," "[m]y decision is definite," "[w]e must now unwind our business affairs," and that "[a]fter doing so, I will remain available to consult or advise the RMA Group about business in Afghanistan, as any of you, or Bob Gannon requires." (Defs.' Mot. Ex. A.) Delunas also proposed to "meet first privately to make a rough accounting of our mutual affairs and a settlement schedule" and to "make a transition plan." (*Id.*) In another email that day, Delunas wrote that "recent events require we unwind our business relationship, sooner and maybe more quickly, than I expected," and that they should have a meeting to "decide a settlement plan for our mutual affairs" and to reach a "mutual agreement of accounts and an acceptable plan how to settle those accounts." (Defs.' Mot. Ex. B.)

The Court is free to consider these emails without converting this motion to a summary-judgment motion. Federal Rule of Civil Procedure 12(d) provides, "If, on a motion under Rule . . . 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." But not all documents attached to a Rule 12(c) motion are necessarily "outside the pleadings." The Court may generally consider a document "referred to in the complaint" and "central to" a claim as "part of the pleadings." *See Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999) (citation omitted). Here, Counter-Defendants' exhibits were expressly referred to in the counterclaim,

which indicates that "on June 5, 2011, Kevin Whitcraft suddenly and unlawfully notified Mr. Delunas via e-mail, that the Whitcraft Defendants and RMAHK intended to take over the day-to-day operational management and control of the Partnership Business" and that "[i]n response, and also on June 5, 2011, Mr. Delunas advised the Partnership" of the specific details described at length above. (Counterclaim ¶¶ 51, 53.) Counter-Plaintiffs do not dispute this. Further, these emails are "central" to the counterclaim, as they detail what Delunas views as the initial breach of the alleged partnership (his ouster from a management role) and his first steps to attempt to formally unwind and dissolve the arrangement. Thus, the Court may consider these referenced emails to be part of the pleadings without converting Counter-Defendants' motion.

But Counter-Plaintiffs have also attached a host of their own exhibits relating to their conversion claims. And Counter-Plaintiffs' request to convert the motion to a summary-judgment motion is grounded in that evidence as well. But the Court sees no reason to consider the evidence that Counter-Plaintiffs have presented, so the Court will exclude it. *See Northville Downs v. Granholm*, 622 F.3d 579, 585 (6th Cir. 2010) ("It is well-established that Rule 12(c) requires only one action by the district court for the conversion to a summary judgment motion to occur: failure to exclude presented outside evidence." (internal quotation marks and citation omitted)). Even assuming that discovery has yielded factual support for Counter-Plaintiffs' conversion claim, as the Court will discuss, the claim is legally flawed because it is not "separate and distinct" from the contract claims at the heart of this dispute. Thus, Counter-Plaintiffs' exhibits do not justify converting Counter-Defendants' motion from one under Rule 12 to one under Rule 56. *See id.* at 586 (finding no reversible error in district court's failure to expressly exclude matters outside of the pleadings on a Rule 12(c) motion because, among other things, the

"claim lacks merit as a matter of law, and . . . [a]ny additional evidence would have no bearing on the underlying legal issues.").[1]

The Court therefore excludes from consideration the evidence that Counter-Plaintiffs have attached to their response and declines to convert Counter-Defendants' motion for judgment on the pleadings into a summary-judgment motion.

## B.

Motions pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c) are governed by the same standards. *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 898 (6th Cir. 2014). The Court accepts as true the non-conclusory allegations in the counterclaim and then asks whether those permit "the reasonable inference" that Counter-Defendants are "liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although this plausibility threshold is more than "sheer possibility that a defendant . . . acted unlawfully," it is not a "'probability requirement.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Whether a plaintiff has presented enough factual matter to "'nudg[e]'" its claim "'across the line from conceivable to plausible'" is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Id.* at 679–80 (quoting *Twombly*, 550 U.S. at 570).

