UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLOBAL FLEET SALES, LLC, R.M.
ASIA (HK) LIMITED, RMA MIDDLE
EAST FZE, RMA AUTOMOTIVE CO.,
LTD. and KEVIN ROBERT WHITCRAFT,

       Plaintiffs,

v.

LEONARD JAMES DELUNAS and
MOHAMMAD ("DAVID") WAHAB,

       Defendants,

_____/

LEONARD JAMES DELUNAS and
and DAVID WAHAB

       Defendants/Counter-Plaintiffs,

v.

KEVIN ROBERT WHITCRAFT, R.M. ASIA
(HK) LIMITED, and RMA MIDDLE EAST
FZE,

       Plaintiffs/Counter-Defendants.

Case No. 12-15471
Honorable Laurie J. Michelson
Magistrate Judge R. Steven Whalen

---

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT [129] AND GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [133]**

---

For close to a decade, the parties worked together to sell various goods and services to

the United States military and others in Afghanistan. They operated with no written agreements.

Eventually, the relationship soured.

Now, after years of litigation, the parties dispute nearly everything. They contest the

nature of their business relationship: was it a partnership agreement or instead a contract under

which Defendant Leonard Delunas agreed to serve as the "country manager" for the Afghanistan-based business operations of Plaintiffs Kevin Whitcraft and his many businesses in the RMA Group? They dispute who misappropriated funds from whom during their relationship: did Delunas siphon corporate funds for personal use, or did Whitcraft engage in years of accounting fraud to deprive Delunas of his fair share of profits? They dispute whether, after their relationship fell apart, they reached an enforceable agreement to end their business affairs: did they reach a so-called "separation agreement," or were the terms of that purported agreement simply part of ongoing negotiations? And finally, they dispute who wronged whom after they parted ways: did Whitcraft and his companies wrongfully take Delunas's assets and deprive him of profits, or did Delunas try to take Plaintiffs' business and customers?

Despite these disputes, both sides filed motions for summary judgment aimed at resolving liability on essentially all of the close to 20 remaining claims and counterclaims. The motions are extensively briefed, and the Court heard oral argument on July 18, 2016. For the reasons discussed, the Court will deny Plaintiffs' motion and grant Defendants' motion in part.

## I.

This case stems from a 2002 agreement between Defendant Leonard Delunas and Plaintiff Kevin Whitcraft to do business together in Afghanistan through various companies under the umbrella of the RMA Group—a group of companies associated with Whitcraft and his family.

### A.

Several basic facts about this business relationship are undisputed. First, the parties do not dispute the type of business they were in: importing, selling, and maintaining equipment (including generators, vehicles, and heavy equipment), and later supplying fuel and selling

products extracted or made in Afghanistan (including granite, marble, and concrete blocks).  (R. 133–9, PID 5627, 5681.) Second, the parties do not dispute that under their arrangement, Delunas was entitled to 25% of the RMA Group's profits generated from Afghanistan and was on the hook for 25% of the losses (regardless of which RMA affiliate made the profits or losses). (R. 129, PID 5005; R. 139, PID 6170.) Third, over the years, the parties formed several entities to do business in Afghanistan: RM Asia Afghanistan Limited ("RMAA"), Asia Trade & Commodities Co. Ltd. ("ATC"), and Global Fleet Sales Co. Lt. ("GFSA"). (R. 129, PID 5005; R. 139, PID 6170.) And fourth, their relationship fell apart in 2011.

Few other issues are undisputed.

## B.

The parties first dispute whether their arrangement to do business together in Afghanistan—one never reduced to writing—was a partnership or a mere contractual relationship.

Many people involved with the business referred to the arrangement as a "profit sharing" agreement. This is consistent with both a partnership and a contract. In an October 2002 email, apparently before any agreement was finalized, Kevin Whitcraft proposed a "75-25" "profit sharing arrangement" from the "core business" and "60-40" on "[g]eneral trade/new projects/other business." (R. 133–7, PID 5541.) Delunas responded that the "proposal is too good at the high end. I don't want more than each of the three of you. . . . [M]y share should be 25% across the board." (*Id.*) Whitcraft later testified, "[W]e agreed on a profit sharing agreement . . . with [Delunas] responsible to manage the business in Afghanistan." (R. 133–8, PID 5558.) Whitcraft also testified that the arrangement was a "profit and loss arrangement." (*Id.*, PID 5560.) Similarly, RMA's CFO from 2004–10, Richard Brenneisen (R. 133–10, PID 5690–91),

described the arrangement as a "profit share agreement . . . 75/25 . . . on the Afghan business," (*Id.*, PID 5695). Robert Gannon, RMA's COO in Afghanistan until he became the "country manager" in 2011 (R. 133–12, PID 5805–06), also confirmed that he understood that Delunas had a "profit share" or "shareholder" interest in the business. (*Id.*, PID 5816.)

Delunas claims that the arrangement was a partnership between Kevin Whitcraft, and two of Whitcraft's relatives—his father, Mark, and brother, Thomas. (*See*, *e.g.*, R. 133–6, PID 5526.) Others involved in the business at times described the arrangement in terms of a partnership. Brenneisen described the arrangement as a "partnership" during his deposition. (R. 133–9, PID 5700, 5704.) Carlo Crosetto, Brenneisen's successor as CFO (R. 133–11, PID 5727), also described Delunas and Whitcraft as "partners" during his testimony, (*id.*, PID 5732), and said that Whitcraft told him Delunas was a "partner," (*id.*, PID 5738). And in certain communications, Whitcraft himself referred to Delunas as his "partner," (R. 133–15, PID 5841; R. 133–17, PID 5851; R. 133–8, PID 5564), and the arrangement as a "partnership," (R. 133–14, PID 5837; R. 133–8, PID 5560–61; R. 133–18, PID 5855).

But Whitcraft claims that the arrangement was a contract—one he calls the "Country Manager Agreement," under which Delunas was obligated to run the RMA Group's business in Afghanistan in exchange for his profit and loss share. (R. 133–8, PID 5599.) Some witnesses, including Whitcraft and Gannon, testified that Delunas was the "country manager." (R. 133–8, PID 5562; R. 133–12, PID 5806.) And, as evidenced by the multitude of emails in the record, Delunas's email address that he used for RMA business in Afghanistan was "regional.manager@rmasia-ca.net." Further, in affidavits, Mark and Thomas Whitcraft stated that—contrary to Delunas's partnership theory—they were not involved in day-to-day operations

4

of any of the RMA Afghan entities, never held stock in those entities, and never entered into any agreements, partnership or otherwise, with Delunas. (R. 37, PID 753; R. 38, PID 775.)

**C.**

The parties agree that they formed several entities to do business in Afghanistan, but they to some extent dispute the scope of the obligations triggered by the entities' formation.

The parties first established RMAA. (R. 133–22, PID 5890.) Delunas was named President and Kevin Whitcraft was named Vice President. (*Id.*) According to a spreadsheet provided by Defendants, Whitcraft was the registered shareholder for 75% of RMAA's shares, and Delunas was the registered shareholder for the remaining 25%. (R. 133–23, PID 5893.) According to that same spreadsheet, RMAHK, one of the RMA Group companies, was a 75% "beneficial" shareholder, with Delunas holding the remaining 25%. (*Id.*) In their response brief, Plaintiffs state the term "beneficial shareholder" was "not defined in writing but was understood by the RMA Plaintiffs to refer to the 25% profit sharing agreement." (R. 140, PID 6463.) They cite Brenneisen's deposition testimony, but the transcript does not appear to expressly say that. (*See* R. 133–10, PID 5704.) In any event, the parties generally do not disagree on the registered and beneficial ownership percentages of RMAA or the other entities they formed. (R. 133, PID 5422; R. 140, PID 6463.)

The parties later established ATC. (R. 133–24, PID 5895.) Delunas was named President, and Defendant Mohammad Wahab was named Vice President. (*Id.*) According to Defendants' spreadsheet, Delunas was the registered shareholder of 98% of ATC's shares, and Wahab was the registered shareholder of the remaining 2%. (R. 133–23, PID 5893.) Additionally, RMAHK was the beneficial shareholder for 75% of the shares, with Delunas beneficially holding the remaining 25%. (*Id.*)

5

In 2009, the parties established GFSA. (R. 133–27, PID 5938.) Wahab was named President and non-party Zakaria Sawda was named Vice President. (*Id*.) According to Defendants' spreadsheet, Wahab was the registered shareholder for 70% of the shares, and Sawda was the registered shareholder for the remaining 30%. (R. 133–23, PID 5893.) Delunas was the beneficial shareholder for 25% of the shares, and RMA Automotive Co. Ltd. beneficially held the remaining 75% of the shares. (*Id*.)

Wahab signed two separate declarations of trust relating to his holdings of ATC's and GFSA's registered shares. (R. 133–25, PID 5897; R. 133–28, PID 5940.) Each declaration named him as the trustee. And each declaration stated that the trust was established "To transfer pay and deal with the said share(s) and all dividends and other entitlements as aforesaid in such manner as the Beneficial Owner shall from time to time direct," (R. 133–25, PID 5897; R. 133–28, PID 5940).

In addition to forming RMAA, ATC, and GFSA, the parties also established a relationship to pursue a fuel business along with non-party Sadat Naderi to supply fuel to the U.S. Army and other entities in Afghanistan. Under the fuel arrangement, at least initially, Naderi was entitled to 50% of the profits, and RMAHK was entitled to 50%, meaning under the 25% profit sharing agreement, Delunas was entitled to 12.5% of the fuel business's overall profits (i.e., 25% of RMAHK's 50% share). (R. 133–8, PID 5576; R. 133–11, PID 5757, 5766; R. 133–29, PID 5944.) Delunas testified that this fuel business amounted to a second distinct partnership agreement. (R. 133–9, PID 5650.) Whitcraft disputed during his testimony that this arrangement was a partnership or that profits from this business were treated any differently from the rest of the business in Afghanistan. (R. 133–8, PID 5563.)