## III.

## A.

Counter-Plaintiffs filed their state-law conversion claim in this Court pursuant to its supplemental jurisdiction under 28 U.S.C. § 1367. (*See* Counterclaim ¶ 8.) "A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum

---

[1] Counter-Plaintiffs have separately moved for summary judgment on their conversion claim, contending that the undisputed evidence establishes conversion (and their breach of partnership claims) as a matter of law. (Dkt. 133, at 4.) In response, Counter-Defendants simply relied on their arguments made in the present motion. (Dkt. 140, at 40.)

state to the same extent as if it were exercising its diversity jurisdiction." *Super Sulky, Inc. v. UnitedStates Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999).[2] "[F]ederal courts sitting in diversity apply state substantive law and federal procedural law." *Saab Auto. AB v. Gen. Motors Co.*, 770 F.3d 436, 440 (6th Cir. 2014) (internal quotation marks and citation omitted); *see also Hanna v. Plumer*, 380 U.S. 460, 465 (1965). When deciding issues of substantive law, this Court must apply the law of the state's highest court. *Id.* If the state's highest court has not decided the applicable law, the state law must be ascertained "'from all relevant data,' which includes the state's appellate court decisions." *Id.* (quoting *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995)).

Counter-Plaintiffs assert their conversion claim under two sources of Michigan law. Conversion under Michigan common law is "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 606 (Mich. 1992). Counter-Plaintiffs also seek damages under Michigan Compiled Laws § 600.2919a, which provides a treble damages remedy for conversion—requiring the additional showing that "the defendant employed the converted property for some purpose personal to the defendant's interests." *Aroma Wines & Equip, Inc. v. Columbian Distribution Servs., Inc.*, 871 N.W.2d 136, 149 (Mich. 2015).

The thrust of Counter-Defendants' motion for judgment on the pleadings is that this is a dispute over what the parties owe each other under contractual obligations—partnership

---

[2] The parties dispute whether the law of Afghanistan or Michigan should apply to determine whether a partnership agreement existed. But Counter-Plaintiffs have pled in the alternative that if an enforceable partnership agreement did not exist, an enforceable contract did. As the counterclaim is therefore grounded in the notion that the parties reached an enforceable agreement in one form or another, the Court need not determine at this time what the nature of that agreement was or what law applies for that determination.

agreements or otherwise—and that a conversion claim, because it is a tort claim, is thus inappropriate. The Court agrees.

## B.

Under Michigan law, generally a plaintiff cannot "maintain an action in tort for nonperformance of a contract." *Ferrett v. Gen. Motors Corp.*, 475 N.W.2d 243, 247 (Mich. 1991) (citation omitted); *see also DBI Investments, LLC v. Blavin*, 617 F. App'x 374, 381 (6th Cir. 2015). Michigan courts look to whether the duty allegedly violated "arise[s] separately and distinctly from a defendant's contractual obligations." *Loweke v. Ann Arbor Ceiling & Partition Co.*, 809 N.W.2d 553, 559 (Mich. 2011) (citation omitted).

Under this doctrine, courts have barred conversion claims (and other torts) stemming from disputes over contractual rights. For example, in *Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 772 (E.D. Mich. 2014) (Lawson, J.), a group of investors asserted a conversion claim against defendants who had agreed to manage and repair certain Detroit homes that the defendants had allegedly fraudulently sold to the investors. The investors claimed that "in an effort to conceal the fraudulent scheme, the defendants charged the plaintiffs for repairs that were never made and court fees and eviction costs even though no one lived at the properties." *Id*. at 789. The court held that such allegations "do[] not state a cause of action for conversion" because the investors alleged no "separate duty." The court reasoned:

> [The investors' claim of false repair charges and court fees] states no more than that the defendants did not live up to their property management obligations. If it were not for the parties' management agreement, the defendants would have had no legal obligation to make repairs or initiate legal proceedings. The gravamen of their complaint is that the defendants failed to manage the properties in conformity with the parties' contractual agreement and charged the plaintiffs for management services that were unnecessary or never completed.

*Id.*

Courts have also barred similar claims under a related doctrine called the "economic loss doctrine." As the Michigan Supreme Court has explained in the products liability context, "The economic loss doctrine, simply stated, provides that where a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only economic losses." *Neibarger v. Universal Cooperatives, Inc.*, 486 N.W.2d 612, 615 (Mich. 1992) (internal quotation marks and citations omitted). The purpose of the doctrine is to minimize the "danger that tort remedies could simply engulf the contractual remedies and thereby undermine the reliability of commercial transactions." *Huron Tool & Eng'g Co. v. Precision Consulting Servs.*, Inc., 532 N.W.2d 541, 544 (Mich. Ct. App. 1995). "The doctrine is animated by the idea that tort remedies should not bail out parties who could have anticipated losses caused by failed performance and negotiated an appropriate response." *Llewellyn-Jones*, 22 F. Supp. 3d at 778 (citing *Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 240 (6th Cir. 1994)).