**D.**

The parties accuse each other of financial impropriety during the course of their profit sharing arrangement.

Delunas claims that he often drew less money than the share he earned. Defendants cite, for example, a 2007 RMAHK general ledger, which says that Delunas's "Accrued" profit share at the time was over $4 million. (R. 133–21, PID 5886.) Whitcraft described the accrual as meaning "we would be planning that that expense is payable and due and that it was an expense incurred during that time period, and so it was accrued, but it was not physically paid." (R. 133–8, PID 5572–73.) Plaintiffs deny that Delunas took smaller draws. They cite an affidavit from their expert, who claims that from its formation through July 31, 2011, RMAA actually generated losses of $7.8 million, but Delunas still took advances of $1.1 million. (R. 141, PID 6741.)

Plaintiffs claim that Delunas mishandled the fuel business. For example, Dennis Thompson, whom they apparently brought in to handle collections, noted in an October 2011 email, "There appears to be an ongoing trend of neglect/incompetence shared to some degree by several parties in the compensation chain" and that $39 million was in arrears at the time. (R. 140–8, PID 6637.)

Plaintiffs additionally claim that Delunas siphoned money during his tenure. They again cite their expert's affidavit, who says that $30 million in fuel profits is missing. (R. 92–6, PID 2322; R. 141, PID 6746.) But Crosetto testified that this money had been recorded in RMAHK's "offshore" Afghan books and that he had made efforts to record the money "officially" in the RMA Group's financial statements. (R. 133–11, PID 5754.) Additionally, Defendants point to testimony from several RMA employees that they essentially had no evidence Delunas had

7

stolen any funds. For instance, Guy Spilborghs, who was "in control of all the cash and the banking," testified that he never believed that Delunas was siphoning off funds. (R. 133–19, PID 5872.) Similarly, Brenniesen, RMA's former CFO, testified that he had no basis to believe Delunas had siphoned money. (R. 133–10, PID 5695.) Gannon testified that no one had ever told him they believed Delunas was stealing funds. (R. 133–12, PID 5808.) Crosetto testified, "[T]o say that I have evidence about any wrongdoing, the answer is no, I don't have any evidence of that." (R. 133–11, PID 5744.) Crosetto also testified that Whitcraft never raised this issue with him. (*Id.* PID 5745.)

For his part, Delunas claims that Whitcraft cheated him out of a fair profit share throughout their relationship. Whitcraft testified that his finance staff calculated the profit share "at my direction." (R 133–8, PID 5566.) And, for instance, Crosetto testified that in December 2012 "the question that [Whitcraft] had to Pradeep, who works for me, was to basically provide any information or potential writeoffs which could have reduced the settlement of the profit sharing . . . and was asking for the potential writeoff that could have reduced the amount to be owed to Len [Delunas]." (133–11, PID 5772.) Defendants also point to a document labeled as a "how to" on calculating Delunas's share, which indicated, among other things, to "[a]djust with development cost ($1,800 per unit), and admin cost ($200 per unit)." (R. 133–44, PID 6093.) Defendants say in their brief, without any record support, that Whitcraft "could not explain the basis for the deductions." (R. 133, PID 5432.) But Whitcraft testified at length about the development cost, saying, for example, "Basically these vehicles [subject to the development cost] resulted from years of basically development on the suspension and other things and we felt it was appropriate to apply it to the . . . modified vehicles being sold in Afghanistan." (R. 133–8, PID 5586.)

**E.**

In June 2011, Delunas's relationship with Whitcraft began to fall apart. And much of the current dispute centers on negotiations, communications, and conduct surrounding the termination of their business relationship.

**1.**

In a June 5, 2011 email, Whitcraft proposed having Delunas "take on the role of Director" and "giv[ing] Bob Gannon operational management of the day to day business in Afghanistan." (R. 129–2, PID 5035.) That day, Delunas sent Whitcraft and other RMA "[s]hareholders" an email with a subject "UNWINDING BUSINESS AFFAIRS," stating, "I will not join you in your plan to move forward," "[m]y decision is definite," and "[w]e must now unwind our business affairs." (R. 129–3, PID 5039.) In another email that day, with a subject "FOR THE SAKE OF GOOD RELATIONSHIP," Delunas wrote that "recent events require we unwind our business relationship, sooner and maybe more quickly, than I expected," and he proposed a meeting "to decide a settlement plan for our mutual affairs." (R. 129–4, PID 5042.)

Discussions on how to terminate their relationship continued over email throughout the summer of 2011. For example, in a July 31, 2011 email with the subject "UNWINDING /RGannon assignment," Delunas wrote, "I plan to be back in Kabul on or about 15 Sep. That allows 45 days more – in addition to the past 20 days – to finalize a deal. If we are unable to seal a deal by then (numbers and terms – actual govt registration changes can follow quickly afterward), please make plans to reassign Bob [Gannon] to work somewhere else while the deal is finalized." (R. 129–6, PID 5048; *see also* R. 129–5, PID 5046; R. 129–7, PID 5050.)

**2.**

In September 2011, Delunas and Whitcraft met in London to discuss how to end their relationship.

Delunas's testimony confirmed the basic parameters of what he and Whitcraft discussed at this meeting. First, going forward (and retroactive to July 31, 2011), Delunas would be entitled to 50% of the parties' profits from the fuel business, upping his share of the overall fuel business's profits from 12.5% to 25%. (R. 133–9, PID 5642–43.) Second, Plaintiffs would pay Delunas his 25% share of other profits due to him under their original arrangement and 25% of the value of the assets of the entities they formed in Afghanistan. (*Id.*, PID 5644.) Third, Whitcraft and RMA would establish new operating companies (the NewCos) to take over the business being done through RMAA and ATC (the OldCos), and they made various arrangements to transition the business from the OldCos to the NewCos (*id.*, PID 5643), which will be discussed in further detail during the Court's analysis.

In his testimony, Delunas first described these terms as an "agreement" but later just as a "plan." (R. 133–9, PID 5642–43.) Defendants say the meeting in London was part of a series of ongoing negotiations. Plaintiffs maintain that these terms reflected a binding "separation agreement."

**3.**

To some extent, the record suggests that Delunas and Whitcraft started to implement what they had discussed in the September 2011 London meeting.

Communications reflect attempts to value Delunas's accrued profit share and the existing business's assets. For instance, on September 6, 2011, Whitcraft sent internally to other RMA personnel a spreadsheet apparently reflecting that the accrued profit share owed to Delunas

10

through May 2011 was $2,799,030.86. (R. 129–10, PID 5183–84; R. 130, PID 5364.) By October 11, 2011, Whitcraft sent Delunas an updated spreadsheet reflecting that Delunas's estimated accrued profit share was $2,155,092 as of July 31, 2011. (R. 139–3, PID 6282; R. 129–18, PID 5242.) Whitcraft also exchanged emails into October 2011—with Delunas and others at RMA—about valuing the OldCos' assets. (*See* R. 129–11, PID 5188; R. 129–12, PID 5191.) For example, on October 3, 2011, Spilborghs emailed Whitcraft and Delunas balance sheets from ATC, GFS, and RMAA. (R. 129–15, PID 5198.)

Various communications also reflect plans to form the NewCos and transfer employees from the OldCos to the NewCos. On September 21, 2011, Delunas wrote, "RMA Group has decided to establish two new companies (NEWCO's) to conduct operations in Afghanistan. Effective immediately stop consigning an [sic] shipments to ATC." (R. 129–14, PID 5196.) After Delunas and Whitcraft met again in Kabul (R. 133–9, PID 5662), on October 9, 2011, Delunas wrote the following to Whitcraft, Spilborghs, and various others: "In accordance with changes agreed by shareholders last Thursday, all Afghan staff employed by ATC will be terminated effective Octo 31, 2011. (Some or all will be offered positions working for NEWCO (AISA) or NEWCO (COMM)[.]" (R. 129–16, PID 5236–37.) Delunas also advised that certain actions had to be taken to accomplish that. (*Id.*) In an October 11, 2011 email to Whitcraft and others, Delunas inquired about the NewCos' registration status, noting, "We are working on an agreed schedule to complete this transfer from Oldco's to NEWCo's by Oct 31. I provided a list of activities to be completed to ensure a smooth transition for staff and customers by Oct 31." (R. 129–17, PID 5239.) Plaintiffs ultimately registered the NewCos, Global Star Motors Ltd. and RMA Group (Afghanistan) Limited, in Afghanistan sometime in late 2011. (R. 129–18, PID 5262; R. 129–19, PID 5265.) Communications also suggest that RMA started to transfer

11

employees from the OldCos to the NewCos at around that time. (*See* R. 129–21, PID 5267.) And communications further illustrate attempts to transfer certain assets from the OldCos to the NewCos. (R. 129–24, PID 5280; R. 129–25, PID 5283–84 .)

**4.**

Despite some progress toward resolution, disagreements continued throughout the transition process. For example, in November 2011, Delunas criticized the transfer of employees from the OldCos to NewCos as a "terribly flawed process by which 500 staff in Afghanistan were terminated." (R. 129–22, PID 5272–74.)  Whitcraft and Deluans also contested how to handle money in the OldCos' accounts. In a December 8, 2011 email, Whitcraft wrote this to Delunas:

> [Y]ou are not authorized to control the funds in ATC and RMAA as you see fit and as you have done. Our agreement is that all transactions post July31 are the assets of RMA 100%. Thus your actions are contrary to the agreement we made. It is RMA's responsibility to ensure there are sufficient funds available in RMAA, ATC, and GFS to run these businesses until closure - except of course direct costs incurred by you for your future business which you are for now keeping in ATC.

 (R. 129–7, PID 5289.) They also appear to have disputed how to handle amounts of money payable to the OldCos. In a December 14, 2011 email to Whitcraft entitled "TDCA / Settlement of $1.8 Mio," Delunas objected to a "haircut" that RMA Group took in collecting certain receivables due to the OldCos, writing that the "amount will definitely be to your account in our settlement." (R. 129–29, PID 5294.)