For example, in *DBI Investments, LLC*, a panel of the Sixth Circuit held that the economic loss doctrine barred fraud claims arising from the dissolution of a partnership. 617 F. App'x at 382. The plaintiff—a limited partner investor in an investment fund pursuant to a limited partnership agreement—alleged that the defendant—who controlled the limited partnership—made misrepresentations about when and how the partnership could be dissolved and about certain effects of the fund's compensation structure. *Id.* at 377, 381. The Court held that "[b]ecause the allegations of fraud based on the statements about dissolution procedures and the Performance Fee are 'interwoven' with the nonperformance or foreseeable effect of contract terms, they are barred by the economic loss doctrine." *Id.* at 382. The Court reasoned that the allegations of fraud surrounding the partnership's dissolution procedure "are essentially claims

14

of nonperformance of the relevant contract provisions governing that procedure" and that the allegations concerning the compensation structure "concerns the operation of a contract provision with which both parties were directly familiar." *Id.*

Although the counterclaim allegations in this case are similar to the facts in *DBI Investments*, one issue cautions against applying the economic loss analysis as opposed to the more general "separate and distinct" analysis: no Michigan court appears to have held whether the economic loss doctrine applies to conversion claims.[3] And federal courts applying Michigan law do not uniformly agree on whether the economic loss doctrine applies to conversion claims. *Compare  Tyson v. Sterling Rental, Inc.*, 80 F. Supp. 3d 736, 742 (E.D. Mich. 2015) ("[U]nder Michigan law, the economic loss doctrine bars recovery for conversion when the underlying transaction is governed by a contract." (citing cases)), *with Gillis v. Wells Fargo Bank, N.A.*, 875 F. Supp. 2d 728, 738 (E.D. Mich. 2012) (denying motion to dismiss conversion claim in part because, "[t]he Michigan Court of Appeals has recognized . . . that '[t]he viability of the doctrine in actions for intentional torts . . . remains an unaddressed issue in Michigan.'" (citing *Huron Tool and Eng'g Co. v. Precision Consulting Services, Inc.*, 532 N.W.2d 541, 543 (Mich. Ct. App. 1995)).

---

[3] Some courts have conflated the economic loss doctrine with the "separate and distinct" principle. *See, e.g., Universal Bearing Co. v. Baker Bearing Co.*, No. 10-11142, 2010 WL 3258357, at *3 (E.D. Mich. Aug. 17, 2010) ("[T]he economic loss doctrine precludes a tort claim where there is no separate and distinct duty from a breach of contract."). Other courts have more properly characterized the economic loss doctrine as a specific application of the more general "separate and distinct" principle. *See, e.g., Metro. Alloys Corp. v. Considar Metal Mktg., Inc.*, No. 06-12667, 2007 WL 2874005, at *5 (E.D. Mich. Sept. 25, 2007) ("apart from the economic loss doctrine and the specific context in which it applies, the Michigan courts have recognized the more general principle that a mere failure to perform a contractual obligation cannot support an action in tort, absent the 'violation of a legal duty separate and distinct from the contractual obligation.'").

In any event, the more general "separate and distinct" analysis bars Counter-Plaintiffs' conversion claim: they have failed to allege any duty separate and distinct from the alleged contractual rights in a way that would make the conversion claim actionable.

### C.

The gravamen of Counter-Plaintiffs' conversion claim is that Whitcraft, acting in concert with or through the Counter-Defendant entities (RMAHK and RMA Middle East), failed to act in conformity with the alleged partnership agreement.

The counterclaim asserts that Counter-Defendants are liable for conversion in three different ways, each of which is interwoven with an alleged contractual right. First, Counter-Plaintiffs allege that the Counter-Defendants converted "the Profits to which Mr. Delunas is entitled" under the two alleged partnerships—the general Afghanistan business and the fuel business. (Counterclaim ¶ 94.) But that is exactly what Delunas claims he was entitled to under the partnership agreements (or in the alternative, enforceable contracts): 25% of the main partnership's profits and 12.5% of the fuel partnership's profits (eventually increased to 25%). (*See id.* ¶¶ 24, 45, 47.) Second, Counter-Plaintiffs allege that Counter-Defendants converted "the value of Mr. Delunas' 25% ownership interest in the assets of the Partnership." (*Id.* ¶ 94.) This also corresponds directly to an alleged contractual right: Counter-Plaintiffs allege the partners agreed that "[u]pon dissolution and the winding down of the Partnership, the assets of the Partnership in or relating to Afghanistan (or the cash value of such assets) would be divided equally between the four Partners." (*See id.* ¶ 24.) Finally, Counter-Plaintiffs allege that Counter-Defendants converted the "*revenue and profits*" of certain leases that they "unlawfully novated/assigned to NewCos" from the OldCos. (*Id.* ¶ 94 (emphasis added).) To reiterate, the alleged partnership agreement entitled Delunas to a share of the profits of the partnership's