Whitcraft and Delunas also disagreed on how to divvy up the OldCos' assets. In a March 27, 2012 email with a subject "Distribution of Assets," Delunas wrote to Whitcraft, "We spoke about the value of assets and liabilities – according to an accounting that you prepared. We spoke only generally about the disposition of those assets. Never definitively. You asked that I list the assets which I will retain." (R. 129–32, PID 5316–18.) Delunas then provided a detailed list of

his understanding of which assets were his. Whitcraft responded that "this goes against the agreement we had last year and the actions we agreed to take. . . . [W]e completely disagree with your statements in this email." (R. 139–15, PID 6386.)

**5.**

Each side accuses the other of some form of misconduct after their September 2011 meeting.

Delunas claims that Plaintiffs improperly cut off his profit-share payments. For instance, he points to a March 29, 2012 email in which Whitcraft wrote, "I basically earlier in the day cut off all payments to him which were happening monthly – namely to his mother, to his girlfriend in Thailand, to his wife and to his niece." (R. 133–39, PID 6054.) But Whitcraft noted in that same email that "[u]p until now we've got roughly US$ 4 million due to him from past profit share. Plus whatever we settle on the fuel." (*Id.*) And though Whitcraft and Delunas had agreed Delunas would receive an increased share of the fuel profits after July 31, 2011, Whitcraft testified that he never paid Delunas the greater share because "the whole settlement agreement, and whether there are any amounts due or not depended on the whole closure and settlement, closure of the companies, settlement, transfer of assets and transfer of properties." (R. 133–8, PID 5601.)

Next, Delunas claims that Whitcraft "converted" funds owed to him "and used them to further RMA business or to pay dividends to the Whitcraft family and other RMA entities and shareholders." (R. 133, PID 5433.) But he mostly cites testimony standing largely for the idea that the RMA Group companies paid dividends to Whitcraft and his family, the companies' ultimate shareholders. (*See, e.g.*, R. 133–8, PID 5553–55, 5591; R. 133–10, PID, 5710–11, 5717.) Additionally, Delunas points to a spreadsheet that appears to be a list of contract numbers

13

under the heading of "assigned agreements." (*See* R. 133–41, PID 6069.) Defendants' brief says it reflects leases that ATC obtained in 2010 and 2011 to provide "leased trucks to various United States government contractors." (R. 133, PID 5430.) According to testimony from Gannon, Whitcraft directed Gannon and Crosetto to transfer those leases from ATC to RMA Group Afghanistan Limited, one of the NewCos. (R. 133–12, PID 5814–15.) An assignment agreement shows this transfer was executed in October 2011. (R. 133–42, PID 6071.) Defendants say this was "without legal authority" and that Plaintiffs have failed to account for the profits they earned under the leases. (R. 133, PID 5430.)

Delunas also claims that Whitcraft pushed him out of certain business opportunities. For instance, in comments included in a draft agreement attached to a December 2012 email, Whitcraft appears to have suggested changing the contracting entity, writing, "We don't want [Delunas and Wahab] getting their grubby hands on the deal." (R. 133–43, PID 6081.) Whitcraft also wrote to certain employees in February 2012 that Delunas "has no operational role in the fuel business," "[y]ou are to take no instructions from Len in this regard or in any other business matter of [RMAHK]" and "[t]here is no need to copy Len on communications." (R. 133–37, PID 6049.)

Plaintiffs claim that Delunas tortiously interfered with certain contracts and business relationships or expectancies. They also claim that Delunas and Wahab improperly diverted payments to themselves from the OldCos. For instance, Whitcraft expressed some concerns in a March 2012 email: "I am concerned about damages he is causing to the firm when we became aware of a game he is trying to pay [sic] – passing expenses to RMA Afghanistan; not accepting the transfer of assets to RMA Group Afghanistan; and not allowing Guy [Spilborghs] to transfer funds wrongly paid by clients to ATC back to RMHK." (R. 133–39, PID 6054.) Finally,

Plaintiffs claim that Wahab breached his two declarations of trust by failing to return his shares of ATC and GFSA after Whitcraft's request. The Court will discuss the evidence specific to these claims in its analysis below.

**F.**

Plaintiffs Kevin Whitcraft, Global Fleet Sales, LLC, RMA Middle East FZE, RMA Automotive Co., and R.M. Asia (HK) Limited filed a multi-count complaint against Defendants Leonard Delunas and Mohammad "David" Wahab in this Court on December 13, 2012 (R. 1), followed by an amended complaint on May 16, 2013, (R. 8). On August 30, 2013, Defendants answered and filed a multi-count counterclaim against Kevin Whitcraft, R.M. Asia (HK) Limited, and RMA Middle East FZE, and a third-party complaint against Thomas and Mark Whitcraft. (R. 19.)

In February 2014, U.S. District Judge Patrick J. Duggan (to whom this case had originally been assigned), granted Plaintiffs' motion to dismiss the third-party complaint in its entirety and granted in part and denied in part Defendants' motion to dismiss Plaintiffs' amended complaint. (R. 55.) A host of Plaintiffs' claims survived the motion to dismiss: (1) a Lanham Act claim against Delunas for his conduct relating to RMA's website; (2) a breach of contract claim on the theory that Delunas breached a "Country Manager Agreement" and that Wahab breached the declarations of trust relating to ATC and GFSA; (3) breach of fiduciary duty claims; (4) a claim for tortious inference with contract concerning a fuel supply arrangement; (5) a claim for tortious interference with prospective economic advantage against Delunas; and (6) an unjust enrichment claim.

Defendants' counterclaim asserts the following claims: (1) breaches of partnership on the theory that the overall arrangement and the fuel arrangement were each partnerships; (2) breach

15

of fiduciary duties on the same theories; (3) a claim for accounting on the same partnership theories; (4) conversion; and (5) alternative claims for breach of contract, promissory estoppel, and unjust enrichment in the event no partnership existed. (R. 19.)

Following the order on Defendants' motion to dismiss, the case was reassigned to the undersigned in May 2014. (R. 57–58.) After several faciliatation sessions with a third-party mediator and extensive discovery, the parties filed dispositive motions. Plaintiffs filed a motion for judgment on the pleadings as to Defendants' conversion claims (R. 122), which the Court granted (R. 155). *See Glob. Fleet Sales, LLC v. Delunas*, No. 12-15471, 2016 WL 3251764 (E.D. Mich. June 14, 2016). Plaintiffs also filed a motion for partial summary judgment to enforce a purported "separation agreement" stemming from Delunas's September 2011 meeting with Whitcraft in London. (R. 129.) Defendants also filed their own motion for summary judgment, seeking judgment as a matter of law as to all of the claims and counterclaims remaining in this case. (R. 133.)[1]

## II.

As the parties have both moved for summary judgment on claims that they have asserted and that have been asserted against them, the standard for summary judgment is two-fold.

To the extent a party seeks summary judgment on claims for which it does not bear the burden of persuasion at trial, the moving party may discharge its initial summary-judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support [the non-moving party's] case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the

---

[1] The non-moving party's response to each summary-judgment motion asks the Court to grant summary judgment on claims that were not raised in the non-moving party's own summary-judgment motion. The Court will not do so, as the local electronic filing policies and procedures prohibit combining a response with a counter-motion. *See* CM/ECF Pol. & Proc. R5(f), available at https://www.mied.uscourts.gov/PDFFIles/policies_procedures.pdf.

moving party does so, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the non-moving party's claims to a factfinder, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587.

To the extent a party seeks summary judgment on claims for which it has the burden of persuasion, the moving party's burden is greater. The moving party's showing "must be sufficient for the court to hold that no reasonable trier of fact could find other than for [it]." *See Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (citation omitted). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587.

### III.

The Court will first address Defendants' motion for summary judgment. Defendants seek summary judgment in their favor on all remaining claims in this case (their counterclaims and Plaintiffs' claims) on the issue of liability. (R. 133, PID 5402.) In their view, the sole issue for trial is how much money Plaintiffs owe Delunas and Wahab—now allegedly upwards of $100 million. (*Id.*, PID 5401.)

### A.

The Court turns first to Defendants' arguments that they are entitled to summary judgment for the breach of partnership and breach of fiduciary duty claims their counterclaim

asserts against Plaintiffs. On this record, where the parties dispute the existence of a partnership, summary judgment is unwarranted. Indeed, as Plaintiffs argue in their response, "The RMA Plaintiffs recognize that the parties dispute the specific terms of the parties' business relationship, and they certainly dispute the facts related to the breach of the terms of that relationship. . . . That is precisely why the RMA Plaintiffs have not moved for summary judgment on the breach of the parties' agreement." (R. 140, PID 6480.)

## 1.

Before turning to the merits, a threshold issue is which law applies to Defendants' partnership claims. Plaintiffs want to apply Afghan law because it purportedly contains a registration requirement that would invalidate the partnerships. Defendants argue that Michigan law controls because Plaintiffs have "previously 'argued solely in terms of Michigan' law." (R. 133, PID 5438.) As will be discussed, the parties have opted—at least implicitly—to apply Michigan law to all of the other claims—both in the counterclaim and the amended complaint. So this inquiry concerns only Defendants' partnership-related counterclaims.

At the very least, Michigan law will govern the choice of law inquiry. The parties' pleadings assert that the Court has supplemental jurisdiction over their claims relating to the nature of their business relationship (and the alleged breaches) pursuant to 28 U.S.C. § 1367. (R. 19, PID 295 ¶ 8; R. 8, PID 111 ¶ 70.) And "[a] federal court exercising supplemental jurisdiction is bound to apply the law of the forum state, including its choice of law rules." *Menuskin v. Williams*, 145 F.3d 755, 761 (6th Cir. 1998) (citation omitted).