16

business in Afghanistan. (*Id.* ¶ 24.) And under that arrangement, it was apparently immaterial which RMA entity—an RMA affiliate, OldCo, NewCo, or otherwise—originated the revenues: Counter-Plaintiffs claim that a key provision of the partnership agreement was that the profit share was sweepingly based on "all revenue generated by any entity affiliated, in any manner, with the RMA Group from business in or relating to Afghanistan, as well as any legal entity or unincorporated association established or to be established by the Partnership to conduct business in or relating to Afghanistan." (*Id.*)

Counter-Plaintiffs have failed to identify any duty distinct from these alleged contractual rights that would have compelled Counter-Defendants to give Delunas the profits, revenues, and assets that were allegedly converted. In urging that the conversion violated duties separate and distinct from contractual rights, Counter-Plaintiffs cite only duties arising from the alleged partnership arrangement: the fiduciary duties partners owe to one another and the statutory duty for partners to account to one another. (Pls.' Resp. at 22.) However, Counter-Plaintiffs alleged in their counterclaim that the alleged partners agreed to owe Delunas these very fiduciary duties as part of the main partnership agreement and fuel partnership agreement: the other partners allegedly "agreed" to owe Delunas several "fiduciary duties," including a "duty to render true and accurate accounts," a "duty to account to Mr. Delunas for any benefit derived from any transaction concerning the [partnerships]," and a "duty to cooperate in the winding-down of the [partnerships], and in particular in the realization, application and distribution of the [partnerships'] assets." (Counterclaim ¶¶ 25, 46.)

Even putting aside Counter-Plaintiffs' express allegations that these duties were owed under the alleged agreements, a Michigan court would be unlikely to find that the statutory or common law duties arising from a partnership agreement are separate and distinct from any

contractual duties. As the Michigan Court of Appeals explained in a case where it rejected a claim for exemplary damages stemming from a partnership dispute:

> If it were to be assumed that a partner's breach of his fiduciary duty or appropriation of partnership equipment and business contract to his own use and profit are torts, it is clear that the duty breached arises from the partnership contract. One acquires the property interest of a co-tenant in partnership only by the contractual creation of a partnership; one becomes a fiduciary in partnership only by the contractual undertaking to become a partner. There is no tortious conduct here existing independent of the breach of the partnership contract.

*Gilroy v. Conway*, 391 N.W.2d 419, 423 (Mich. Ct. App. 1986); *see also Urbain v. Beierling*, 835 N.W.2d 455, 460 (Mich. Ct. App. 2013) (per curiam) ("In *Gilroy* . . . this Court clearly articulated that the fiduciary duty between partners arises only from the partnership agreement.") Moreover, these fiduciary duties, standing alone, would not have compelled Counter-Defendants to turn over to Delunas the revenues, profits, or assets of their business in Afghanistan.

The other problem for Counter-Plaintiffs' conversion claim is that everything they claim was converted—"the profits to which Mr. Delunas is entitled," the "value of Mr. Delunas's 25% ownership interest," and the "revenue and profits" of the leases (*see* Counterclaim ¶ 94)— amounts to nothing more than money. Under Michigan law, "It is clear that when the dispute is over moneys owed, conversion is only applicable in cases involving money that is the property of one party but held by another party (e.g., bank accounts, trusts, etc.) which is then wrongfully taken." *Sudden Serv., Inc. v. Brockman Forklifts, Inc.*, 647 F.Supp.2d 811, 815–16 (E.D. Mich. 2008) (citing cases); *see also Garras v. Bekiares*, 23 N.W.2d 239, 242 (Mich. 1946). The counterclaim does not lend itself to the conclusion that Delunas was ever in possession of the disputed funds and then handed them over and entrusted them to the Counter-Defendants.