As the Sixth Circuit has noted, "In [*Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 702 (Mich. 1995)], the Michigan Supreme Court endorsed the approach found in the Restatement (Second) of Conflict of Laws; therefore, Michigan courts balance the

expectations of the parties to a contract with the interests of the states involved to determine which state's law to apply." *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008) (internal quotation marks and citations omitted). Under the Restatement's approach, "[i]n the absence of an effective choice of law by the parties," the place of contracting is only one of several enumerated factors that inform which law should apply, which also include "the place of negotiation of the contract," "the place of performance," "the location of the subject matter of the contract," and the "domicile, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict of Laws § 188 (1971). The Restatement applies these same factors to choice of law principles to determine "[t]he rights and duties owned [sic] by partners to each other." *Id.* § 294. The Court has found no authority expressly concluding that under Michigan law these factors also apply to determine the validity of an alleged partnership agreement. But given that such an inquiry is, in essence, an inquiry into the validity of a contract, the Court will apply the Restatement's factors here.

The Court agrees with Plaintiffs that none of the Restatement's factors, standing alone, suggest that Michigan law should apply instead of Afghan law. Other than that this case was filed in Michigan and one of the various Plaintiffs is a Michigan entity, this case has almost nothing to do with Michigan. It is undisputed that the business relationship between the parties was not formed in Michigan. It was not negotiated in Michigan. Nor was most performance in Michigan. And the subject matter of the arrangement was to provide goods and services in Afghanistan, not Michigan. Still, several issues caution against applying the law of Afghanistan to Defendants' partnership claim.

First, the factors described above are not the only factors under the Restatement's approach to determine the applicable law. As the Sixth Circuit has observed, "Underlying the

19

factors set out in section 188 are the general policy considerations found in section 6." *Mill's Pride, Inc. v. Cont'l Ins. Co.*, 300 F.3d 701, 706 (6th Cir. 2002). And § 6 of the Restatement (Second) provides that in general, outside of the partnership-specific inquiry, "factors relevant to the choice of the applicable rule of law include": "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6 (1971).

The last several factors raise special concern here. For one, the Court doubts that the parties' "justified expectations" would favor the application of Afghanistan law. It is questionable that at the time the parties negotiated and formed their business relationship— partnership or otherwise—they legitimately expected to apply the law of a country that was embroiled in war and regime change. Moreover, if the Court were to apply Afghanistan law, the results would be far from certain, predicable, or uniform. Indeed, the Court has found no authority suggesting that any American federal court has applied Afghanistan law in a contract dispute such as this one. This is likely for good reason: it is far from easy to determine what the law of Afghanistan even is. Plaintiffs have cited to a PDF file entitled "Partnership Law of Afghanistan," which is available online at www.afghanembassy-uae.com/file.php?id=19&code=8c0b39e. The link appears to be a website of the Afghan Embassy with the United Arab Emirates. The document is in English and appears to contain the partnership code for Afghanistan. But nothing indicates its authenticity. Nothing on the face of the document or otherwise in the record establishes that the law was effective at the time Delunas

and Whitcraft went into business together. Furthermore, Plaintiffs' counsel do not purport to be trained in Afghan law. Yet they have provided no expert testimony on how these provisions apply in Afghanistan. *See* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."). Thus, based on what Plaintiffs have offered, the Court would be ill-equipped to apply the law of Afghanistan. Counsel for Plaintiffs conceded as much at oral argument.

As a second overarching point, throughout the course of this litigation, it appears that the parties have implicitly stipulated to the application of Michigan law to their contract-related claims. "[T]he parties to a lawsuit can, within broad limits, stipulate to the law governing their dispute." *See Cates v. Morgan Portable Bldg. Corp.*, 780 F.2d 683, 687 (7th Cir. 1985) (holding that "the parties here have impliedly stipulated to the application of Illinois law; and an implied stipulation is good enough"). To that end, Defendants cite *Anderson v. Franklin*, No. 2:09-CV-11096, 2010 WL 742765, at *7 (E.D. Mich. Feb. 26, 2010), where a magistrate judge's report and recommendation made an often repeated observation in this district: "By arguing solely in terms of Michigan, the parties have implicitly stipulated that Michigan law is controlling." Granted, in *Anderson*, no party suggested another jurisdiction's law applied instead of Michigan law. But here, though Plaintiffs indeed have urged that Afghanistan law could apply to Defendants' partnership claim, they have done so in a way that is quite inconsistent. For instance, in Plaintiffs' own summary-judgment motion, which will be analyzed below, Plaintiffs relied exclusively on Michigan law to contend that the undisputed facts established the existence of an enforceable "separation agreement" that was negotiated in London and concerned their business activities in Afghanistan. (*See* R. 129, PID 5019–26.) Yet if the undisputed facts

21

suggest anything, it is that the alleged separation agreement has about as much connection to Michigan as the parties' original arrangement to do business in Afghanistan—little to none. Plaintiffs thus seek to apply the law of Afghanistan to undermine Defendants' partnership claim but conveniently apply Michigan law to their own contract claim.

Accordingly, the Court will apply Michigan law to Defendants' partnership claims. The parties' justified expectations, the certainty, predictability, and uniformity of the result, one party's location here, as well as the lack of ease of determining the law of Afghanistan all weigh in favor of applying Michigan law. The Court recognizes that little basis exists to apply Michigan law specifically as opposed to the law of another jurisdiction less tenuously connected to the alleged partnership agreements in this dispute. But the parties have offered no alternatives, and the record is murky as to precisely when and where the alleged partnership was executed, if at all. Furthermore, because Plaintiffs have otherwise argued in terms of Michigan law for their own contract claims, the Court finds that the parties have implicitly stipulated to Michigan law.

**2.**

Turning to Defendants' breach of partnership claim, under Michigan law, "A partnership is an association of 2 or more persons . . . to carry on as co-owners a business for profit." Mich. Comp. Laws § 449.6(1). "[I]ntent to create a partnership is not required if the acts and conduct of the parties otherwise evidence that the parties carried on as co-owners a business for profit." *Byker v. Mannes*, 641 N.W.2d 210, 218 (Mich. 2002); *see also Van Stee v. Ransford*, 77 N.W.2d 346, 355 (Mich. 1956) ("[I]n the absence of an express agreement, [the parties'] acts and conduct in relation to the business are the test to be used in determining if a partnership existed." (citation omitted)).

"The determination of whether a partnership exists is a question of fact." *See McMahon v. McMahon*, No. 270477, 2007 WL 3274862, at *3 (Mich. Ct. App. Nov. 6, 2007) (citation omitted). Here, there are no documents establishing a formal partnership. Nonetheless, Defendants urge that "[t]here is no genuine dispute concerning the existence of the Partnership and the Fuel Partnership, nor is there any dispute about Mr. Delunas's respective share in each Partnership or the other relevant terms." (R. 133, PID 5440.)

Defendants' main evidence is that Delunas had a profit sharing agreement with Whitcraft. To be sure, no one disputes that. Whitcraft acknowledged during his testimony that Delunas was entitled to 25% of RMA's business in Afghanistan. (R. 133–8, PID 5566.) Likewise, no one disputes that Delunas entered a subsequent arrangement in which he was entitled to 12.5% of the overall profits from a new fuel business (later revised to 25%). Granted, under Michigan partnership law, "The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business." Mich. Comp. Laws § 449.7(4). But that does not mean a profit share is conclusive evidence of a partnership. As the statute makes clear, "The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived." *Id.* § 449.7(3).

Nor do Whitcraft's references to Delunas as a "partner" establish the existence of the partnerships. The Michigan Supreme Court has said that such labels are insignificant: "In determining whether a partnership exists, the focus is not on whether individuals subjectively intended to form a partnership, that is, it is unimportant whether the parties would have labeled themselves 'partners.'" *Byker*, 641 N.W.2d at 211; *see also Auto Indus. Supplier Employee Stock Ownership Plan (ESOP) v. Snapp Sys., Inc.*, No. 03-74357, 2006 WL 3628017, at *6 (E.D.

23

Mich. June 27, 2006), *report and recommendation adopted*, No. 03-74357, 2006 WL 3627935 (E.D. Mich. Dec. 12, 2006) ("If *Byker* has meaning in Michigan jurisprudence, and it does, it first stands for the proposition that the existence or non existence of labels has no importance.").

On this record, the absence of other typical indicia of partnerships could lead a rational trier of fact to conclude that Delunas and Whitcraft never executed a partnership agreement. For instance, Defendants cite no evidence that Delunas made any capital contribution to the partnership. *See Kilbourne v. Kilbourne*, No. 240178, 2003 WL 21977234, at *6 (Mich. Ct. App. Aug. 19, 2003) (per curiam) ("[T]he fact that Clifford Kilbourne made no capital contribution could indicate that the parties intended an employer-employee relationship[.]"). At oral argument, counsel for Defendants suggested that Delunas's presence in Afghanistan was his capital contribution, but Defendants have offered no authority to support that. Defendants also cite no evidence that any certificate of partnership was filed (pursuant to either Michigan or Afghan law). *See Gunnett v. Brooks*, No. 263838, 2007 WL 127844, at *3 (Mich. Ct. App. Jan. 18, 2007) (per curiam) ("Important indicia of a partnership include the filing of a certificate of partnership, common authority in the administration and control of the business, a common interest in the capital employed, and a sharing in the profits and losses of the business."); *see also* Mich. Comp. Laws § 449.101 ("No 2 or more persons shall hereafter be engaged in carrying on any business as copartners unless such persons shall first make and file with the county clerk of the county in which such copartnership business is or shall be located, a certificate in writing . . . ."). In addition, two of the other supposed partners—Thomas and Mark Whitcraft— maintained in affidavits that they never entered any agreement with Delunas. Under Michigan law, "A person cannot become a member of a partnership without the consent of all partners." Mich. Comp. Laws § 449.18(g).

As for the alleged fuel partnership, Defendants offer little evidentiary support that the arrangement was a partnership agreement. For instance, in their "statement of undisputed material facts," Defendants state:

> Mr. Delunas proposed that a second partnership should be created—which would include Mr. Delunas, Mr. Naderi, and RMAHK—to capitalize on the opportunity Mr. Delunas identified [to provide fuel to the U.S. Army and other customers in Afghanistan]. . . . Mr. Whitcraft and RMAHK agreed to Mr. Delunas's proposal and, in 2005, a second partnership (the 'Fuel Partnership') was created between Mr. Delunas , Mr. Naderi and RMAHK.