Counter-Plaintiffs' attempts to characterize the allegedly converted property as something other than money are unpersuasive. Counter-Plaintiffs first try to style the conversion

18

claim as one concerning Delunas's "partnership interest." (Pls.' Resp. at 15.) True, under Mich. Comp. Laws § 449.26, "A partner's interest in the partnership is his share of the profits and surplus, and the same is personal property." And, at least somewhat consistent with that idea, other jurisdictions have allowed conversion claims to proceed on the theory that partnership distributions or profits were converted. *See, e.g., Surratt v. Brown*, No. 15 CVS 1551, 2015 WL 4523291, at *7 (N.C. Super. July 27, 2015) (denying motion to dismiss a claim that partner converted "profits and distributions"). But neither source of authority means that under Michigan law a conversion claim can proceed when, as here, a plaintiff alleges no violation of a duty separate and distinct from contractual rights under a partnership agreement or otherwise.

Counter-Plaintiffs also style the property allegedly converted as "partnership assets"—specifically Delunas's 25% ownership interest in the alleged partnership's assets, including the lease agreements that were allegedly converted. (Pls.' Resp. at 19.) On that note, it is true that under Mich. Comp. Laws § 449.25(1), "[a] partner is a co-owner with his partners of specific partnership property holding as a tenant in partnership," and that under § 449.25(2)(a), partners have "an equal right with [their] partners to possess specific partnership property for partnership purposes." But the only authority Counter-Plaintiffs cite to suggest that partners' co-tenancy matters here are two nineteenth century Michigan Supreme Court cases—neither of which a Michigan court has cited in the last hundred years—for the idea that one cotenant can be liable for conversion by excluding another cotenant from property. *See Williams v. Rogers*, 68 N.W. 240, 241 (Mich. 1896); *see also Bray v. Bray*, 30 Mich.479, 481 (1874). But these cases came before the Michigan Supreme Court's opinion in *Hart v. Ludwig*, 79 N.W.2d 895 (Mich. 1956), which was essentially the genesis of the separate and distinct analysis. And the Michigan Court of Appeals' subsequent discussion noted above in *Gilroy* suggests that a Michigan court would

19

not hold that partners' co-tenancy gives rise to any duty separate and distinct from the partnership agreement. *See* 391 N.W.2d at 423 ("One acquires the property interest of a co-tenant in partnership only by the contractual creation of a partnership. . . . There is no tortious conduct here existing independent of the breach of the partnership contract.").

Two other issues that Counter-Plaintiffs raise give the Court more pause—but not enough to alter the outcome. The first issue is Counter-Plaintiffs' contention that their conversion claim should not be barred because some of the allegedly culpable entities—the NewCos, RMAHK, and RMA Middle East—were not direct parties to the alleged partnership agreements. (*See* Pls.' Resp. at 23.)

To start, the NewCos are not even named in the counterclaim as Counter-Defendants, so their alleged role in the conversion does not, standing alone, make the conversion claim viable.

As for RMAHK, the counterclaim makes clear that RMAHK had obligations under the main alleged partnership and was a party to the alleged fuel partnership. For instance, the counterclaim states that under the main agreement, "[t]he Whitcraft Defendants, RMAHK and/or the Partnership would indemnify" Delunas. (Counterclaim ¶ 25.) RMAHK was also the primary entity through which the partners initially did business, and Delunas "h[e]ld himself out as the 'Regional Manager' for RMAHK." (*Id.* ¶¶ 26, 27.) Additionally, the counterclaim states that in September 2011, after Whitcraft and Delunas had their falling out, Delunas negotiated with Whitcraft "on behalf" of RMAHK and "agreed" to various terms for the potential winding down of the business, some of which expressly involved RMAHK. (*Id.* ¶ 54.) Moreover, the counterclaim asserts that RMAHK was a direct party to the alleged fuel partnership, again serving as the vehicle through which the main partnership did business. (*Id.* ¶ 44.) The counterclaim also makes various references to the original partnership agreement itself directly

including RMAHK (in the alternative that the partnership was not with the Whitcrafts directly), and the counterclaim thus names RMAHK as a Counter-Defendant for all of the breach of partnership claims. (*See*, *e.g.*, *id.* ¶ 68.)