(R. 133, PID 5423.) To support this, Defendants cite only this small portion of Delunas's own testimony:

> Q. Up to and including 2011, what entity or entities collected payments made pursuant to what you've called the Fuel BPA Partnership?
>
> A. Until and including 2011?
>
> Q. Yes, sir.
>
> A. R.M. Asia Hong Kong, the partner in the fuel partnership. The partnership consisted of Sadat Naduri, myself, and R.M. Asia Hong Kong, and R.M. Asia Hong Kong continues to do business with Sadat Naduri under that same partnership and have not provided me with information about sales, have not calculated my share of profit, nor—or offered me payment for my share of the profits.

(R. 133–9, PID 5650.) Thus, Delunas's only support for the existence of the fuel partnership's creation in 2005 is his own generalized testimony that a fuel partnership was created, which does not even mention the year. This alone would not require all rational triers of fact to conclude that the fuel business was a partnership.

In sum, the Court is unconvinced that the undisputed facts establish as a matter of law that the two business arrangements—Delunas's and Whitcraft's overall arrangement to do business in Afghanistan and the subsequent fuel arrangement—were partnership agreements (as opposed to a contractual agreement as argued by Plaintiffs).

25

This makes Defendants' remaining claims against Plaintiffs simple to resolve. In particular, Defendants say they are entitled to summary judgment in their favor for the following counterclaims against Plaintiffs: breach of the two alleged partnerships (Counts I & III); breach of fiduciary duties in connection with the two alleged partnerships (Counts II & IV); and accounting for the two alleged partnerships (Count V).

But Defendants base their arguments for these claims on the assumption that the undisputed facts demonstrate the existence of the partnership agreements. (*See* R. 133, PID 5438, 5440–44.) As discussed, a rational trier of fact could find that the parties never entered the relevant partnership agreements. So Defendants are not entitled to judgment in their favor as to all of their partnership-related claims. (The same goes for Defendants' conversion claim, which the Court has already dismissed by way of a separate opinion.)

In sum, given the genuine issues of material fact that exist, Defendants' motion for summary judgment is denied as to their counterclaims.

**B.**

Defendants' summary-judgment motion fares better when it comes to Plaintiffs' claims against them.

**1.**

As the Court has recently entered the parties' stipulated order to resolve Count I of Plaintiffs' amended complaint (Plaintiffs' Lanham Act claim) (R. 157), and Count II has already been dismissed, the Court will proceed to Count III, which asserts breach of contract claims against Defendants. (R. 8, PID 138.) Count III survived Defendants' motion to dismiss to the extent it asserts a claim that Delunas breached the alleged "country manager agreement" and that Wahab breached the GFSA and ATC declarations of trust. (*See* R. 55, PID 1231.)

26

"A party claiming a breach of contract must establish (1) that there was a contract, (2) that the other party breached the contract and, (3) that the party asserting breach of contract suffered damages as a result of the breach." *Dunn v. Bennett*, 846 N.W.2d 75, 79 (Mich. Ct. App. 2013) (per curiam) (internal quotation marks and citation omitted).

As for that first element of Plaintiffs' claim, Defendants make a cursory argument that the Court should dismiss Count III of Plaintiffs' amended complaint because "RMA has proffered no evidence to demonstrate the existence or terms of the alleged 'Country Manager Agreement.'" (R. 133, PID 5444.) Defendants say that "RMA did not produce or identify during discovery any of the 'contemporaneous and subsequent writings' that allegedly demonstrate that the parties' relationship was simply a contract, rather than a partnership." (*Id.*) But much of the evidence Defendants rely on to support their partnership theory is consistent with a country manager agreement as well. For instance, in Whitcraft and Delunas's original October 2002 email exchange, Whitcraft wrote that he was "interested to put in for a 6 month trial," and they discussed Delunas's "salary"—which seems consistent with an employer/employee relationship. (R. 133–7, PId 5541.) And there was testimony that Delunas was the "country manager." (*See* R. 133–8, PID 5562; R. 133–12, PID 5806.) So Plaintiffs' claim that Delunas breached the alleged country manager agreement will survive summary judgment.

Defendants also say that Wahab is entitled to summary judgment as to Plaintiffs' claims that he breached the ATC and GFSA declarations of trust by failing to return the shares, which is also part of Count III of Plaintiffs' amended complaint.

The parties do not appear to dispute that ATC and GFSA declarations of trust were valid contracts (though Whitcraft's signature line is blank in the ATC declaration, (*see* R. 133–25, PID 5897)). Nor do they dispute the declarations' terms. Each declaration named Wahab as "the

27

Trustee." (R. 133–25, PID 5897; R. 133–28, PID 5940.) The ATC declaration provided that "THE TRUSTEE holds 2% of AFN 50,000 total registered capital in Asia Trade and Commodities Limited . . . upon the trusts set out in Clause 2." (R. 133–25, PID 5897.) The GFSA declaration provided that "THE TRUSTEE holds share(s) of 70 % each in  Global Fleet Sales Ltd. . . . upon the trusts set out in Clause 2." (R. 133–28, PID 5940.) Clause 2 in each declaration provided, in relevant part:

> 2. THE trusts hereinbefore referred to are as follows:
>
> (a) TO hold the share(s) specified as aforesaid and all dividends and other entitlements accrued or to accrue upon the same or any of them upon trust for the Beneficial Owner and his successors in title.
>
> (b) TO transfer pay and deal with the said share(s) and all dividends and other entitlements as aforesaid in such manner as the Beneficial Owner shall from time to time direct.

(R. 133–25, PID 5897; R. 133–28, PID 5940.) The ATC declaration named Kevin Whitcraft as the "Beneficial Owner," and the GFSA declaration named Global Fleet Sales Co., Ltd as the "Beneficial Owner." (R. 133–25, PID 5897; R. 133–28, PID 5940.) Plaintiffs' theory is that Wahab failed to the return the shares to the beneficial owners after their request.

The evidence suggests that Plaintiffs indeed requested that Wahab return the GFSA shares. For instance, on November 20, 2012, RMA's counsel emailed a letter from Whitcraft to Wahab, which among other things stated, consistent with Clause 2, "You are instructed to immediately transfer all shares of GFS-Afghanistan currently in your name to RMA-Automotive." (R. 140–15, PID 6727.) The email transmittal included another letter from RMA Automotive Co.'s counsel, which reiterated, "you shall immediately transfer all shares of Global Fleet Sales Ltd. . . . which you currently hold in trust." (R. 140–15, PID 6729.) That letter indicated "we understand that the actual transfer of shares will take some time." (*Id.*, PID 6730.)

28

Wahab acknowledged in his testimony that he never returned the shares. In response to the letters, Wahab testified that "I asked [Whitcraft] to come and receive the shares." (R. 140–14, PID 6720.) Wahab went on to say, among other things, "I cannot unilaterally take steps to transfer the shares. There has to be someone who's going to receive the shares from me." (*Id.*, PID 6721.) Wahab also explained, "[T]o the best of my knowledge, the Afghan government requires for us to apply to transfer the shares, there has to be a receiving recipient of the shares, and he has to be present in the court, in the trade court or commerce court in Afghanistan. It has to go to different Afghan entities to be cleared . . . ." (*Id.* PID 6722.)

Defendants maintain that based on these statements, they are entitled to summary judgment. In their view, Wahab "testified that he tendered the shares back by asking Mr. Whitcraft to collect the shares, but that Mr. Whitcraft never collected them." (R. 133, PID 5448.) But this is circular. And it is only one reading of the testimony. The other reading is that Wahab was simply sandbagging. Nor is there anything on the face of the GFSA declaration of trust that requires Whitcraft to come to Wahab and collect the shares. Thus, the Court finds that a genuine issue of material fact surrounds whether Wahab complied with the GFSA declaration of trust.

But this does not end the inquiry. Defendants also say that even if Wahab breached the GFSA declaration of trust, Plaintiffs have failed to demonstrate that they suffered any damages from that breach. In particular, Defendants point to admissions in Plaintiffs' pleadings that "GFSA transferred its assets and payables" to the NewCos. (R. 133, PID 5449 (citing R. 19, PID 108 ¶ 51).) In response, Plaintiffs argue, "To the extent that Mr. Delunas or Mr. Wahab caused GFSA . . . to incur liabilities wrongfully without sharing appropriate information with the RMA Plaintiffs—as required by the Declaration[] of Trust—or after the time when Mr. Wahab should have relinquished control over his shares in . . . GFSA, those improper liabilities would directly

29

stem from Mr. Wahab's breaches." (R. 140, PID 6496.) But what improper liabilities? Plaintiffs' response fails to cite any evidence and thus fails to create a genuine issue of material fact as to whether Plaintiffs suffered damages from Wahab's alleged breach of the GFSA declaration of trust.

Nevertheless, Plaintiffs say that if they are unable to prove damages, they are still entitled to specific performance as a remedy. Under Michigan law, "the equitable remedy of specific performance may be awarded where the legal remedy of damages is impracticable." *Ruegsegger v. Bangor Twp. Relief Drain*, 338 N.W.2d 410, 411 (Mich. Ct. App. 1983) (per curiam). Plaintiffs have failed to point to any evidence, or make any argument, as to why assuming Wahab breached the GSFA declaration of trust, "the legal remedy of damages is impracticable." Plaintiffs' conclusory statement to that effect is not enough to survive summary judgment.

Likewise, for the ATC declaration of trust, Plaintiffs have cited no evidence that Whitcraft or anyone else ever even made a request to Wahab to transfer his ATC shares—or that Wahab otherwise breached the declaration. So Plaintiffs have failed to create a genuine issue of material fact as to breach and damages for that declaration.

In conclusion, to the extent that Count III asserts a claim against Wahab for breaching the ATC or GFSA declarations of trust, the claim will be dismissed. But the claim survives against Delunas for his alleged breach of the country manager agreement.