This leaves RMA Middle East. But the counterclaim is not even clear as to what RMA Middle East's specific role was in the alleged conversion. The counterclaim alleges that RMA Middle East formed the NewCos, and "through and under the direction of the Whitcraft Defendants" (now only Kevin Whitcraft) "caused those entities to assist in . . . unlawful conversion of assets." (Counterclaim ¶ 18.) This allegation appears to relate to the leasing arrangements that ATC entered into and were novated—allegedly "unlawfully"—to the NewCos. (Counterclaim ¶¶ 61–65.) But the counterclaim asserts that the partners "agreed" to something that bears striking resemblance to this alleged conversion: "To the extent that the Defendants wished to continue the Partnership Business, they would establish new operating companies in Afghanistan (the 'NewCos') to take over the business then being transacted by and through RMAA and ATC (collectively the 'OldCos')." (Counterclaim ¶ 54.) Additionally, Delunas himself was not even a direct party to the leases prior to the alleged novation—ATC was. (*Id.* ¶ 61.) So his right to the leases' revenues, according to the counterclaim, is rooted in the alleged partnership. And as stated earlier, it appears immaterial which entity held the leases: Delunas has claimed that the partnership agreement entitled him to the Afghanistan-related profits of any RMA entity and any entity the partners set up to do business in Afghanistan, which by implication includes both ATC and RMA Middle East.

In short, while RMA Middle East may not have directly been a party to the alleged partnership, its role in the alleged conversion is indistinguishable from the contested contractual rights at issue here. Contractual rights were the only reason Delunas was entitled to a share of

21

RMA Middle East's profits. And contractual rights were also the only reason he would have had a right to any proceeds of the leases or the leases themselves to begin with. Thus, the Court sees little reason why Delunas should be allowed to maintain a conversion claim arising solely from a contractual dispute simply by naming as a defendant an entity that was not a direct party to the contracts at issue when its role in the conversion was "under the direction" of one who was, namely Whitcraft, (*see Id.* ¶ 18). *See DBI Investments, LLC*, 617 F. App'x at 382 (holding, albeit in applying the economic loss doctrine instead of the separate and distinct analysis, that a plaintiff limited partner "cannot avoid the economic loss doctrine merely by suing Defendant in his personal capacity" because while the defendant was not directly a partner, he controlled the entity that was).

As a final point, Counter-Plaintiffs maintain that they are entitled to plead conversion in the alternative because the Court has made no findings of fact as to the nature of the parties' agreement to do business in Afghanistan. (Pls.' Resp. at 12.)

Federal Rule of Civil Procedure 8(d)(3) allows parties to plead claims in the alternative. And here Counter-Plaintiffs have pled some of their claims in the alternative. For instance, Counter-Plaintiffs plead Count IX, a breach of contract claim, as follows: "This Count is pled in the alternative in the event that the Court or jury determines that the Partnership did not exist or that the terms of that partnership differed materially from those set forth above (which Counter-Plaintiffs deny)." (Counterclaim ¶ 112.) Similarly, the counterclaim states that Count X, another breach of contract claim, is "pled in the alternative in the event that the Court or jury determines that the Fuel Partnership did not exist." (*Id.* ¶ 119.) Under both of those counts, Counter-Plaintiffs asserted that if either of the partnerships are "not determined to be a legal partnership," then a "binding and enforceable contract was formed." (*Id.* ¶¶ 113, 120.) Thus, while Counter-

Plaintiffs pled in the alternative, a scenario in which no enforceable contractual rights existed is not one of the alternatives. And unlike their breach of contract claims, Counter-Plaintiffs did not plead their conversion claim in the alternative. Their conversion claim is expressly predicated on the existence of a partnership. As stated before, Counter-Plaintiffs allege that Counter-Defendants converted (along with the leases' revenues) "the Profits to which Mr. Delunas is entitled pursuant to the Partnership and Fuel Partnership" and "value of Mr. Delunas's 25% ownership interest in the assets of the Partnership." (*Id.* ¶ 94.)

In conclusion, the Court will dismiss Counter-Plaintiffs' conversion claim as a matter of law because the claim is interwoven with their breach of partnership claims or their breach of contract claims. Simply put, outside of the alleged contractual agreements at issue in this case, none of the Counter-Defendants would have had any obligation to hand over to Counter-Plaintiffs the allegedly converted property: profits of the alleged partnership, the value of the alleged partnership's assets, and profits and revenues from leases entered into during the course of the alleged partnership.

## IV.

For the reasons discussed, Counter-Defendants' Motion for Judgment on the Pleadings (Dkt. 122) is GRANTED. Accordingly, Count VI of the counterclaim is DISMISSED WITH PREJUDICE.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  June 14, 2016

23

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 14, 2016.

<u>s/Jane Johnson</u>
Case Manager to
Honorable Laurie J. Michelson