**2.**

Count IV of the amended complaint asserts that Delunas and Wahab breached the fiduciary duties they had to Plaintiffs as officers, directors, or record shareholders of the OldCos. (R. 8, PID 138–39.)

Plaintiffs first say that the "law of the case" is that Delunas owed them fiduciary duties. (R. 140, PID 6492); *See United States v. Cunningham*, 679 F.3d 355, 376 (6th Cir. 2012) (noting that the law of the case doctrine holds that "a decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation"). To support that contention, Plaintiffs cite to a portion of Judge Duggan's opinion that addressed Defendants' motion to dismiss and included this statement: "[Certain conduct] not only violated the contract but also constituted a breach of Delunas's fiduciary duties to the RMA Afghan Entities." (R. 55, PID 1203.) But the Court was simply describing the pleadings and accepting them as true, as it had to at the motion to dismiss stage. The Court made no determination that a fiduciary relationship existed. So the law of the case doctrine has no application here.

The basis for Defendants' motion is the issue of breach, so the Court will assume without deciding that Defendants owed Plaintiffs a fiduciary duty. A fiduciary "has a duty to act for the benefit of the principal regarding matters within the scope of the relationship," *Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.*, 698 N.W.2d 900, 906 (Mich. Ct. App. 2005) (per curiam), and must "subordinat[e] [his] personal interests to that of the other person," *Wallad v. Access BIDCO, Inc.*, 600 N.W.2d 664, 666 (Mich. Ct. App. 1999) (per curiam) (emphasis omitted).

Plaintiffs have offered sufficient evidence to create a genuine issue of material fact on whether Delunas and Wahab handled the OldCos' finances in a way inconsistent with the duties a fiduciary would owe. Whitcraft testified that Wahab received a payment of $18,251 that "wasn't for any benefit for the business" and that after the parties' agreement to sever their relationship in 2011 "there was no use for David Wahab to get an advance." (R. 133–8, PID 5604.) As for Delunas, Whitcraft testified that "[t]here were a huge number of cash advances to

31

individuals—we don't know what that was for—and they were all signed for and approved by Len." (*Id.*) Whitcraft also testified that despite the parties' alleged agreement to part ways amicably in September 2011, by December 2011, "Len sent a memo to the banks that none of the signatories from our side were . . . authorized to sign anymore on those accounts and he proceeded to use that money as he saw fit." (R. 133–8, PID 5569.) On a similar note, in March 2012, Whitcraft wrote to his colleagues that "I am concerned about damages [Delunas] is causing to the firm when we became aware of a game he is trying to pay [sic]—passing expenses to RMA Afghanistan; not accepting the transfer of assets to RMA Group Afghanistan; and not allowing Guy to transfer funds wrongly paid by clients to ATC back to RMHK." (R. 140–9, PID 6644.)

One further issue requires consideration though. For Wahab, Defendants base their motion for summary judgment on the contention that "RMA's claim against Mr. Wahab is based on the ATC and GFSA Declarations of Trust" and that Plaintiffs have failed to allege a breach of any duty "separate and distinct from" Wahab's contractual obligations. (R. 133, PID 5452.) In its prior opinion dismissing Defendants' conversion claim, the Court described at length the doctrine under Michigan law that generally prevents a plaintiff from bringing a tort claim when the duty allegedly violated is not "separate and distinct" from a contractual duty. *See Glob. Fleet Sales, LLC v. Delunas*, No. 12-15471, 2016 WL 3251764, at *6–10 (E.D. Mich. June 14, 2016). Contrary to Defendants' assertion, Plaintiffs' claim against Wahab is not rooted in the declarations of trust. Instead, the amended complaint expressly states that the claim stems from Wahab's and Delunas's status as officers, directors, or record shareholders of the OldCos.

Thus, Plaintiffs' breach-of-fiduciary-duty claims will survive summary judgment.

**3.**

Count V of Plaintiffs' amended complaint asserts a claim of tortious interference with contract and business relations. (R. 8, PID 139–40.) This count survived Defendants' motion to dismiss only as it related to the following contracts: "(1) the Blanket Purchase Agreement ('BPA') that Plaintiff RMA-HK entered into with the United States Army to supply fuel for the United States Army Kabul Regional Contracting Center . . . and (2) the RMA-HK and DynCorp fuel supply agreement[.]" (R. 55, PID 1238.) Count VI of Plaintiffs' amended complaint asserts a claim of tortious interference with prospective economic advantage against Delunas and Wahab. (R. 8, PID 140.) That count survived Defendants' motion to dismiss, but only as to Delunas. (R. 55, PID 1240.)

 "In Michigan, tortious interference with a contract or contractual relations is a cause of action distinct from tortious interference with a business relationship or expectancy." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 848–49 (Mich. Ct. App. 2005) (citing cases). "[B]oth claims require that a plaintiff prove either 'the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship.'" *Erickson's Flooring & Supply Co. v. Tembec, Inc.*, 212 F. App'x 558, 565–66 (6th Cir. 2007) (quoting *Feldman v. Green*, 360 N.W.2d 881, 886 (Mich. Ct. App. 1984)). And while there are other elements Plaintiffs must prove to succeed on their tortious interference claims, the evidence they cite to support those claims does not create a genuine issue of material fact as to this requirement.

First, Plaintiffs maintain "[t]here is ample evidence that Defendants caused the breach, disruption, or termination" of fuel supply contracts with the U.S. Army and DynCorp. (R. 140,

PID 6498.) Plaintiffs cite an October 2011 email written from Dennis Thompson, who on the face of the email was "joining the RMA Group as Director of Business Development – US Government." (R. 140–8, PID 6636.) Thompson wrote to Kevin Whitcraft: "There appears to be an ongoing trend of neglect/incompetence shared to some degree by several parties in the compensation chain" and that he planned to contact "DFAS Rome" to "Get their take on the reason for high amount ($39M) of arrears." (*Id.*, PID 6637.) But Plaintiffs do not explain why this supports the conclusion that Delunas specifically was the cause of the supposed $39 million in arrears. Nor does this explain how, even if Delunas was the source of the "ongoing trend of neglect/incompetence," that amounts to intentional misconduct. *See Inbounds, Inc. v. Gary Player Grp., Inc.*, No. 11-10806, 2012 WL 1571311, at *7 (E.D. Mich. May 3, 2012) (holding that certain "negligence-based arguments are unavailing and insufficient to establish" the intentional act requirement of tortious interference with a business expectancy or relationship).

Second, Plaintiffs assert that "with respect to DynCorp, specifically, Mr. Delunas's conduct led to incorrect payments to ATC, rather than RMAHK, and over $500,000 that was owed was never paid due to his actions." (R. 140, PID 6498.) But their only evidence is a portion of Whitcraft's testimony, who said that Spilborghs found that "for some reason Dyncorp paid [about $500,000] into the ATC account, he didn't understand what that amount was, so he investigated, he found it was matching up with the amounts due from Dyncorp, so he transferred those amounts to RM Asia Hong Kong, who should have been the beneficiary of those payments." (R. 133–8, PID 5593.) As Whitcraft went on to say, "when Len found out about it, he basically stopped [Spilborghs'] authorization for transferring money on bank accounts, his authority to transfer money from bank accounts." (*Id.*) But this only permits an inference that Delunas did not approve of Spilborghs' conduct and believed that the $500,000 was properly in

34

the ATC account. It does not permit the reasonable inference that it was Delunas who caused Dyncorp to make the payment to ATC rather than RMAHK. As Crosetto testified, "I know that Dyncorp has paid funds to the wrong account . . . I don't have the documents here to say it was Delunas who instructed Dyncorp. . . . I don't have any evidence that shows . . . that this money has gone to Len Delunas' pocket, but I do know that Dyncorp should have paid in the right account." (R. 133–11, PID 5751.)

Finally, Plaintiffs cite a portion of their counter-statement of material facts, which claims that one of the results of Delunas's conduct was the "threatened cancellation of the contract by the U.S. Army on December 28, 2011." (R. 140, PID 6469.) But the cited evidence provides no support for the statement of fact. Plaintiffs quote a December 28, 2011 email chain as saying "Due to your reluctance to cooperate, I am already processing the cancellation modification." (*Id*.) That quote is nowhere in the email chain, which appears unrelated to the fuel contract with the United States Army. (*See* R. 140–6, PID 6578.) At oral argument, Plaintiffs' counsel provided no clarification.

In short, this evidence does not create a genuine issue of material fact as to whether Delunas tortiously interfered with Plaintiffs' contracts, business relationships, or business expectancies.

**4.**

Count VII of the amended complaint asserts an unjust enrichment claim against Delunas and Wahab. (R. 8, PID 140.)

"[I]n order to establish a claim of unjust enrichment, [Plaintiffs] must demonstrate: (1) the receipt of a benefit by the other party from the complaining party and (2) an inequity

resulting to the complaining party because of the retention of the benefit by the other party." *Karaus v. Bank of New York Mellon*, 831 N.W.2d 897, 906 (Mich. Ct. App. 2012) (per curiam).

Defendants attack Plaintiffs' evidence on the first element, but only with this conclusory assertion: "There is no dispute regarding the fact that it is [Plaintiffs] that received an improper benefit by, among other things, holding Mr. Delunas's profit share hostage following his exclusion from the Partnerships' operations and management, making millions of dollars in improper deductions to Mr. Delunas's profit, assigning profitable leases to themselves, and retaining Partnership assets following Mr. Delunas's exclusion from the Partnership (while at the same time refusing to wind-up the affairs of the Partnership)." (R. 133, PID 5465.) Defendants' motion casts as "undisputed" the issues that are at the very heart of this dispute—e.g., the existence of a partnership, the propriety of certain business dealings, the winding-down of the relationship, and who owes what to whom. Thus, the Court cannot say that no genuine issue of material fact remains for this claim.

*   *   *

In sum, the Court finds that Defendants are not entitled to summary judgment for any of their counterclaims because the evidence does not compel every rational trier of fact to find for them on those claims. But the Court finds that the following of Plaintiffs' claims should be dismissed as a matter of law: Count III to the extent it asserts that Wahab breached the GFSA and ATC declarations of trust, Count V, and Count VI.

### IV.

The Court next turns to Plaintiffs' motion for partial summary judgment, which asks the Court to enforce a purported "separation agreement" that Delunas and Whitcraft reached in their

September 2011 London meeting. The Court is unpersuaded that the undisputed facts demonstrate such an agreement as a matter of law.

**A.**

Defendants' counterclaim described the September 2011 meeting in London in detail. (R. 19, PID 312–13 ¶ 54.) According to the counterclaim, Whitcraft and Delunas "agreed as follows" at the meeting:

a. As an initial matter, the Fuel Partnership would not be dissolved or wound-down, but would remain in existence.

b. Retroactive to July 31, 2011, the Partnership's share of the profits generated by the Fuel Partnership would be split as follows: 50% for Mr. Delunas and 50% for the Partnership, such that Mr. Delunas would be entitled to 25% of all profits generated by the Fuel Partnership on and after July 31, 2011.

c. The Fuel Partnership would continue uninterrupted for so long as the business opportunity remained, subject only to the change in profit distribution identified in the preceding sub-paragraph.

d. To the extent that the Defendants wished to continue the Partnership Business, they would establish new operating companies in Afghanistan (the "NewCos") to take over the business then being transacted by and through RMAA and ATC (collectively, the "OldCos").

e. The OldCos would remain active until all accounts receivable under existing contracts entered into by those entities had been paid, all accounts payable owed by those companies had been paid, and all tax returns and taxes owed by OldCos had been filed and paid.

f. The OldCos would terminate the contracts of their staff (other than a small core of staff who would be retained to administer the winding down those companies) and who would ultimately be transitioned to any NewCos formed by the Defendants to conduct business in Afghanistan.

g. The OldCos would notify their customers that all business (other than existing contracts) would be transferred to the NewCos in accordance with all contractual and other legal requirements (such as proper approvals of novations, assignments, etc.).

h. The transition from OldCos to NewCos would take place as soon as practicable, but not later than October 31, 2011;

37

i. The Whitcraft Defendants and/or RMAHK, solely or with other Defendants and affiliated entities, would purchase all ownership interests in OldCos from all individuals who possessed such ownership interests, including Mr. Delunas and Mr. Wahab.

j. The Whitcraft Defendants and/or RMAHK, solely or with other Defendants and affiliated entities, would pay Mr. Delunas all amounts due and owing to him under the Partnership Agreement, including but not limited to all profits due Mr. Delunas and 25% of the value of the assets of the Partnership (which included the value of the assets of the OldCos).

(*Id.*)

In their answer to this paragraph, contrary to their position now, Plaintiffs maintained that "[n]o final agreement resulted from these negotiations, and Counter-Plaintiffs have not presented and cannot present such an agreement." (R. 27, PID 456.) Along with their answer, Plaintiffs moved to strike all of the counterclaim's paragraphs describing the London meeting (and a subsequent meeting in Dubai over a year later, in December 2012). (R. 26.) In that motion, Plaintiffs took the position that "[t]hese meetings never ended in a final settlement agreement" and that the allegations in the counterclaim's relevant paragraphs "represent inadmissible settlement negotiations that are protected by Federal Rule of Evidence 408." (R. 26, PID 379–80.) In their response to that motion to strike, Defendants also took a position contrary to their current one, arguing that the counterclaim's allegations relating to the September 2011 meeting "set forth the ***express terms of various agreements reached between Mr. Delunas and the Whitcrafts regarding the conduct, operation and winding-up of the Partnership.***" (R. 31, PID 631 (emphasis in original).)  Judge Duggan denied Plaintiffs' motion to strike, finding that "the Court cannot, at this juncture, reach the conclusion that the challenged paragraphs have 'no possible relation to the controversy.'" (R. 55, PID 1267.)

Now the parties have swapped positions. Plaintiffs base their motion for partial summary judgment on the notion that stemming from the London meeting, "[t]he undisputed facts

38

establish not only the existence of the Separation Agreement but also its enforceability." (R. 129, PID 5019.) Defendants respond that "the facts establish that no agreement was reached during the September 2011 meeting in London and the parties continued to negotiate terms up until the day [Plaintiffs'] filed [their] Complaint." (R. 139, PID 6197.) Delunas maintained this position, at least to some extent, during his deposition. Initially, when counsel for Plaintiffs asked Delunas whether sub-paragraph (b) above was "consistent with [his] understanding of what was agreed to" at the London meeting, Delunas responded, "Yes, it is, as part of the agreement." (R. 129–9, PID 5170.) But Delunas then said, "I want to amend what I said before. A plan for unwinding is what we discussed. There were several actions that had to be done." (*Id.*, PID 5171.) He went on to confirm that each sub-paragraph describing the London meeting's terms was "part of the plan" or "was the plan" discussed—without characterizing the meeting as culminating in a formal agreement. (*Id.*, PID 5171–76.)

## B.

The issue for the Court is whether the parties' conduct—along with Defendants' admissions—establish as a matter of law that they reached an enforceable agreement in their September 2011 London meeting. But first the Court will consider whether either side is barred from asserting their current position on whether they reached a binding agreement.

Defendants contend that Plaintiffs have made judicial admissions that the purported agreement was *not* formed. (R. 139, PID 6189–96.)

"[J]udicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Trimas Corp. v. Meyers*, 572 F. App'x 347, 352 (6th Cir. 2014) (citation omitted). But the Sixth Circuit has cautioned that it is "reluctant" to treat "legal conclusions" as "binding judicial admissions,"

because judicial admissions "typically concern only matters of fact." *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 341 (6th Cir. 1997) (holding that statements concerning whether someone was negligent or caused an accident were "legal conclusions" and therefore not "binding judicial admissions"); *see also Roger Miller Music, Inc.*, 477 F.3d 383, 394–95 (6th Cir. 2007) (holding that certain statements that someone owned copyrights "dealt with legal conclusions, and not matters of fact" and therefore were not judicial admissions). True, as noted above, in Plaintiffs' answer to the counterclaim and in various briefs throughout this litigation, Plaintiffs have taken the position that the September 2011 meeting did not result in a final agreement. (*See* R. 27, PID, 448, 456–57; R. 26, PID 379–82.) Nonetheless, Plaintiffs' statements about the enforceability of the purported agreement were legal conclusions, so the Court will not treat them as judicial admissions. *See Padre Nterprises, Inc. v. Rhea*, No. 4:11CV674, 2013 WL 394811, at *2 (E.D. Tex. Jan. 31, 2013), *report and recommendation adopted*, No. 4:11CV674, 2013 WL 1131631 (E.D. Tex. Mar. 18, 2013) ("While the denial [of the existence of a contract] in Defendant's answer may be fruitful material for cross at trial, such does not foreclose Defendant from alleging a breach of contract claim.").

Plaintiffs have employed a similar argument regarding the effect of Defendants' prior positions in this litigation. Plaintiffs say that Defendants should be judicially estopped from arguing that no enforceable agreement was reached. (R. 147, PID 6781.) "The doctrine of judicial estoppel prevents a party who successfully assumed one position in a prior legal proceeding from assuming a contrary position in a later proceeding." *Mirando v. U.S. Dep't of the Treasury*, 766 F.3d 540, 545 (6th Cir. 2014) (citing *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). Several factors are useful to determine whether judicial estoppel applies, including "whether the party has succeeded in persuading a court to accept that party's earlier position, so

that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Mirando*, 766 F.3d at 545 (quoting *New Hampshire*, 532 U.S. at 750–51).

In response to Plaintiffs' motion to strike the counterclaim's paragraphs detailing the September 2011 meeting, Defendants appear to have taken the position that the meetings were part of an express agreement. (R. 31, PID 631.) But Judge Duggan made no finding on the issue when denying Plaintiffs' motion. So while Defendants prevailed on the motion, they did not prevail on the issue of the separation agreement's enforceability. Thus, the Court sees little reason why Defendants should not have the same opportunity as Plaintiffs to take a different position on this unresolved issue of law.

## C.

Moving to the merits of Plaintiffs' claim that the September 2011 London meeting resulted in an enforceable agreement, Michigan law has various requirements for a valid contract. "Before a contract can be completed, there must be an offer and acceptance." *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 417 (6th Cir. 2011) (quoting *Pakideh v. Franklin Commercial Mortg. Grp., Inc.*, 540 N.W.2d 777, 7806 (Mich. Ct. App. 1995)). "Beyond these requirements, the elements of a valid contract in Michigan are: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Id.* (quoting *Hess v. Cannon Twp.*, 696 N.W.2d 742, 748 (Mich. Ct. App. 2005)). "Most of the elements listed above reflect the fact that the parties to a contract must have a meeting of the minds on all essential terms of a contract. . . . Where mutual assent does not exist, a contract does not exist." *Calhoun Cty. v. Blue Cross Blue*

41

*Shield Michigan*, 824 N.W.2d 202, 209 (Mich. Ct. App. 2012) (internal quotation marks and citations omitted).

"A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Stanton v. Dachille*, 463 N.W.2d 479, 483 (Mich. Ct. App. 1990) (citation omitted). Whether the parties reached a meeting of the minds is a question of fact. *See Tecorp Entm't Ltd. v. Heartbreakers, Inc.*, No. 209861, 2001 WL 740007, at *2 (Mich. Ct. App. Feb. 9, 2001) (per curiam) (citing *Martin v. De Young*, 205 N.W. 142, 144 (1925)).

To some extent, the parties' conduct after the September 2011 London meeting suggests that they had a meeting of the minds on at least some of the key terms of the purported separation agreement. Indeed, they started to implement some of its alleged terms. For example, Plaintiffs established two NewCos in Afghanistan in late 2011. (R. 129–19, PID 5262; R. 129–20, PID 5265.) Communications reflect that Delunas and RMA personnel discussed transferring employees from the OldCos to the NewCos. (*See, e.g.*, R. 129–21, PID 5267.) Communications also illustrate that Delunas discussed with RMA personnel the valuation of assets to be transferred from the OldCos to the NewCos. (*See, e.g.*, R. 129–24, PID 5280; R. 129–25, PID 5283.) And communications also show attempts to value the profit share Delunas had accrued through July 31, 2011. (*See, e.g.*, R. 139–3, PID 6282.)

Furthermore, in several communications, Delunas or Whitcraft wrote in terms suggesting they viewed the London meeting as resulting in a binding agreement that formally separated their business affairs as of July 31, 2011. For instance, Whitcraft wrote to Delunas in December 2011 that "[o]ur agreement is that all transactions post July31 are the assets of RMA 100%. Thus your actions are contrary to the agreement we made." (R. 129–27, PID 5289.) Delunas responded,

"Yes transactions after July 31 – in the sense of revenue generated and income earned, are NEWCO responsibility." (R. 129–28, PID 5292.) In January 2012, Delunas wrote to Whitcraft in a lengthy email, "We met in London and, I thought, worked out an acceptable way forward. . . . I asked to change the [fuel] profit share to 75/25. You asked to make it 50/50. I agreed with no disagreement or discussion." (R. 129–30, PID 5303.) In June 2012, Delunas also wrote this in an email to several people (not including Whitcraft):

> When Kevin and I met in September, he proposed a statement of accounts that I accepted. Without question. Why did I accept so readily? Because I went to that meeting with a number in my mind that would be a satisfactory settlement. Did I realize Kevin's accounting was incorrect? (Mainly the way he charged overhead and capital investments to reduce net profits.) Sure! But I want to settle amicably. Without arguing. So I accepted his numbers without arguing the formulas."

(R. 129–33, PID 5320–21.)

But the evidence cited by Plaintiffs tells only one side of the story. The other side of the story suggests that Delunas's and Whitcraft's meeting in London was instead part of a series of ongoing negotiations. And under Michigan law "[m]ere discussions and negotiation, including unaccepted offers, cannot be a substitute for the formal requirements of a contract." *Kamalnath v. Mercy Mem'l Hosp. Corp.*, 487 N.W.2d 499, 503 (Mich. Ct. App. 1992) (citing *Kirchhoff v. Morris,* 275 N.W. 778 (Mich. 1937)).

Many communications after the London meeting reflect the possibility that the parties were still negotiating a final agreement and had not arrived at a meeting of the minds on the essential terms of any separation agreement. For instance, various emails suggest that even months after the September 2011 London meeting, the parties had yet to agree on how to divide the OldCos' assets. In March 2012, Whitcraft wrote to Delunas, "Further to our discussion Saturday, can you please list assets which you consider yours." (R. 129–32, PID 5316.) Delunas responded later that month, "We spoke about the value of the assets and liabilities – according to

an accounting that you prepared. We spoke only generally about the disposition of those assets. Never definitively." (*Id.*) Delunas then provided a detailed list of assets, noting, "Since the list of assets is quite large, even this list may not be definitive." (*Id.*) Whitcraft responded that "this goes against the agreement we had last year and the actions we agreed to take. . . . [W]e completely disagree with your statements in this email." (R. 139–15, PID 6386.) A month later, Delunas wrote another email stating, "I sent Kevin my understanding of the remaining steps in unwinding our business relationship—distributing assets. . . . Kevin disagreed completely without explaining any specifics. . . He said you would provide your ideas in that next week. . . . It is now three weeks later and I have nothing specific from you." (R. 139–16, PID 6391.)

Additionally, Plaintiffs have produced little showing that the parties ever agreed to what was arguably the most essential term of the purported separation agreement: the amount of money that they would pay Delunas to settle the profit sharing arrangement through July 31, 2011. For instance, Plaintiffs maintain that as of October 11, 2011, Delunas's "accrued profit share" through July 31, 2011 was $2,155,092. (R. 129, PID 5012.) They cite an email that Whitcraft sent Delunas with a spreadsheet (R. 129–18, PID 5242) and say, "At no point before the dispute that later arose over the performance of the Separation Agreement did Mr. Delunas even question—much less contest—the accuracy of this accrued profit share figure" (R. 129, PID 5012). But even Whitcraft's cover email suggests that the spreadsheet reflected preliminary numbers. He wrote, among other things, "Some accounts receivable or noted – not yet reconciled . . . Guy and Golf reconciling back to July 31. . . .GFS has been added. Details are not yet reviewed." (R. 139–3, PID 6282.) And Delunas testified that the numbers were still being reconciled. (R. 139–2, PID 6260.) Moreover, months later, revised numbers appear to suggest that Plaintiffs actually owed Delunas $4 million. Specifically, in March 2012, Kevin Whitcraft

wrote in an email to his brother, father, and others that he "earlier in the day cut off all payments to" Delunas and that "[u]p until now we've got roughly US$ 4 million due to him from past profit share. Plus whatever we settle on the fuel." (R. 133–39, PID 6054.)

More emails suggest that the parties acknowledged that their September 2011 meeting was informal and that they continued to negotiate Delunas's profit share until this case was filed. In an August 2012 email, Delunas quoted from an earlier email in which Mark Whitcraft had written, "I do understand from what I hear there are many areas that could be easily agreed and some where there are clearly differing opinions. Clearly all must be settled in a single agreement not piecemeal." (R. 139–20, PID 6406.) In an email that month to a lawyer retained by Plaintiffs to negotiate a settlement, Stephen Jarvis, (R. 26, PID 382), Delunas wrote that in meetings "almost a year ago" "[m]any details were not discussed. Just the general plan." (R. 139–21, PID 6409.) Delunas also wrote that he and Kevin Whitcraft had met "to discuss an amicable settlement at least three times." (*Id.*) Delunas later wrote to Jarvis, "Had the Whitcraft Family engaged in a sincere effort to settle beginning in October 2011, we would have most likely have already concluded our negotiations. But they did not." (R. 139–22, PID 6412.) In September 2012, Jarvis sent Delunas a spreadsheet reflecting an accrued profit share of close to $4.9 million, up even further from Kevin Whitcraft's March 2012 estimate. (R. 139–24, PID 6419.) Delunas later wrote to Jarvis, "Your clients and I have both acknowledged that our problems, today, are the direct result of the informal approach taken to settlement last year. I will not repeat that mistake." (R. 139–27, PID 6428.) And Jarvis later wrote, "It is not intended . . . that our future settlement meeting be dealt with in the same way as your previous discussions. . . . Assuming that a settlement is then agreed—it is our intention to have that settlement recorded in written legally binding agreements." (R. 139–28, PID 6430.)

This all culminated in a December 2012 meeting between Delunas and Whitcraft in Dubai. (R. 129–34, PID 5328; R. 139–7, PID 6360; R. 139–8, PID 6363; R. 139–30, PID 6439–46.) For that meeting, Jarvis had prepared a proposed agreement in writing, which reads, among other things, "The Profit Sharing Agreement has come to an end and the Parties have been discussing the exact method of unwinding the business in Afghanistan (the 'Separation')" and that "[o]ne of the unresolved issues, as between the Parties, concerned the amount payable to [Delunas]." (R. 139–30, PID 6442.) By then, Plaintiffs contemplated a payment of $8.2 million to Delunas—yet another fluctuation as to one of the most critical terms of the now-claimed final "separation agreement" made in London. (*Id.*, PID 6443.) No one signed the proposed agreement from the December 2012 meeting, and after the meeting, Plaintiffs filed their complaint.

Is evidence of the December 2012 meeting off limits? Despite referencing the meeting in their "statement of undisputed material facts" (R. 129, PID 5019), Plaintiffs contend that the "discussions and the amount of the settlement offer are not admissible evidence because it was specifically agreed they would be part of privileged and 'without prejudice' settlement negotiations" and that "Defendants' repeated reference to these discussions in public filings is facially improper, and the underlying facts are certainly inappropriate for consideration as part of a summary judgment motion." (R. 140, PID 6468.)

Federal Rule of Evidence 408 provides that "conduct or a statement made during compromise negotiations" is not admissible "to prove or disprove the validity or amount of a disputed claim." But courts have recognized that settlement negotiations can be admissible for other purposes, including proving the existence of an agreement. *See Glen Elec. Holdings GmbH v. Coolant Chillers, Inc.*, No. 1:10-CV-1109, 2013 WL 2407613, at *6 (W.D. Mich. May 31,

46

2013) (citing cases and holding that evidence of settlement negotiations was admissible when "offered to prove the existence and terms of the settlement agreement itself").

The Court finds that evidence of the December 2012 meeting is admissible to prove the existence (or lack thereof) of the previous alleged separation agreement. Plaintiffs' theory is that the September 2011 meeting yielded an enforceable oral agreement. But they acknowledge that the proposed December 2012 settlement agreement "was very similar to the terms to which the parties had previously agreed." (R. 129, PID 5019.) Thus, essentially Plaintiffs are asking the Court to enforce an oral version of a subsequent written proposed agreement that was admittedly never executed. The subsequent written proposed agreement, and discussions surrounding it, are therefore relevant as to whether the prior discussions were mere negotiations or instead resulted in a binding agreement.

In short, the Court finds that, on this record, the undisputed facts do not establish that the September 2011 meeting resulted in a final agreement. A genuine issue of material fact surrounds whether the parties had a meeting of the minds on all of the essential terms of the purported agreement.

## V.

For the reasons discussed, Defendants' motion for summary judgment (R. 133) is GRANTED IN PART and DENIED IN PART. The motion is GRANTED to the extent that Counts V and VI of Plaintiffs' amended complaint are dismissed as a matter of law, and Count III of Plaintiffs' amended complaint is dismissed as a matter of law insofar as it asserts a claim that Defendant David Wahab breached the ATC or GFSA declarations of trust. Defendants' motion is denied in all other respects. Additionally, Plaintiffs' motion for partial summary

judgment (R. 129) is DENIED.

SO ORDERED.


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  August 26, 2016


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 26, 2016.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson